**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC *et al.*,<br><br>Debtors.[1] | **Case No. 23-10063 (SHL)** |
| DIGITAL CURRENCY GROUP, INC.<br><br>Plaintiff,<br><br>- against -<br><br>GENESIS GLOBAL CAPITAL, LLC; and<br>GENESIS ASIA PACIFIC PTE. LTD.<br><br>Defendants. | **Adversary Pro. No.** _____ |

## COMPLAINT

Plaintiff Digital Currency Group, Inc. ("**Plaintiff**" or "**DCG**"), by its undersigned attorneys, brings this action against Defendants Genesis Global Capital, LLC ("**GGC**") and Genesis Asia Pacific Pte. Ltd. ("**GAP**") (together, "**Defendants**" or "**Genesis**"), and alleges[2]:

## INTRODUCTION

1. Plaintiff DCG is a global investor, builder, and incubator committed to advancing decentralized ecosystems built on blockchain technology. To this end, DCG invests in cryptocurrency related companies, among other activities. Defendants GGC

---

[1] The Wind-Down Debtors in these cases, along with the last four digits of each Wind-Down Debtor's registration number in the applicable jurisdiction, are as follows: Genesis Global Holdco, LLC (8219), Genesis Global Capital, LLC (8564), and Genesis Asia Pacific Pte. Ltd. (2164R).

[2] Unless otherwise indicated, emphasis and highlighting has been added to quotations, and internal quotations, brackets, citations, filed footnotes have been omitted.

and GAP—DCG's wholly owned, indirect subsidiaries—were engaged in cryptocurrency brokerage and related activities, including lending to institutional and high net worth individual customers, prior to filing for bankruptcy in January 2023.

2.       In this lawsuit, DCG seeks a declaration that it has no further obligations under a promissory note that, in the midst of unprecedented turbulence in cryptocurrency markets, DCG voluntarily extended to backstop Genesis against potential loss from the June 2022 default of a large borrower, Three Arrows Capital, Ltd. ("**TAC**").  The valid, binding promissory note had an initial Principal Amount of $1.1 billion that was "reduced immediately and automatically (on a dollar-for-dollar basis)" by all "TAC Recover[ies]." As laid out below, these TAC Recoveries by Genesis to date have exceeded the initial $1.1 billion Principal Amount by hundreds of millions of dollars, and the Principal Amount of the note has been reduced "immediately and automatically" to zero.  Genesis ultimately suffered no loss from TAC's default; rather Genesis has ***profited*** by hundreds of millions of dollars (which Genesis is entitled to keep).  Thus, the promissory note fulfilled its legitimate, salutary function of backstopping $1.1 billion of Genesis's exposure to potential loss from TAC's default—potential loss that has been reduced to (and below) zero.  Further, DCG is entitled to recover from Genesis overpayments DCG made, pursuant to a full reservation of its rights, on the belief that the payments were owed to GGC under the promissory note.[3]  To be clear, DCG makes no claim to the hundreds of millions of dollars of profit that Genesis ultimately realized from TAC's default through Genesis's recoveries from the TAC collateral.  DCG seeks only to

---

[3] Notwithstanding the foregoing, DCG does not intend to seek "claw back" of any past individual creditor recoveries from the Genesis estate.

enforce the express terms of the support it voluntarily provided to Genesis—memorialized in the promissory note—under which Genesis is not entitled to an additional $1.1 billion from DCG on top of the hundreds of millions Genesis already has profited from TAC's failure.

3.      In 2022, the cryptocurrency markets were disrupted by a series of shocks. Among the first was the collapse of TAC, a prominent cryptocurrency hedge fund that was one of Genesis's largest borrowers. TAC's failure stunned the markets and threatened Genesis with the potential losses that prompted DCG's entirely voluntary assistance. In particular, in mid-June 2022, TAC failed to satisfy a margin call by Genesis, triggering a default on approximately $2.36 billion in dollar-denominated loans from Genesis (the "**TAC Loans**"). The collateral that TAC had provided to secure the loans from Genesis (the "**TAC Collateral**") was then valued significantly below TAC's unpaid loan balance. As a result, Genesis was facing, by operation of the usual quarter-end accounting processes, a threatened "hole" in the book value of GAP's equity at the end of June.

4.      To address the potential "hole" in GAP's book equity, DCG—voluntarily and without any obligation to do so—made a unilateral contribution to Genesis, its indirect wholly owned subsidiary. Importantly, DCG's assistance targeted the threatened equity "hole," not any liquidity problem. Genesis's liquidity remained strong in the summer of 2022, and Genesis was able to meet all lender redemption requests for many more months until the FTX supernova in November. Indeed, from June 2022 until the November 2022 failure of FTX, Genesis's liquidity was at no time less than about $1 billion and as high as $2.4 billion. It was not until after FTX's collapse months later in

3

November that a "run on the bank" ultimately pushed Genesis (and many others) into bankruptcy.

5.      DCG's contribution to Genesis came in the form of a ten-year promissory note issued to GGC on June 30, 2022 (the "**Promissory Note**" or "**Note**").[4]  The Note had a specific purpose:  to fill a potential "hole" in the end-of-quarter book value of GAP's equity from TAC's default.  The TAC Loans were secured by the TAC Collateral, which consisted of certain cryptocurrency assets including Bitcoin ("**BTC**"), Ether ("**ETH**"), and shares of Grayscale Bitcoin Trust ("**GBTC**").  Due to the then-severe disruptions to cryptocurrency markets, the TAC Collateral fell approximately $1.1 billion short of covering TAC's outstanding obligations to Genesis when valued at the depressed market prices at the end of June 2022.  Thus, at the end of the second quarter, the potential shortfall (assuming no further realizations from TAC or from any of the collateral that TAC had posted) as of that date was thought to be approximately $1.1 billion, and the initial Principal Amount of the Promissory Note was therefore set at that amount.  The Note was intended to backstop any actual realized losses up to $1.1 billion. Consistent with this function, the Note contained a mechanism tailored to "reduc[e] immediately and automatically (on a dollar-for-dollar basis)" the Principal Amount due if, and as, the shortfall was filled over time by recoveries on the TAC Collateral and on the TAC Loans.  Significantly, the Promissory Note expressly obligated Genesis to maximize the value of recoveries from the TAC Collateral and any other recoveries in respect of the TAC Loans,a to minimize the amount ultimately due on the Note.

---

[4] A true and correct copy of the Promissory Note is attached as Exhibit 1 to this Complaint.

6.      As is often the case after a dip, cryptocurrency prices eventually recovered.  In particular, the GBTC shares provided by TAC as collateral increased in value from approximately $428.5 million on June 30, 2022 to more than $2.1 billion in late May 2024—when, on information and belief, Genesis used most of them to offset and satisfy GGC's liabilities to certain creditors.  Under these circumstances, the incremental amounts realized by Genesis after issuance of the Note were, based on the pleadings filed by Genesis in this Court seeking approval of that transaction, far more than sufficient to overcome the prior $1.1 billion collateral shortfall—and, on information and belief, allowed Genesis to profit from TAC's default by recovering nearly $2.8 billion on the original $2.36 billion in TAC Loans.[5]  Genesis also received from DCG an additional $106 million of TAC Recoveries on account of payments from TAC's liquidation proceedings, in connection with which DCG unambiguously reserved all of its rights, and which because the balance of the Note had already been reduced to zero, Genesis must return.

7.      It is plain from the face of the Promissory Note and consistent with the intent of the parties that DCG was obligated to pay up to $1.1 billion *only to the extent* that recoveries from the collateral combined with any recoveries from the TAC liquidation proceeding or from any other person or entity by setoff or otherwise were insufficient to allow Genesis to recover the shortfall in the collateral's value that existed

---

[5] DCG does not know the specifics of Genesis's recoveries from the TAC Collateral, including the BTC and the 35,585,040 GBTC shares provided by TAC to secure the TAC Loans.  But the value of these GBTC shares in late May 2024 (about $2.1 billion) when GGC used most of them to satisfy some of its creditors' claims was about $1.7 billion higher than on June 30, 2022.  Thus, even on the entirely implausible assumption that Genesis did not realize any appreciation above June 30, 2022 values when it liquidated the other TAC Collateral (which was worth approximately $685 million on June 30, 2022), Genesis would have liquidated the TAC Collateral for more than $2.8 billion.

on June 30, 2022.  No one did, or would have, intended that Genesis could or would both reap a massive windfall on the TAC' Collateral and then receive an additional $1.1 billion from DCG to boot.

8.      The Promissory Note's express terms confirm that DCG has no further obligation on the Note.  In the Note, Genesis and DCG expressly "expected" that GAP would realize further recoveries on the TAC Collateral—with "TAC Collateral" defined as the "collateral provided by TAC to secure certain of the TAC Loans."  *See* Note at 1 whereas cl. 4.[6]  The Note obligates GAP "to pay or transfer over" those recoveries (each a "**TAC Recovery**") to GGC "for application to the Principal Amount [of the Note] then remaining unpaid, until paid in full."  *Id.* § 1.6.1.  Likewise, DCG is required to pay TAC Recoveries from the TAC liquidation proceeds to GGC to pay down any then-remaining Principal Amount.  *See id.*  The parties agreed that upon receipt by GGC of a TAC Recovery from GAP, DCG or any other person or entity, "by set-off or otherwise," the Note's Principal Amount "shall be *reduced immediately and automatically* (*on a dollar-for-dollar basis*)."  *Id.* § 1.6.2.  The Note also obligates GAP and GGC to "use commercially reasonable efforts … to maximize the TAC Recovery" (*id.* § 1.6.3) that reduces its Principal Amount (*id.* §§ 1.6.1 & 1.6.2)—and expressly conditions DCG's obligation to pay the Principal Amount on both GAP's and GGC's performance of the obligations summarized in this paragraph (*id.* § 1.6.4).  Because TAC Recoveries have already far exceeded the Principal Amount of the Note, the Principal Amount has been "immediately and automatically" (*id.* § 1.6.2) reduced to zero.

---

[6] The Note incorporates the recitals in its "whereas" clauses "into the operative provisions of this Note."  Note at 2.

9.      Significantly, the parties expressly acknowledged at the time they executed the Note their belief that subsequent realizations on the TAC Collateral, as opposed to recoveries on the TAC Loans from TAC's liquidation, might be the only way that the Principal Amount would be reduced by TAC Recoveries:

> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

Note at 1 whereas cl. 4.  In fact, this is *exactly* how it has played out: GGC's recoveries on the TAC Collateral were far more than sufficient to adjust to zero the Principal Amount of the Promissory Note *before* DCG received any recovery from TAC's liquidation.

10.     This is why DCG is entitled to recover the payments that it has made on the Note—that is, payments from DCG to GGC of recoveries from the TAC liquidation proceedings received by DCG and forwarded to GGC *after* TAC Recoveries received by GGC had already "automatically" (*id.* § 1.6.2) reduced the Note's Principal Amount to zero.  Notwithstanding the foregoing, DCG does not intend to seek "claw back" of any past individual creditor recoveries from the Genesis estate.

## JURISDICTION

11.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and under the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409, including because this adversary proceeding arises from and relates to the Chapter 11 Cases filed in

7

this District.  In addition, the Promissory Note contains a forum selection clause in which

GGC and DCG "submit to the exclusive jurisdiction of the State and Federal courts

located in the State of New York."  Note § 2.2.

13.     No prior request for the relief requested herein has been made to this

Court or any other court.

## PARTIES

14.     Plaintiff DCG is a global investor, builder, and incubator committed to

advancing decentralized ecosystems built on blockchain technology.  DCG is organized

under Delaware law and headquartered in Stamford, Connecticut.

15.     Defendants are cryptocurrency companies wholly owned by DCG that no

longer operate and are the subject of Chapter 11 bankruptcy proceedings before this

Court.  The following partial organizational chart depicts the corporate relationship

between Plaintiff and Defendants.



16.     Defendant Genesis Global Capital, LLC is a wholly owned subsidiary of

Genesis Global Holdco, LLC, which is a wholly owned subsidiary of DCG.  GGC is

organized under Delaware law and based in the United States.

8

17.     Defendant Genesis Asia Pacific Pte. Ltd. is a wholly owned subsidiary of Genesis Global Holdco, LLC.  GAP is based in Singapore.

18.     When they were operating, GGC and GAP were managed independently of DCG, and had a separate executive team, employees, and compliance and legal departments.

## BACKGROUND

### I.     Genesis's Business

19.     Through GGC and GAP, Genesis engaged in the business of lending, borrowing, and trading crypto assets (such as Bitcoin), and fiat currency (such as U.S. dollars), primarily to and from institutional and high net worth individual customers.

20.     Two aspects of Genesis's business are particularly relevant to this matter: Genesis's lending to TAC, and GGC's borrowing through the "Gemini Earn" program operated by Gemini Trust Company LLC ("**Gemini**").

#### A.     Genesis's Lending to TAC

21.     TAC, a Singapore-based investment firm that traded digital assets, was one of Genesis's biggest borrowers.

22.     In 2019 and 2020, Genesis extended secured U.S. dollar-denominated loans to TAC pursuant to Master Loan Agreements ("**MLAs**") and Pledge Agreements. GGC and GAP both lent to TAC.  On information and belief, TAC had never, prior to June 2022, defaulted on a margin call or other loan obligation owed to Genesis.

23.     As collateral for the TAC Loans, TAC posted to Genesis 35,585,040 GBTC shares, and digital currency in the form of 33,348.3 BTC and 17,455.73 ETH.[7]

---

[7] TAC pledged other cryptocurrency (AVAX and NEAR tokens) as collateral but never delivered it to Genesis.  Those tokens were worth approximately $92 million at the end of June 2022.  Genesis

24.     GBTC is an exchange traded fund, launched in 2013, whose investment objective is to reflect the value of the cryptocurrency Bitcoin that the fund holds in trust. GBTC is sponsored by Grayscale Investments, LLC, which is a wholly owned subsidiary of DCG.  While the GBTC shares initially tended to trade at a premium to the net asset value ("**NAV**") of the Bitcoin held by the fund, the shares subsequently traded at a substantial discount to NAV until January 2024 when the Securities and Exchange Commission ("**SEC**") authorized the conversion of GBTC to an exchange traded fund. Since then, GBTC has generally traded at or close to NAV.

25.     GAP funded its loans to TAC through intercompany loans from GGC to GAP.  These intercompany loans were undocumented, bore no interest, had no maturity date, and provided GGC no right to "call" them, i.e., to require repayment on demand.  In July 2020, GGC assigned all of its MLAs and Pledge Agreements with TAC to GAP.

26.     As detailed below, TAC defaulted on the TAC Loans in mid-June 2022 and commenced a liquidation proceeding on June 27, 2022.

B.     **GGC's Borrowing Through the Gemini Earn Program**

27.     Gemini is a U.S.-based cryptocurrency exchange and custodian bank.  In February 2021, Gemini launched the Gemini Earn program, under which holders of cryptocurrency at Gemini ("**Gemini Lenders**") made interest-bearing loans of their cryptocurrency to GGC.

28.     Throughout the course of the Gemini Earn program, GGC borrowed from Gemini Lenders a wide variety of cryptocurrency coins such as BTC, ETH, Solana, and

---

subsequently relinquished any claim to that cryptocurrency in favor of TAC pursuant to a settlement among TAC, Genesis and DCG.

USD Coin.  The proof of claim that Gemini filed on behalf of the Gemini Lenders in Genesis's bankruptcy proceedings identified fifty-one coin types loaned to GGC, allegedly valued at (coincidentally) approximately $1.1 billion as of January 19, 2023.

29.     On August 15, 2022, GGC entered into a security agreement with Gemini, as agent for its lenders, pursuant to which GGC pledged 30,905,782 GBTC shares (the "**30.9M GBTC Shares**") to secure certain of GGC's obligations to Gemini under the Gemini Earn program.  All of the 30.9M GBTC Shares pledged by GGC were among the approximately 35.6 million shares that TAC previously had pledged to Genesis, and therefore were a subset of the TAC Collateral.

30.     GGC halted redemptions under the Gemini Earn program on November 16, 2022 and filed for Chapter 11 protection on January 19, 2023.

**II.     DCG's Assistance to Genesis in the Wake of TAC's Default**

31.     In 2022 and 2023, cryptocurrency markets suffered a "crypto winter," characterized by lasting, steep declines in cryptocurrency values and serial failures of large players in the cryptocurrency space.

32.     Beginning in mid-2022, global crypto lenders like Celsius Network began suspending withdrawals, shaking investor confidence.  In early May 2022, the stablecoin TerraUSD began dramatically de-pegging from the U.S. dollar and the price of its cryptocurrency counterpart (Luna) plunged.  In June 2022, TAC collapsed, as discussed below.  In July 2022, crypto lenders Celsius Network and Voyager Digital filed for bankruptcy.  This was all capped by the most shocking event in the industry's history when, in November 2022, FTX and Alameda Research filed for bankruptcy in the wake of a massive, unprecedented fraud—toppling crypto lender BlockFi into bankruptcy weeks later.  By March 2023, Silvergate Bank announced that it would wind down

11

operations and undergo liquidation in light of its losses on FTX's bankruptcy, and the following month, Signature Bank—which catered to crypto operators like Binance—also collapsed.  In the wake of these failures of significant players in the cryptocurrency space, the cryptocurrency industry overall experienced significant contagion and market-wide value loss.  Genesis was, in no small part because of DCG's voluntary support, among the last of the major crypto Chapter 11 filings.

### A.    TAC's Default

33.    On June 13, 2022, TAC failed to post to GAP approximately $334 million in collateral in response to margin calls.  This was unprecedented as to both TAC, which had never previously defaulted, and as to Genesis, which had not previously experienced a material borrower default.

34.    In response, Genesis declared TAC in default on the TAC Loans, which had at the time outstanding balances totaling approximately $2.36 billion, denominated in U.S. dollars, and accelerated TAC's obligation to repay the balances.

35.    On June 30, 2022, Genesis held the TAC Collateral consisting of 35,585,040 GBTC shares (at that time worth about $428.5 million), 33,348.3 BTC (worth about $666 million), and 17,455.73 ETH (worth about $19 million).

36.    The Promissory Note is clear that because the 35,585,040 GBTC shares, 33,348.3 BTC, and 17,455.73 ETH were "collateral provided by TAC to secure certain of the TAC Loans," they were "TAC Collateral."  Unsurprisingly, Genesis's general ledger expressly labeled these holdings as "TAC Collateral," including after Genesis already was in Chapter 11, which accords perfectly with Genesis's contemporaneous understanding and the unambiguous terms of the Promissory Note.

12

37.     On June 27, 2022, following its default on the TAC Loans, TAC commenced a liquidation proceeding.

### B.     DCG's Assistance to Genesis

38.     As a result of TAC's default and the shortfall in the value of the TAC Collateral at the time, GAP faced the risk of a significant "hole" in its book equity value for the quarter ended June 30, 2022.

39.     After exploring various ways to assist its subsidiary, DCG voluntarily assumed up to $1.1 billion of GAP's intercompany liability to GGC, reducing the liabilities on GAP's balance sheet by $1.1 billion—the initial Principal Amount of the Promissory Note.  DCG structured the liability to GGC as a promissory note that backstopped the potential losses from the TAC default, up to $1.1 billion, to the extent that GAP did not eventually recover a sufficient amount from the value of the TAC Collateral and/or GGC did not receive sufficient recoveries (via DCG) from the TAC liquidation proceedings or any other person or entity, by setoff or otherwise.

### 1.     The Assumption and Assignment Agreement

40.     On June 30, 2022, DCG and GAP entered into an Assignment and Assumption Agreement (the "**A&A**") in which DCG assumed GAP's liability to GGC, which the parties valued at $1.1 billion as of June 30, 2022.  The parties explained that the contemporaneously executed Promissory Note "evidence[s] [DCG's] obligations in respect of the Assumed Liability and … memorialize[s] the terms of the repayment thereof."  GGC executed the A&A "[s]olely for purposes of consenting to" this assignment.

### 2.     The Promissory Note

41.     The Promissory Note that DCG extended to GGC on June 30, 2022 had a $1.1 billion initial Principal Amount, a ten-year maturity, and a 1% interest rate.[8] Because the intercompany liability of GAP to GGC that the Note replaced had no maturity date, was not callable, and carried no interest, and because DCG was a much more creditworthy counterparty, the Promissory Note was more favorable to GGC than the intercompany arrangement it had in place with GAP.

42.     Critically, the Note has a repayment provision that the parties expressly agreed and specifically structured to ensure that GGC had recourse to a creditworthy counterparty (DCG) in the event that subsequent recoveries—either through further recoveries on the TAC Collateral or recoveries on the TAC Loans through the TAC liquidation proceedings or otherwise—were insufficient to pay the Principal Amount.

43.     Consistent with the issuance of the Promissory Note for this specific purpose—to fill any ultimate "hole" left by the TAC default based on a shortfall of up to $1.1 billion—the Note contains a straightforward mechanism for automatically reducing its "Principal Amount" in response to TAC Recoveries, including the "expected recoveries" on the TAC Collateral (which subsequently materialized).

44.     The Promissory Note is premised on the parties' explicit expectation that there would be further "recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the '**TAC Collateral**')" (*see* Note at 1 whereas

---

[8] Interest is paid quarterly in arrears, and can be paid "in kind," meaning it can be added to the Principal Amount.  *See* Note § 1.2.2.

cl. 4), for which DCG's obligation under the Note was a backstop.  Each of the expected recoveries by GAP was denominated a "TAC Recovery**.**"  Note § 1.6.1.

45.  The Note defines TAC Recovery to include *any* recovery by GAP or DCG on the TAC Collateral or the TAC Loans:

> Each of [DCG] and GAP hereby agrees to promptly pay or transfer over … to [GGC] any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after [June 30, 2022], whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

Note § 1.6.1.  GAP's obligation to pay TAC Recoveries to GCC has no expiration date.

46.  In fact, the parties believed at the time that future realizations on the TAC Collateral might be the *only* TAC Recoveries that would reduce the Note's Principal Amount, and the parties had no confidence that there would be recoveries on the TAC Loans from the liquidation of TAC:

> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

Note at 1 whereas cl. 4.

47.  The Promissory Note further provides for its "Principal Amount" to be "immediately and automatically" reduced "on a dollar-for-dollar basis" "upon the receipt by [GGC] of any TAC Recovery" from "any" person, "by set-off or otherwise."  Note § 1.6.2.  These "immediat[e] and automati[c]" reductions "on a dollar-for-dollar basis" (*id.*) in the Note's Principal Amount obtain for every dollar of additional recovery that GGC receives in excess of the value of such TAC Collateral at the time of the issuance of the Note.

15

48.     To this end, the Note expressly requires Genesis (and DCG) to use "commercially reasonable efforts … to maximize the TAC Recovery."  Note § 1.6.3.

49.     Every TAC Recovery must "promptly" be paid by GAP (or DCG) to GGC—as "Holder" of the Note—"for application to the Principal Amount then remaining unpaid."  *Id.* § 1.6.1.  There is no expiration date for any of these provisions, including the immediate and automatic reduction of the Note's Principal Amount to reflect TAC Recoveries.

50.     GAP's performance of its obligations under Section 1.6 of the Note—including the duties to maximize TAC Recoveries and promptly pay them to GGC to reduce the Note's Principal Amount—is an express condition precedent to DCG's payment obligations under the Note.  *See* Note § 1.6.4.  Indeed, GAP is a signatory to the Note "solely for purposes of the agreements set forth in Section 1.6 of th[e] Note."  Note at 1.  This is of course entirely unsurprising.

51.     Consistent with this expected and logical repayment mechanism, the Promissory Note's definition of its "Principal Amount" expressly contemplates these reductions in the Principal Amount:

> FOR VALUE RECEIVED, [DCG] promises to pay to [GGC] on [June 30, 2032] the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, as applicable, due solely to the payment of PIK interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**") ….

Note at 2.

52.     Like the Principal Amount, the $1.1 billion "Assumed Liability" under the Promissory Note likewise is "reduced in accordance with the terms of Section 1.6 of th[e]

16

Note to reflect any repayment or other recoveries (including any *further* realization on the TAC Collateral [by Genesis])" after June 30, 2022.

> WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereafter defined) as of [June 30, 2022], is $1,1,000,000.00 (the "**Assumed Liability**");

> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

> WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof.

Note at 1 whereas cls. 3-5. Section 1.6 of course contains the provisions, discussed above, that explicitly reduce the "Principal Amount" "dollar-for-dollar" by TAC Recoveries. *See* Note § 1.6.2. This further confirms that TAC Recoveries reduce DCG's obligations to GGC under the Note.

53.     The Promissory Note's terms correspondingly reflect that the challenge Genesis faced was caused by TAC's insolvency (and lack of visibility into future recoveries from TAC itself) and by the depressed value of the TAC Collateral, and that DCG stood ready at the conclusion of the Promissory Note's term (or earlier, to the extent that DCG received TAC Recoveries at a time when the Note still had a principal balance) to pay Genesis to make up for whatever shortfall—if any—remained at that time. Having recourse to DCG for any ultimate shortfall put Genesis in a much better position than merely having a claim of uncertain value in the TAC liquidation and having additional recourse only to the then profoundly depressed TAC Collateral. Because

17

DCG's promise to pay served as a backstop, the objective was not to provide Genesis with cash up front (which it did not at that time need).  The problem the Note was solving was a book equity problem, threatened by operation of the quarter-end accounting processes, not an immediate liquidity problem.

54.     DCG did not request or receive the TAC Collateral and potential upside as part of the Promissory Note transaction.  Instead, DCG issued the Note as a backstop in the event of any ultimate shortfall in recoveries from the TAC Collateral or the TAC liquidation proceedings, and Genesis kept the collateral from TAC and assumed an obligation to maximize the recoveries on it.  This arrangement was highly favorable to Genesis because keeping the TAC Collateral and all of its upside allowed Genesis to receive value on account of it much sooner than the maturity date of the Note.  And, on information and belief, Genesis has reaped hundreds of millions of dollars in profits from TAC's defaults as a result of retaining the TAC Collateral.

**III.     Genesis's Bankruptcy**

55.     DCG continued to provide material assistance to Genesis after June 2022. In addition to the Promissory Note, DCG between June 2022 and November 2022 paid and contributed crypto assets and fiat currency to Genesis through equity infusions, loan repayments and loan forgiveness—which are now worth well over a billion dollars.

56.     DCG's continued provision of assistance did not suffice to save Genesis from subsequent tectonic market shocks, however.  In November 2022, the world's largest digital asset exchange, FTX, and its affiliated trading firm, Alameda, failed amidst allegations that they were engaging in unprecedented fraud.  The ensuing market contagion caused Genesis to halt its lending and borrowing business on November 16, 2022, despite the substantial assistance DCG had rendered to Genesis.

57.     While GGC's direct credit exposure to FTX was not material, the FTX bankruptcy spawned the equivalent of a tsunami in the crypto world, causing broad and lasting effects including GGC's bankruptcy filing on January 19, 2023 due to the "run on the bank" that ensued in November 2022 and caused Genesis to halt withdrawals.  Even had TAC not defaulted in June 2022, GGC would not have had sufficient capital to withstand the unexpected and devastating market rout that followed the collapse of FTX in November 2022, which also led crypto lender BlockFi to file for Chapter 11 bankruptcy in the same month.  On January 19, 2023, GGC and GAP—along with their direct corporate parent Genesis Global Holdco, LLC—filed for bankruptcy.

58.     As a result of the support DCG provided to Genesis before bankruptcy and a massive upswing in the value of cryptocurrency during the bankruptcy, virtually all of Genesis's counterparty creditors have already fully recovered their out-of-pocket losses (or more) as measured by the dollar value of their asset holdings as of the date of the bankruptcy filing.  Under the bankruptcy plan confirmed by the Bankruptcy Court, Genesis "[c]reditors are entitled to receive distributions up to 100% of the in-kind claim asset value," potentially plus any applicable interest or fees.[9]  Because of the significant appreciation in cryptocurrency values since the petition date, this has resulted in recoveries that exceed the dollar value of the creditors' claims as of the petition date.  Indeed, Genesis's counsel announced in August 2024 that, based solely on "the initial distributions to creditors on the effective date," Genesis's creditors with claims denominated in BTC received "166% of their petition date value," creditors with Ether

---

[9] Genesis Global Holdco, LLC, "Frequently Asked Questions," at § I.12 (May 15, 2025), *available at* https://restructuring.ra.kroll.com/genesis (Frequently Asked Questions).

claims received "153% of their petition date value," and creditors with U.S. dollar claims received "100% of their … petition date value."[10]  There have been three subsequent distributions to Genesis's creditors.

## IV.      The Rebound of Cryptocurrency

59.      Since June 2022, cryptocurrency values generally have increased dramatically.  GBTC received an additional boost in January 2024 after Grayscale prevailed in litigation against the SEC, and the SEC granted approval for GBTC to be converted to an exchange traded fund, thereby erasing the "discount."

60.      At the end of June 2022, GBTC was valued at around $12.00 per share, and the 35,585,040 GBTC shares provided by TAC as collateral were worth about $428.5 million.  GBTC dramatically increased in value as a result of the several fold increase in Bitcoin (the underlying asset it tracks) and the discount to NAV having been erased upon GBTC's conversion to an exchange traded fund.  On May 31, 2024, for example, GBTC had a market value of $60.09 per share—a more than fourfold increase from June 2022.  Thus, the approximately 35.6 million GBTC shares had a market value of approximately $2.1 billion—about $1.7 billion more than their value upon issuance of the Note.  This appreciation of the GBTC shares—which resulted in GGC receiving TAC Recoveries by set-off of its obligations to Gemini Lenders—is significantly greater than the Principal Amount of the Note (that is, the June 2022 estimate of the loss on the TAC Loans).  On information and belief, this one transaction—GGC's use of the 30.9M GBTC Shares worth nearly $1.9 billion to satisfy its obligations to the Gemini Lenders—by itself,

---

[10] Cleary Gottlieb, "Genesis Completes Debt Restructuring" (Aug. 26, 2024), *available at* www.clearygottlieb.com/news-and-insights/news-listing/genesis-completes-debt-restructuring.

reduced the Principal Amount to zero, even leaving aside all other recoveries on the remaining TAC Collateral.

**TAC RECOVERIES BY GENESIS HAVE REDUCED
THE PROMISSORY NOTE'S PRINCIPAL AMOUNT TO ZERO**

61.     DGG is entitled to a declaration from this Court that the Principal Amount of the Promissory Note is $0, and DCG has no further obligations under the Note.  Under the terms of the Promissory Note, Genesis's realization of massive gains from the TAC Collateral in excess of the value of the TAC Collateral at the time of the issuance of the Note—which are denominated as "TAC Recoveries"—immediately and automatically reduced the Principal Amount of the Note on a dollar-for-dollar basis.  In fact, Genesis has realized gains on the TAC Collateral subsequent to issuance of the Note that far exceed its initial $1.1 billion Principal Amount.

62.     In addition, DCG has (unnecessarily, it turns out) turned over nearly $106 million in TAC Recoveries from TAC's liquidators to GGC for application against the Principal Amount of the zero balance Note.

**I.     GGC's TAC Recovery on the GBTC Shares It Pledged to Gemini**

63.     By May 31, 2024, Genesis obtained a TAC Recovery on the 30.9M GBTC Shares that were among the TAC Collateral.  This TAC Recovery occurred when GGC used the 30.9M GBTC Shares (then worth nearly $1.9 billion) to pay the Gemini Lenders.  This TAC Recovery was the culmination of a series of events relating to the Gemini Earn program, including GGC's default under that program.

64.     On August 15, 2022, GGC pledged the 30.9M GBTC Shares—which TAC previously had posted to Genesis as collateral—to Gemini to secure GGC's borrowings under the Gemini Earn program.  Pursuant to the governing security

agreement, GGC remained the "sole owner" of the 30.9M GBTC Shares. On August 18, 2022, GGC transferred the 30.9M GBTC Shares to Gemini.

65.     In early November 2022, FTX and its affiliate Alameda—which was among GGC's larger borrowers—collapsed and sought bankruptcy protection.

66.     As a result, GGC suspended withdrawals on its borrowing platform and delayed redemptions from the Gemini Earn program. On November 16, 2022, Gemini purported to foreclose on the 30.9M GBTC Shares.[11] Gemini, on behalf the Gemini Lenders, later submitted claims in Genesis's bankruptcy.

67.     In October 2023, Gemini commenced an adversary proceeding against Genesis in the bankruptcy proceeding seeking a declaration that it was entitled to set off the foreclosure value of the 30.9M GBTC Shares against the Gemini Lenders' claims.

68.     On April 19, 2024, the bankruptcy court approved a settlement between Gemini and Genesis. Pursuant to the settlement, the parties agreed that "Gemini [had in fact] failed to foreclose" on the 30.9M GBTC Shares, which Genesis (not Gemini) owned "from the date such assets were acquired until such assets are delivered to the Gemini Lenders" through Gemini. ECF No. 1499, Ex. B at 17. The 2024 settlement agreement provided for GGC to deliver the 30.9M GBTC Shares to Gemini, and authorized Gemini to monetize them as necessary to satisfy, through in-kind delivery, GGC's obligations to the Gemini Lenders. *See id.* Ex. B at 12. GGC received a reduction of its obligation to the Gemini Lenders on a "coin-for-coin basis" for each asset delivered to the Gemini Lenders. *Id.*

---

[11] Genesis and Gemini subsequently reached a settlement that gave no effect to Gemini's purported "foreclosure." *See infra* ¶ 68.

22

69.     On information and belief, GGC used the 30.9M GBTC Shares to achieve a TAC Recovery far more than sufficient to adjust to zero the Principal Amount of the Promissory Note.  Under the settlement agreement, GGC was required to deliver the 30.9M GBTC Shares to Gemini by May 31, 2024, offsetting GGC's obligation to the Gemini Lenders.  Through that delivery, GGC realized a recovery on the 30.9M GBTC Shares among the TAC Collateral—which was far in excess of the approximately $372 million value of the 30.9M GBTC Shares at the time the Note was issued—by using the shares to satisfy by offset GGC's obligations under the Gemini Earn program.  Under the Promissory Note's terms, the incremental recovery beyond the value of the GBTC shares at the time the Note was issued "immediately and automatically" reduced the Note's Principal Amount "on a dollar-for-dollar basis."  Note § 1.6.2.  Based on the market price of GBTC—for example, $60.09 per share on May 31, 2024—the TAC Recovery to GGC on this one transaction alone far exceeded the $1.1 billion original Principal Amount of the Promissory Note plus capitalized interest.  That is, there was a further realization of value on the 30.9M GBTC Shares after the date the Note was issued—that is, a realization on 30.9M GBTC Shares in excess of their approximately $372 million value at the end of June 2022—on the order of $1.4–$1.5 billion.  Such incremental value realized after issuance of the Note reduced the Principal Amount to zero.

## II.     GGC's Other TAC Recoveries

70.     While DCG does not have transparency into Genesis's liquidation of the TAC Collateral other than the 30.9M GBTC Shares, GGC has, on information and belief, liquidated that other TAC Collateral since issuance of the Note, including to repay its creditors in its bankruptcy proceeding.  To the extent that the proceeds received exceeded the value of such assets at the time the Note was issued, each of those liquidations also

23

constituted a TAC Recovery that "immediately and automatically" reduced the Note's

Principal Amount "on a dollar-for-dollar basis."  Note § 1.6.2.

### III.   TAC Recoveries Via DCG

71.   From time to time, DCG has received payments from TAC through the

TAC liquidation proceedings.  With the exception of the most recent payment, which

DCG received on August 4, 2025, DCG has remitted to Genesis each payment from TAC

as TAC Recoveries, under the misapprehension that the Principal Amount of the

Promissory Note had not already been adjusted to zero.

72.   Each of the four TAC Recoveries payments that DCG remitted to GGC

was accompanied by DCG's express reservation of its rights:  "Nothing herein or in any

correspondence shall prejudice either party's right to exercise any rights, remedies or

powers or to assert any claims, causes of action, or defenses now or hereafter available

under the Promissory Note, the June A&A Agreement, the A&A Agreement, the Loan

Documents, any instruments or agreements referred to therein and/or applicable law, all

of which rights, remedies, powers, claims and causes of action are cumulative and all of

which are hereby specifically reserved."

73.   Over the life of the Promissory Note, DCG has (mistakenly, it turns out)

sent nearly $106 million to GGC in TAC Recoveries.

### THE PROMISSORY NOTE HAS
### FULFILLED ITS INTENDED PURPOSE

74.   GGC, GAP and DCG agree that the Note was and is a valid instrument

that is in full force and effect; the instant dispute is simply about what the terms of the

Note provide.  All DCG seeks through this action is to hold the parties to their original

bargain based on the plain language of an instrument it voluntarily tendered to Genesis to support it.

75.     As discussed above, the purpose of the Note was to backstop, up to $1.1 billion, any ultimate shortfall to the extent subsequent TAC Recoveries were insufficient—and assuredly not to provide a windfall to GGC and GAP in the event that TAC Recoveries made them whole (or, as it turned out, better) on the TAC Loans. Through TAC Recoveries to GGC and GAP to date, including on the GBTC shares GGC pledged to Gemini, this purpose has been more than fulfilled.

## COUNT I

**Declaratory Judgment:
TAC Recoveries Have Adjusted to Zero the
Principal Amount of the Promissory Note
(Against GGC)**

76.     DCG incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, … may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

78.     There is a concrete, live controversy between DCG, on the one hand, and GGC and GAP, on the other hand, as to whether the TAC Recoveries have adjusted to zero the Principal Amount of the Promissory Note. After DCG received a payment from TAC through the TAC liquidation proceedings on August 4, 2025, counsel for Genesis has requested that DCG pay that amount to GGC. DCG has not made the requested payment because DCG no longer has any obligation under the Note.

25

79.     Each TAC Recovery described above "immediately and automatically" reduced the Principal Amount of the Promissory Note, and these TAC Recoveries, in aggregate, have adjusted to zero the Principal Amount.

80.     Accordingly, DCG is entitled to a declaration the TAC Recoveries identified above have adjusted to zero the Principal Amount of the Promissory Note, the Promissory Note has been fully satisfied by DCG, and DCG has no further obligation under the Promissory Note.

81.     DCG has not requested this relief from any other court.

## COUNT II

### Money Had and Received:
### DCG's Overpayment of TAC Recoveries
### (Against GGC)

82.     DCG incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     Under the Promissory Note, DCG had an obligation to pay any TAC Recovery to GGC "for application to the Principal Amount then remaining unpaid" only "until" the Principal Amount was "paid in full."  Note § 1.6.1.

84.     On information and belief, TAC Recoveries from the TAC Collateral had adjusted to zero the Principal Amount of the Promissory Note by no later than May 31, 2024, and DCG had no further obligation to pay TAC Recoveries to GGC.

85.     GGC was aware that the TAC Recoveries from TAC Collateral exceeded the Principal Amount of the Promissory Note, including capitalized interest, but GGC did not acknowledge or inform DCG that the TAC Recoveries that it received from the TAC Collateral had adjusted to zero the Principal Amount of the Promissory Note.

26

86.     DCG paid a total of approximately $106 million in TAC Recoveries to GGC after the Principal Amount of the Promissory Note already had been adjusted to zero.

87.     GGC benefited, and continues to benefit, from the TAC Recoveries paid by DCG, which were not owed under the Promissory Note, and to which GGC has no legal entitlement and which rightfully belong to DCG.

88.     Under these circumstances, it would be inequitable and unjust for GGC to retain the TAC Recoveries paid by DCG to GGC, and principles of equity and good conscience require that GGC repay these amounts to DCG.

89.     Accordingly, DCG is entitled to judgment against GGC ordering GGC to restore $105,938,161.07, plus interest, to DCG.

90.     DCG has not requested this relief from any other court.

## COUNT III

**Restitution of Mistaken Payment:
DCG's Overpayment of TAC Recoveries
(Against GGC)**

91.     DCG incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     Under the Promissory Note, DCG had an obligation to pay any TAC Recovery to GGC "for application to the Principal Amount then remaining unpaid" only "until" the Principal Amount was "paid in full." Note § 1.6.1.

93.     On information and belief, TAC Recoveries from the TAC Collateral had adjusted to zero the Principal Amount of the Promissory Note by no later than May 31, 2024, and DCG had no further obligation to pay TAC Recoveries to GGC.

27

94.     GGC was aware that the TAC Recoveries from TAC Collateral exceeded the Principal Amount of the Promissory Note, including capitalized interest, but GGC did not acknowledge or inform DCG that the TAC Recoveries that it received from the TAC Collateral already had adjusted to zero the Principal Amount of the Promissory Note.

95.     Acting under the mistaken apprehension that the Principal Amount of the Promissory Note had not already been adjusted to zero, DCG paid a total of approximately $106 million in TAC Recoveries to GGC.

96.     GGC derived a benefit as a result of DCG's mistaken payment of TAC Recoveries, which were not owed under the Promissory Note, and to which GGC has no legal entitlement and which rightfully belongs to DCG.

97.     Under these circumstances, it would be inequitable and unjust for GGC to retain the TAC Recoveries paid by DCG to GGC, and principles of equity and good conscience demand restitution of these amounts by GGC to DCG.

98.     Accordingly, DCG is entitled to judgment against GGC ordering GGC to repay $105,938,161.07, plus interest, to DCG.

99.     DCG has not requested this relief from any other court.

### COUNT IV

**Unjust Enrichment:**
**DCG's Overpayment of TAC Recoveries**
**(Against GGC)**

100.    DCG incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    Under the Promissory Note, DCG had an obligation to pay any TAC Recovery to GGC "for application to the Principal Amount then remaining unpaid" only "until" the Principal Amount was "paid in full."  Note § 1.6.1.

102. On information and belief, TAC Recoveries from the TAC Collateral had adjusted to zero the Principal Amount of the Promissory Note by no later than May 31, 2024, and DCG had no further obligation to pay TAC Recoveries to GGC.

103. GGC was aware that the TAC Recoveries from TAC Collateral exceeded the Principal Amount of the Promissory Note, including capitalized interest, but GGC did not acknowledge or inform DCG that the TAC Recoveries that it received from the TAC Collateral already had adjusted to zero the Principal Amount of the Promissory Note.

104. DCG paid approximately $106 million in TAC Recoveries to GGC after the Principal Amount of the Promissory Note had been adjusted to zero.

105. GGC was enriched at DCG's direct expense by the TAC Recoveries paid by DCG, which were not owed under the Promissory Note, and to which GGC has no legal entitlement and which rightfully belongs to DCG.

106. Under these circumstances, principles of equity and good conscience militate against permitting GGC to retain the TAC Recoveries paid by DCG to GGC.

107. Accordingly, DCG is entitled to judgment against GGC ordering GGC to repay $105,938,161.07, plus interest, to DCG.

108. DCG has not requested this relief from any other court.

### **PRAYER FOR RELIEF**

WHEREFORE, DCG respectfully requests that this Court enter an order and judgment in favor of DCG and against Defendants:

a. Declaring TAC Recoveries have reduced the Principal Amount of the Promissory Note to no more than zero dollars, the Principal Amount of the Promissory Note has adjusted to zero, and DCG has no further obligation under the Promissory Note;

29

b.      Ordering GGC to repay to DCG the $105,938,161.07 that DCG paid to

GGC in TAC Recoveries, plus interest; and

c.      Awarding DCG  all other relief, at law or in equity, to which it may be

entitled.

Dated: New York, New York                    Respectfully submitted,
       August 14, 2025

                                              /s/ Benjamin S. Kaminetzky
                                             Benjamin S. Kaminetzky

                                             Davis Polk & Wardwell LLP
                                             450 Lexington Avenue
                                             New York, New York  10017
                                             (212) 450-4000
                                             Marshall S. Huebner
                                             Benjamin S. Kaminetzky
                                             Elliot Moskowitz
                                             David B. Toscano
                                             Daniel J. Schwartz
                                             marshall.huebner@davispolk.com
                                             ben.kaminetzky@davispolk.com
                                             elliot.moskowitz@davispolk.com
                                             david.toscano@davispolk.com
                                             daniel.schwartz@davispolk.com

                                             *Counsel for Plaintiff*
                                             *Digital Currency Group, Inc.*

# EXHIBIT 1

PAYMENT OF THIS NOTE AND OF THE OBLIGATIONS HEREUNDER ARE SUBORDINATED TO THE EXTENT AND IN THE MANNER PROVIDED FOR IN THAT CERTAIN INTERCOMPANY SUBORDINATION AGREEMENT (THE "**SUBORDINATION AGREEMENT**") BY AND AMONG THE OBLIGOR (AS HEREINAFTER DEFINED), THE SUBSIDIARIES OF THE OBLIGOR PARTY THERETO FROM TIME TO TIME, AND SB CORPORATE FUNDING LLC, AS ADMINISTRATIVE AGENT. THE SUBORDINATION AGREEMENT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF AS IF SET FORTH HEREIN IN ITS ENTIRETY.

## PROMISSORY NOTE

$1,100,000,000.00                                                                                  June 30, 2022

THIS PROMISSORY NOTE (this "**Note**") is made as of the date first written above by the undersigned, DIGITAL CURRENCY GROUP, INC., a Delaware corporation (the "**Obligor**"), to GENESIS GLOBAL CAPITAL, LLC, a Delaware limited liability company (together with any successors or assigns or any subsequent holder of this Note, the "**Holder**"), and, solely for purposes of the agreements set forth in Section 1.6 of this Note, GENESIS ASIA PACIFIC PTE. LTD., a corporation organized and existing under the laws of Singapore ("**GAP**").

## WITNESSETH

WHEREAS, GAP heretofore has made or assumed loans and other financial accommodations (collectively, the "**TAC Loans**") provided from time to time to Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("**TAC**");

WHEREAS, the TAC Loans were funded with working capital provided from time to time by the Holder, evidenced by book-entry intercompany transfers from the Holder to GAP and resulting in non-interest-bearing accounts payable from GAP to the Holder (the "**Intercompany Payables**");

WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");

WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans;

WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof;

ACTIVE/117864363.5

WHEREAS, contemporaneously with the issuance of this Note, GAP assigned to the Obligor, and the Obligor assumed from GAP, the Assumed Liability pursuant to that certain Assignment and Assumption Agreement, dated as of even date herewith, between GAP and the Obligor (the "**Assignment**"); and

WHEREAS, the Obligor is issuing this Note to the Holder to evidence the Obligor's obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Note by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

FOR VALUE RECEIVED, the Obligor promises to pay to the Holder on the Maturity Date (as hereinafter defined), the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, if applicable, due solely to the payment of PIK Interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**"), in lawful money of the United States of America in immediately available funds, and to pay interest from the date of issuance of this Note on the Principal Amount from time to time outstanding at a rate per annum and payable on such dates as determined pursuant to the terms of this Note.

**SECTION 1.          TERMS OF PAYMENT**

1.1     Maturity Date.  The unpaid Principal Amount of this Note, together with all accrued and unpaid interest as set forth in this Note, shall be paid in full on or before June 30, 2032 (the "**Maturity Date**").  If any day on which a payment is due pursuant to the terms of this Note is not a day on which banks in the State of New York are generally open (a "**Business Day**"), such payment shall be due on the next Business Day following.

1.2     Interest.

1.2.1   The Principal Amount outstanding from time to time shall bear interest at a rate equal to one percent (1.00%) per annum.

1.2.2   Interest with respect to this Note shall be paid quarterly in arrears on the last Business Day of each March, June, September and December of each calendar year, commencing September 30, 2022 (each, an "**Interest Payment Date**"), either (a) in cash or (b) at the option of the Obligor, or at any time cash payments are not permitted by the terms of the Subordination Agreement, in kind by adding an amount equal to the accrued interest for such quarterly interest period to the then-outstanding Principal Amount (interest so paid under this clause (b), "**PIK Interest**").  Once paid, any PIK Interest shall constitute principal of this Note and shall accrue interest as such.

1.2.3   Under no circumstances shall the rate of interest chargeable under this Note be in excess of the maximum amount permitted by applicable law.  If for any reason any such

2

excess interest is charged and paid, then the excess amount shall be promptly refunded by the Holder.

1.2.4   Interest on this Note shall be computed on the basis of the actual number of days elapsed over a year of 365 days (366 days in a leap year).  In computing such interest, the date this Note is issued shall be included and the date of payment of any Principal Amount shall be excluded.

1.3     Optional Prepayments.  The Principal Amount, together with any accrued and unpaid interest thereon, may be prepaid, at Obligor's option, at any time prior to the Maturity Date, in whole or in part, without premium or penalty. All payments received by Holder hereunder will be applied first to interest and the balance to the Principal Amount. No amount repaid or prepaid hereunder may be reborrowed.

1.4     Recordation of Payments. The Holder is hereby authorized to record all repayments or prepayments under this Note on the schedule attached hereto, or otherwise in its books and records, such schedule and/or books and records constituting *prima facie* evidence (absent manifest error) of the principal amount of this Note; provided, however, that the failure of the Holder to make such a notation or any error in such notation shall not affect the obligations of the Obligor to the Holder under this Note.

1.5     Form of Payment. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Holder may designate from time to time, or if no such designation is made.

1.6     TAC Loans.

1.6.1   Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

1.6.2   The parties hereto agree that the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by the Holder of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, by set-off or otherwise.

1.6.3   Each of GAP and the Holder agrees that it shall use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery.

1.6.4   Each of GAP and the Holder agrees that the Obligor's obligations to repay the Principal Amount, together with interest thereon, in accordance with the terms hereof are subject to performance by GAP and the Holder with its obligations under this Section 1.6.

3

**SECTION 2.**          **MISCELLANEOUS**

     2.1     <u>Amendments and Waivers; Transfers; Successor and Assigns</u>.  No amendment, modification, termination, waiver or consent to departure of any provision of this Note shall in any event be effective without the prior written consent of the Holder and the Obligor.  This Note may not be assigned or transferred by the Holder to any person or entity without the consent of the Obligor, and any such assignment or transfer without the Obligor's prior written consent shall be null and void in all respects.  The Obligor shall not be permitted to assign or transfer any of its rights, liabilities or obligations hereunder without the prior written consent of the Holder, and any such assignment or transfer without the Holder's prior written consent shall be null and void in all respects.  This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

     2.2     <u>Applicable Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law.  The Holder and the Obligor hereby submit to the exclusive jurisdiction of the State and Federal courts located in the State of New York.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

     2.3     <u>Entirety; No Strict Construction; No Third Party Beneficiaries</u>.  This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Holder and the Obligor and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

     2.4     <u>Further Assurances</u>.  Each of the parties hereto agrees from time to time, as and when requested by any party hereto, to execute and deliver or cause to be executed and delivered, all such documents, instruments and agreements and to take or cause to be taken such further or other action as such party may reasonably deem necessary or desirable in order to carry out the intent and purposes of this Note and any other documents or agreements executed or otherwise delivered in connection herewith.

     2.5     <u>Waivers</u>. The Obligor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

4

2.6 <u>Severability</u>. If any provision of this Note is held by a court of competent jurisdiction to be void or unenforceable in whole or in part, the remaining provisions of this Note shall continue in full force and effect.

[*SIGNATURES FOLLOW*]

5

ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

## OBLIGOR

DIGITAL CURRENCY GROUP, INC.

DocuSigned by:

By: _BARRY SILBERT_
 ⎿7160392D4AC14BA...
Name:  Barry E. Silbert
Title:  Chief Executive Officer

Acknowledged and Agreed:

## HOLDER

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____
Name:
Title:

[*SIGNATURES CONTINUE ON NEXT PAGE*]

[*Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC*]
ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

### OBLIGOR

DIGITAL CURRENCY GROUP, INC.

By: _____

Name:

Title:

Acknowledged and Agreed:

### HOLDER

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____

Name:   S. Michael Moro

Title:   CEO

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

Solely for purposes of Section 1.6 of the Note:

GENESIS ASIA PACIFIC PTE. LTD.

By: _____

Name: S. Michael Moro

Title: Director

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

SCHEDULE OF REPAYMENTS
TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

ACTIVE/117864363.5