Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to GGC and GAP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>        Wind-Down Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>Jointly Administered |
| Digital Currency Group, Inc.,<br><br>        Plaintiff,<br><br>    -against-<br><br>Genesis Global Capital, LLC<br>Genesis Asia Pacific Pte. Ltd.,<br><br>        Defendants. | Adv. Proc. No. 25-01129 (SHL) |

**MOTION TO DISMISS COMPLAINT AGAINST**
**GENESIS GLOBAL CAPITAL, LLC AND GENESIS ASIA PACIFIC PTE. LTD.**

---

[1]     The Wind-Down Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

Defendants Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd. ("GAP" and together with GGC, the "Defendants")[2] respectfully submit this motion to dismiss (the "Motion to Dismiss") Digital Currency Group, Inc.'s ("DCG" or "Plaintiff") *Complaint* (ECF No. 1, Adv. Proc. No. 25-01129, the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Defendants respectfully allege:

### Relief Requested

1.      By this Motion to Dismiss, Defendants seek dismissal of the Complaint.

2.      On August 14, 2025, Plaintiff filed its Complaint, seeking (i) a declaratory judgment that the Principal Amount of the Promissory Note has been reduced to zero; and (ii) judgment against GGC ordering GGC to restore $105,938,161.07, plus interest, on grounds of money had and received, restitution of mistaken payment, and unjust enrichment.

3.      For the reasons set forth in Defendants' *Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.* (the "Memorandum of Law"), filed contemporaneously herewith and incorporated herein by reference, Defendants now seek dismissal of the Complaint on the grounds that Plaintiff has failed to state a claim upon which relief may be granted.

### Conclusion

For the foregoing reasons, Defendants respectfully request entry of the proposed order attached hereto as **Exhibit A**, (i) granting Defendants' Motion to Dismiss, (ii) dismissing the Complaint, and (iii) granting such other and further relief as may be necessary and proper.

---

[2]      Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Complaint.

Dated: September 17, 2025
New York, New York

Respectfully submitted,


/s/ Luke A. Barefoot
Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: (212) 225-2000
F: (212) 225-3999

*Counsel to GGC and GAP*

## Exhibit A

Proposed Order

Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to GGC and GAP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>      Wind-Down Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>Jointly Administered |
| Digital Currency Group, Inc.,<br><br>      Plaintiff,<br><br>    -against-<br><br>Genesis Global Capital, LLC<br>Genesis Asia Pacific Pte. Ltd.,<br><br>      Defendants. | Adv. Proc. No. 25-01129 (SHL) |

**ORDER DISMISSING COMPLAINT AGAINST**
**<u>GENESIS GLOBAL CAPITAL, LLC AND GENESIS ASIA PACIFIC PTE. LTD.</u>**

---

[1]     The Wind-Down Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

-1-

Upon Defendants' *Motion to Dismiss Complaint against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.* (the "<u>Motion to Dismiss</u>")[2] in the above-captioned adversary proceeding, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7012(b) (the "<u>Bankruptcy Rules</u>"); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having considered the Motion to Dismiss and the Memorandum of Law; and notice of the Motion to Dismiss having been given in accordance with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York; and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the Motion to Dismiss; and upon the record of the hearing; and after due deliberation and sufficient cause appearing therefor:

IT IS HEREBY FOUND AND ORDERED THAT:

1.      The Complaint brought by DCG against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd. fails to state a claim upon which relief may be granted for the reasons asserted in the Motion to Dismiss and the Memorandum of Law.

3.      The Motion to Dismiss is GRANTED as set forth herein.

4.      The Complaint is hereby DISMISSED WITH PREJUDICE.

6.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion to Dismiss or the implementation, interpretation or enforcement of this Order.

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion to Dismiss.

Dated: _____, 2025
       New York, New York

_____
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to GGC and GAP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Wind-Down Debtors. | Jointly Administered |
| Digital Currency Group, Inc., | |
| Plaintiff, | |
| -against- | Adv. Proc. No. 25-01129 (SHL) |
| Genesis Global Capital, LLC Genesis Asia Pacific Pte. Ltd., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT AGAINST**
**GENESIS GLOBAL CAPITAL, LLC AND GENESIS ASIA PACIFIC PTE. LTD.**

---

[1]     The Wind-Down Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 5

I.      GAP-TAC Lending and Borrowing Relationship; June-July 2022
        Agreements Between GAP, GGC, and DCG ............................................... 5

II.     TAC Proofs of Claim and Settlement Agreement ..................................... 9

III.    2024 Adversary Proceeding and DCG Counterclaim ............................... 9

IV.     Gemini Settlement ...................................................................................... 12

V.      TAC Recoveries, Transfer to GGC, and Agreed Promissory Note
        Reductions .................................................................................................... 14

VI.     DCG's Failure to Timely Assert or Disclose the Claims ........................ 16

VII.    The Present Adversary Proceeding ........................................................... 20

LEGAL STANDARD ................................................................................................ 21

ARGUMENT .............................................................................................................. 21

I.      DCG'S CLAIMS ARE UNTIMELY ........................................................... 22

II.     THE CLAIMS WERE NOT ASSERTED AS COMPULSORY
        COUNTERCLAIMS IN THE 2024 ADVERSARY
        PROCEEDING AND THEREFORE HAVE BEEN FORFEITED ....... 23

        A.      The June-July 2022 Agreements are a Single Transaction,
                and a Single Integrated Contract, for Purposes of Rule
                13(a) ................................................................................................... 24

        B.      The Claims Were Not Brought as Compulsory
                Counterclaims in the 2024 Adversary Proceeding, and
                Have Thus Been Forfeited .............................................................. 26

III.    THE CLAIMS ARE BARRED BY THE DOCTRINE OF
        WAIVER .............................................................................................................. 29

**Page**

IV.     THE CLAIMS ARE BARRED BY THE DOCTRINE OF
        JUDICIAL ESTOPPEL ....................................................................................... 30

V.      THE PLAIN LANGUAGE OF THE PROMISSORY NOTE
        PRECLUDES THE RELIEF SOUGHT ............................................................... 32

        A.     The Claims Rely on an Obviously Wrong Interpretation of
               "TAC Collateral" ..................................................................................... 33

        B.     The Claims Rely on an Obviously Wrong Interpretation of
               "TAC Recovery" ....................................................................................... 36

VI.     DCG HAS NOT PLAUSIBLY PLED A "MISTAKE" AS BASIS
        FOR THE RELIEF SOUGHT IN COUNT III ....................................................... 37

VII.    DCG HAS NOT SUFFICIENTLY ALLEGED FACTS
        RELATING TO "GGC'S OTHER TAC RECOVERIES" TO
        SUPPORT A CLAIM ........................................................................................... 38

VIII.   GAP MUST BE DISMISSED FROM THE ACTION BECAUSE
        THE COMPLAINT FAILS TO STATE A CLAIM AGAINST
        GAP ..................................................................................................................... 40

CONCLUSION.......................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agra v. Dolci (In re Major Model Mgmt. Inc.)*,
No. 22-10169 (MG), 2023 WL 5338580 (Bankr. S.D.N.Y. Aug. 18, 2023)................ 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................... 21, 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................... 39

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000)................................................................. 21, 31

*DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*,
No. 17-cv-962 (JMF), 2019 WL 13414939 (S.D.N.Y. Mar. 11, 2019)........................ 35

*Gonzales v. Nat'l Westminster Bank PLC*,
847 F. Supp. 2d 567 (S.D.N.Y. 2012)....................................................... 21

*Hartford Accident & Indem. Co. v. Hop-On Int'l. Corp.*,
568 F. Supp. 1568 (S.D.N.Y. 1983)......................................................... 40

*In re Calpine Corp.*,
No. 05-60200 (BRL), 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ........................ 23

*In re FRG, Inc.*,
121 B.R. 710 (Bankr. E.D. Pa. 1990) ...................................................... 22

*In re HBL SNF, LLC*,
No. 21-22623 (SHL), 2022 WL 1612221 (Bankr. S.D.N.Y. May 20, 2022) ............... 26

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023)................ 23

*In re Motors Liquidation Co.*,
598 B.R. 744 (Bankr. S.D.N.Y. 2019)....................................................... 22

**Page(s)**

*In re Rhythms NetConnections Inc.*,
    300 B.R. 404 (Bankr. S.D.N.Y. 2003)................................................................. 31

*In re SVB Financial Group*,
    660 B.R. 60 (Bankr. S.D.N.Y. 2024)................................................................. 22

*Jones v. Ford Motor Credit Co.*,
    358 F.3d 205 (2d Cir. 2004)................................................................. 26-27

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)................................................................. 33

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990)................................................................. 33

*Mfrs. Hanover Tr. Co. v. Chem. Bank*,
    559 N.Y.S.2d 704 (1st Dept.1990) ................................................................. 38

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*,
    419 F.3d 115 (2d Cir. 2005)................................................................. 23

*Novick v. AXA Network, LLC*,
    642 F.3d 304 (2d Cir. 2011)................................................................. 26

*Perks v. TD Bank, N.A.*,
    444 F. Supp. 3d 635 (S.D.N.Y. 2020)................................................................. 21

*Reciprocal Merch. Servs., Inc. v. All Advert. Assocs., Inc.*,
    163 B.R. 689 (S.D.N.Y. 1994)................................................................. 32

*Salyers v. A.J. Blosenski, Inc.*,
    731 F.Supp.3d 670 (E.D. Pa. 2024) ................................................................. 40

*TVT Records v. Island Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005)................................................................. 26

*U.S. D.I.D. Corp. v. Windstream Commc'n, Inc.*,
    775 F.3d 128 (2d Cir. 2014)................................................................. 21, 29

*United States v. Aquavella*,
    615 F.2d 12 (2d Cir. 1979)................................................................. 21, 28

*United States v. Olano*,
    507 U.S. 725 (1993)................................................................. 21, 29

**Page(s)**

*Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*,
    111 F. Supp. 2d 450 (S.D.N.Y. 2000).............................................................. 26

*Weisfelner v. Fund 1 (In re Lyondell* Chem*. Co.)*,
    554 B.R. 655 (Bankr. S.D.N.Y. 2016)........................................................... 39

**Rules and Statutes**

Fed R. Bankr. P. 7012.................................................................................... 21

Fed. R. Civ. P. 12(b)(6) ................................................................................. 21

U.C.C. § 9-102(a)(12) .................................................................................... 35

**Other Authorities**

Bloomberg L.P., Grayscale Bitcoin Trust ETF (GBTC) Historical Stock Price,
Bloomberg Terminal (Aug. 28, 2025) ............................................... 6, 17, 19

Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd. ("GAP" and together with GGC, the "Defendants" or "Genesis")[2] respectfully submit this memorandum of law (the "Memorandum of Law") in support of their motion to dismiss (the "Motion") Digital Currency Group, Inc.'s ("DCG" or "Plaintiff") *Complaint* (ECF No. 1, Adv. Proc. No. 25-01129 (SHL), the "Complaint") against Genesis pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3] In support of this Memorandum, the Defendants submit the *Declaration of Aracely Valencia in Support of Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint Against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.* (the "Valencia Declaration"), filed contemporaneously herewith.

### PRELIMINARY STATEMENT[4]

1.      The relief sought by DCG in its latest Complaint is a brazen attempt both to wriggle out of approximately $1 billion in remaining liability to GGC and claw back more than $100 million in the process—much of which has already been distributed to GGC's creditors.  The relief sought is as slapdash as it is brazen:  Not only does DCG make no effort to justify the filing of its Claims against the estate more than two years after the applicable Bar Date; it also (i) contradicts relief that it has already sought in this same Court in a separate adversary proceeding, in which the present Claims should have been asserted (if at all) as compulsory counterclaims; (ii) is barred by DCG's written agreements, executed on four different occasions, when DCG acknowledged the amounts then due under the Promissory Note[5]; (iii) is inconsistent with DCG's assertions in

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the Complaint.  By using such defined terms for the Court's convenience, Genesis in no way adopts or endorses such defined terms.

[3]      All docket number citations are to Case No. 23-10063 (SHL) unless otherwise indicated.

[4]      Capitalized terms not defined in the Preliminary Statement shall have the meanings given to them elsewhere in this Memorandum of Law.

[5]      The Promissory Note is attached to the Complaint as Exhibit 1.

response to the Disclosure Statement, which the Court adopted; and (iv) grossly misconstrues the operative Promissory Note language upon which the Claims rest.

2. **_First_**, the Claims should be dismissed as untimely. DCG did not assert them, or any similar claims, in their timely-filed Proofs of Claim and makes no effort to even suggest they did. The generic reservation of rights included in those Proofs of Claim is legally insufficient to preserve the present Claims, as is the bare fact that DCG attached the Promissory Note (from which these Claims ostensibly arise) to the Proofs of Claim.

3. **_Second_**, the Claims should be dismissed because they were forfeited. Because DCG's latest claims arise out of the same transaction or occurrence as the 2024 Adversary Proceeding, they were compulsory counterclaims that had to be brought, if at all, in that action. In the DCG Counterclaim in the 2024 Adversary Proceeding, DCG argued – in stark contrast to the newfound theory in the Complaint – that pursuant to the TAC MLA A&A Agreement executed in connection with the Promissory Note, DCG became contractually entitled to the Foreclosed Assets despite the fact that those assets had been expressly carved out of the June-July 2022 Agreements (as defined herein). This theory, and the theory underlying the present Claims, is flatly inconsistent with the purpose of the Promissory Note, which was to persuade creditors that DCG had compensated GGC fully for the remainder of the TAC-related indebtedness (valued at $1.1 billion). Because DCG chose to bring that Counterclaim rather than its belated and inconsistent theory that the Promissory Note balance had already been reduced to zero,[6] it forfeited the right to later bring that claim in a separate action. The June-July 2022 Agreements are all interconnected: They constitute a single transaction, and indeed a single integrated contract, that served as the basis

---

[6] The arguments underlying DCG's current Claims contradict its prior assertion in the 2024 Adversary Proceeding that it should be entitled to receive the Foreclosed Assets themselves and any proceeds thereof, thus arguing now that it is entitled to receive the value of any appreciation twice over by also reducing the Promissory Note balance to zero.

2

both for the claims in the 2024 Adversary Proceeding and the Claims in the present proceeding. Indeed, they do not make sense and cannot be read independent of one another. Because both sets of claims relate to the same transactions and occurrences, the present Claims are compulsory counterclaims that were required to be brought in the 2024 Adversary Proceeding or not at all. DCG's perplexing addition of GAP as a nominal defendant in the present action – despite seeking no relief from GAP in the operative counts in the Complaint – does not alter this analysis.

4.        ***Third***, the Claims are based on an interpretation of the governing transaction documents that DCG has waived and is therefore barred from advancing to this Court. DCG has already repeatedly agreed that the balance of the Promissory Note was required to be, and had been, reduced by the distributions DCG received from TAC. Between June 2024 and February 2025, DCG, with eyes wide open, transferred approximately $106 million in recoveries from the TAC liquidating estate to GGC pursuant to its obligations under the Promissory Note pursuant to a series of <u>four</u> Promissory Note Letters memorializing (a) its payment of these amounts, (b) its obligation to make such payments, and (c) the agreed-upon reduced balance of the Promissory Note subsequent to each such payment. The doctrine of waiver, which requires the intentional relinquishment of a known right, applies to bar a claim where a party acknowledged a fact and later sought to take a position inconsistent with that acknowledged fact. DCG's repeated acknowledgement of the agreed outstanding principal amount of the Promissory Note, in a series of four legally binding signed contracts over eight months, precludes the assertion of the Claims.

5.        ***Fourth***, the Claims are barred by the doctrine of judicial estoppel. DCG made no mention of the theory underlying the Claims at any point in the Chapter 11 Cases, despite having convinced the Court to include an extensive discussion of its perspective on a host of issues, including the Promissory Note, in the Debtors' Amended Disclosure Statement. Given the Court's

3

adoption of this purported additional context in approving the Disclosure Statement and its finding that its inclusion provided creditors an adequate basis to vote on the Plan, DCG cannot now take a contrary position.

6. **Fifth**, the Claims should be dismissed because they hinge upon an interpretation of the language of the Promissory Note that is contrary to its plain language. DCG pleads facts concerning only one supposed event constituting a "TAC Recovery" (as defined in the Promissory Note) by GGC that is the basis for all four of its claims—namely, the transactions effectuated pursuant to the Gemini Settlement Agreement (as defined herein). But the Promissory Note defines a "TAC Recovery" as GGC's receipt of "cash, securities or other property."[7] DCG identifies no such cash, securities, or other property that GGC supposedly received in connection with the Gemini Settlement Agreement, because none was in fact received. The Claims also rely on a mistaken interpretation of the term "TAC Collateral" in the Promissory Note, which DCG stretches implausibly to include assets that not only were not "collateral" in any sense as of the date of the Promissory Note, but also were expressly carved out by the parties.

7. **Sixth**, DCG has not plausibly pled any mistake of fact in support of its claim for restitution of its supposedly "mistaken" transmittal of the TAC Recovery Payments.

8. **Seventh**, to the extent DCG seeks relief arising from what it characterizes as "GGC's Other TAC Recoveries," to which it devotes a mere two sentences containing conclusory allegations and zero facts, that relief should be denied on grounds of inadequate pleading.

9. **Eighth**, GAP should be dismissed from this action entirely, because despite naming it as a defendant, DCG has not lodged any claims against, or sought any relief from, GAP.

---

[7]     Promissory Note § 1.6.1.

4

## FACTUAL BACKGROUND

I.   **GAP-TAC Lending and Borrowing Relationship; June-July 2022 Agreements Between GAP, GGC, and DCG**

10.   Between January 2019 and the default of Three Arrows Capital, Ltd. ("TAC") in June 2022, GGC or GAP, on the one hand, and TAC, on the other, had a lending and borrowing relationship governed by a January 10, 2019, Master Loan Agreement between GGC and TAC (the "2019 GGC MLA") and a January 24, 2020, Master Loan Agreement between GAP and TAC.[8]

11.   On July 20, 2020, GGC and GAP executed an Assignment and Assumption of Master Loan Agreement (the "TAC MLA A&A Agreement"), pursuant to which GGC assigned to GAP all of its "right, title, benefit, privileges and interest in" and all of its "burdens, obligations and liabilities in connection with" the 2019 GGC MLA, including the TAC Loans and certain pledge agreements that governed the collateral arrangements in connection therewith, and GAP assumed and agreed to observe and perform "all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities . . . in connection with" the 2019 GGC MLA.[9]   Thereafter, GGC had no remaining lending relationship with TAC, and the Debtors' entire lending relationship with TAC was through GAP.[10]

12.   In June 2022, when TAC collapsed and commenced liquidation proceedings in the British Virgin Islands, the value of GAP's outstanding loans to TAC (the "TAC Loans") amounted to approximately $2.4 billion.[11]   In support of these borrowings, TAC had posted certain collateral

---

[8]      *See* GGC 2024 Complaint (as defined herein) ¶ 9.

[9]      GGC 2024 Complaint ¶ 10.

[10]     *See* Complaint ¶ 25.

[11]     Complaint ¶ 34.

in the form of BTC, ETH, shares of GBTC, and other digital assets (the "TAC Collateral").[12] After serving a notice of TAC's default on the outstanding loan balance, GAP foreclosed on certain of the TAC Collateral (the "Foreclosure")[13] that was then valued at approximately $1.2 billion (the "Foreclosed Assets"), after which point the Foreclosed Assets no longer constituted collateral of any kind, and therefore no longer constituted TAC Collateral.[14] Certain other TAC Collateral, which had not been subject to the Foreclosure, remained TAC Collateral. Among the Foreclosed Assets were 30,905,782 shares of Grayscale Bitcoin Trust (the "GBTC Shares")[15] which were valued at the time at approximately $460 million.[16] In connection with the Foreclosure, GAP applied the value of the Foreclosed Assets to reduce the outstanding balance on the TAC Loans.[17] In addition, because GGC had provided the working capital, in the form of an intercompany loan, to permit GAP to make the loans to TAC in the first place, GAP transferred the Foreclosed Assets to GGC and applied their value to its intercompany loan balance. The application of the value of the Foreclosed Assets left approximately a $1.1 billion remaining loan balance owed by TAC (the "TAC Loan Balance") on GAP's balance sheet, and approximately $1.1 billion in remaining intercompany payables from GAP to GGC (the "Intercompany Payables").[18] Over the course of approximately two weeks in late June and early July 2022, DCG, GGC, and GAP entered into

---

[12]   *See Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982, and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* ("Amended TAC Claim Objection"), Exhibit E (ECF No. 658).

[13]   DCG does not, and cannot, argue that the Foreclosure did not happen or that any aspect of it was ineffectual. Indeed, in the DCG Counterclaim (as defined herein), DCG pleads that in June 2022, "GAP foreclosed on approximately $1.2 billion of collateral pledged by [TAC] to secure its loans." DCG Counterclaim ¶ 13.

[14]   GGC 2024 MTD (as defined herein) ¶ 9.

[15]   Complaint ¶ 29.

[16]   The trading price for GBTC on June 13, 2022 was 14.98. *See* Bloomberg L.P., Grayscale Bitcoin Trust ETF (GBTC) Historical Stock Price, Bloomberg Terminal (Aug. 28, 2025).

[17]   *See* Promissory Note at 1.

[18]   *See* Promissory Note at 1.

three related agreements in respect of the Intercompany Payables and the TAC Loan Balance, collectively constituting a single integrated transaction and contract.

13.     *First*, on June 30, 2022, DCG nominally assumed GAP's remaining $1.1 billion obligation to GGC in respect of the Intercompany Payables by issuing the Promissory Note to GGC.  The $1.1 billion Promissory Note has a 10-year maturity and a fixed interest rate of 1%, payable in kind at DCG's option, and evidences a facial commitment by DCG to pay to GGC the amount of the Intercompany Payables, which was the same as the then-outstanding TAC Loan Balance *after* application of the then-present value of the TAC Collateral on which Genesis had foreclosed.  The Promissory Note obligates each of GAP and DCG "to promptly pay or transfer over … to [GGC] any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date [of the Promissory Note] (each, a "TAC Recovery"), for application to the [principal amount of the Promissory Note]" and that the principal amount of the Promissory Note would be "reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by [GGC] of any TAC Recovery, whether from GAP, [DCG], TAC or any other person or entity, by set-off or otherwise."[19]

14.     As of the date of the Promissory Note, GAP held a security interest in the TAC Collateral that had not been among the Foreclosed Assets (*i.e.* the TAC Collateral that remained after the Foreclosure).  At that time, DCG had no entitlements to the TAC Loans or the TAC Collateral:  Neither the Promissory Note nor the Intercompany Payables A&A Agreement (defined below) effectuated a transfer of GAP's rights under the TAC Loans to DCG.  The parties would require a third agreement, discussed in paragraph 17 below, to tie up this loose end, such that DCG would have the ability to pursue TAC Recoveries in the TAC liquidation proceedings.

---

[19]     Promissory Note §§ 1.6.1-1.6.2.

15.    *Second*, also on June 30, 2022, DCG and GAP entered into an Assignment and Assumption Agreement (the "Intercompany Payables A&A Agreement"),[20] pursuant to which GAP assigned to DCG "all of the rights and obligations in relation to the Assumed Liability," which Assumed Liability (the defined term for the Intercompany Payables upon their assumption by DCG) was the aggregate principal amount of $1.1 billion outstanding under the TAC Loans "after giving effect to all repayments and recoveries in respect of the TAC Loans" (*i.e.* after applying the value of the Foreclosed Assets to the balance under the TAC Loans).[21]

16.    *Third*, on July 14, 2022, DCG and GAP entered into an Assignment and Assumption of the TAC Master Loan Agreement (the "TAC MLA A&A Agreement"[22] and collectively with the Promissory Note and the Intercompany Payables A&A Agreement, the "June-July 2022 Agreements"), effectuating an assignment by GAP and an assumption by DCG of all of GAP's rights under (i) the documents governing the TAC Loans (including the right to file a claim in TAC's British Virgin Islands insolvency proceeding for the TAC Loan Balance) and (ii) the documents governing the then-existing TAC Collateral (which definitionally excluded the Foreclosed Assets, which ceased to be collateral following the Foreclosure). The TAC MLA A&A Agreement tied up the loose end left by the Promissory Note by giving DCG the ability to pursue what had previously been GAP's rights under the TAC Loans and the TAC Collateral, so that DCG bore *both* the $1.1 billion liability from the TAC Loan Balance *and* the rights to pursue claims against TAC and the remaining TAC Collateral in order to offset that liability.

---

[20]    The Intercompany Payables A&A Agreement is attached as Exhibit 1 to the *Declaration of Miranda Hatch in Support of Debtors' Memorandum of Law in Support of Plaintiff's Motion to Dismiss Counterclaim Against Genesis Global Capital, LLC*, Adv. Pro. No. 24-01312 (SHL) (ECF No. 14-2).

[21]    Intercompany Payables A&A Agreement at 1.

[22]    The TAC MLA A&A Agreement is attached as Exhibit 1 to the GGC 2024 Complaint.

8

II.     **TAC Proofs of Claim and Settlement Agreement**

17.     On May 22, 2023, TAC filed proofs of claim nos. 523, 526, and 527 in these Chapter 11 Cases, to which the Debtors objected.[23]   On August 18, 2023, TAC filed amended proofs of claim nos. 981, 982, and 990 (the "TAC Claims"), to which the Debtors also objected.[24]

18.     Following extensive negotiations, the Debtors, TAC, the joint liquidators of TAC, and DCG entered into a settlement agreement, dated as of November 22, 2023 (ECF No. 972, the "TAC Settlement Agreement"), resolving the TAC Claims and preserving the Debtors' right to seek payment from DCG pursuant to the TAC MLA A&A Agreement.[25]   On November 30, 2023, this Court approved the TAC Settlement Agreement authorizing an allowed claim in favor of TAC in the amount of $33 million (the "Allowed TAC Claim Amount").[26]   On February 7, 2024, GAP and GGC entered into an Assignment Agreement, by which GAP assigned to GGC all rights and obligations under the TAC MLA A&A Agreement.[27]

III.    **2024 Adversary Proceeding and DCG Counterclaim**

19.     On February 7, 2024, GGC filed the *Adversary Complaint* (ECF No. 1, Adv. Pro. No. 24-01312, the "GGC 2024 Complaint"), initiating the adversary proceeding captioned *Genesis Global Capital, LLC. v. Digital Currency Group, Inc.* (Adv. Pro. No. 24-01312, the "2024 Adversary Proceeding").   In the GGC 2024 Complaint, GGC sought a declaratory judgment that, pursuant to the TAC MLA A&A Agreement, the $33 million Allowed TAC Claim Amount must

---

[23]     *See Debtors' First Omnibus Objection (Substantive) to Claim Nos. 523, 526 and 527 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (ECF No. 530).

[24]     *See* Amended TAC Claim Objection.

[25]     *See* GGC 2024 MTD ¶ 16.

[26]     *Order Approving Settlement Agreement Between the Genesis Debtors and the Joint Liquidators of Three Arrows Capital, Ltd.* (ECF No. 1012).

[27]     *See* GGC 2024 MTD ¶ 19.

be paid by DCG.[28]  On March 11, 2024, DCG filed its answer and affirmative defenses to the GGC 2024 Complaint (ECF No. 5, Adv. Pro. No. 24-01312).

20.     On April 1, 2024, DCG filed the *Amended Answer, Affirmative Defenses, and Counterclaim of Digital Currency Group, Inc, to Genesis Global Capital, LLC's Adversary Complaint* (ECF No. 8, Adv. Pro. No. 24-01312, the "DCG April 2024 Answer") in which DCG asserted a counterclaim against GGC (the "DCG Counterclaim"), asserting – for the first time in the Chapter 11 Cases – that in the TAC MLA A&A Agreement, DCG obtained all right, title, and interests in the Foreclosed Assets and seeking "turnover to DCG [of] the $1.2 billion" of Foreclosed Assets on grounds that GGC's failure to transfer such assets to DCG constituted a breach of the TAC MLA A&A Agreement.[29]  In other words, once it became clear to DCG that the collateral held by GGC on account of the $2.4 billion in loans to TAC was appreciating in value, DCG sought to re-trade the already unfair deal it had imposed on GGC and GAP in June and July 2022 at the further expense of Genesis creditors.

21.     Neither the DCG April 2024 Answer nor the DCG Counterclaim included any mention of a potential claim that the balance of the Promissory Note should be reduced based on subsequent appreciation in the value of the Foreclosed Assets.  Indeed, the relief the DCG Counterclaim sought – turnover to DCG of the Foreclosed Assets and any proceeds thereof – is inherently inconsistent with any such theory, which would result in DCG receiving such value twice (in the form of the assets themselves and in the form of reduction in the principal amount of the Promissory Note to the extent of the assets' appreciation in value).

22.     On April 4, 2024, GGC filed its *Motion for Judgment on the Pleadings Under*

---

[28]     GGC 2024 Complaint ¶ 21.

[29]     *See* DCG April 2024 Answer ¶ 36.

10

*Federal Rule of Civil Procedure 12(c)* (ECF No. 9, Adv. Pro. No. 24-01312, the "GGC Rule 12(c) Motion"), requesting judgment on both counts of the GGC 2024 Complaint. On April 22, 2024, GGC filed the *Motion to Dismiss Counterclaim Against Genesis Global Capital, LLC* (ECF No. 14, Adv. Pro. No. 24-01312, the "GGC 2024 MTD"), arguing that (i) the DCG Counterclaim was untimely; (ii) the plain language of the TAC MLA A&A Agreement foreclosed the relief sought; and (iii) the DCG Counterclaim was barred by the doctrines of judicial estoppel, equitable estoppel, and estoppel by laches.[30] On April 24, 2024, GGC filed a motion to estimate the DCG Counterclaim at zero (ECF No. 1618, the "Estimation Motion").

23.    On April 29, 2024, DCG filed *Digital Currency Group, Inc.'s Opposition to Genesis Global Capital, LLC's Motion for Judgment on the Pleadings and Cross-Motion for Judgment on the Pleadings* (ECF No. 19, Adv. Pro. No. 24-01312, the "DCG Rule 12(c) Motion", and together with the GGC Rule 12(c) Motion, the "Rule 12(c) Motions"). On May 16, 2024, GGC filed *Plaintiff's (I) Opposition to Cross-Motion for Judgment on the Pleadings and (II) Reply in Support of Motion for Judgment on the Pleadings* (ECF No. 25, Adv. Pro. No. 24-01312).

24.    On May 16, 2024, DCG filed its opposition to the GGC 2024 MTD (ECF No. 26, Adv. Pro. No. 24-01312, the "DCG 2024 MTD Opposition") and an opposition to the Estimation Motion (ECF No. 1688). Therein, DCG reasserted its position that it was entitled to the Foreclosed Assets and requested that the Court deny the GGC 2024 MTD and the Estimation Motion, but in neither pleading did DCG so much as mention a potential claim arising from increases in the value of the Foreclosed Assets by GGC, despite the fact that by this time, GGC had entered into the Gemini Settlement Agreement, which expressly concerned the disposition of the GBTC Shares.[31]

---

[30]    GGC 2024 MTD ¶ 48.

[31]    *See* ¶¶ 26-29 *infra*.

25.     On May 23, 2024, GGC filed a reply brief in support of the GGC 2024 MTD and

the Estimation Motion (ECF No. 28, Adv. Pro. No. 24-01312).  DCG filed a reply brief in support

of its motion for judgment on the pleadings (ECF No. 29, Adv. Pro. No. 24-01312, the "DCG

Reply"), which again did not include any mention by DCG of a potential claim arising from an

increase in value, or GGC's disposition, of the Foreclosed Assets.  On June 28, 2024, the Court

held a hearing to consider the GGC 2024 MTD.  The GGC 2024 MTD and the Rule 12(c) Motions

remain *sub judice*.

## IV.    Gemini Settlement

26.     On August 15, 2022, approximately two months after the Foreclosure, GGC entered

into a security agreement (the "Gemini Security Agreement") with Gemini Trust Company, LLC

("Gemini"), pursuant to which GGC pledged the GBTC Shares to secure certain of GGC's

borrowings under a lender program administered by Gemini called the "Earn Program." [32]

Pursuant to the Gemini Security Agreement, the GBTC Shares were held by Gemini as agent.[33]

On November 16, 2022, Gemini delivered a notice to GGC asserting that it had foreclosed on the

GBTC Shares (the "Purported Foreclosure").[34]

27.     On October 27, 2023, Gemini commenced an adversary proceeding (the "Gemini

GBTC Action") in which it sought, *inter alia*, a declaratory judgment that the Purported

Foreclosure had been proper, such that the GBTC Shares were property of Gemini (the

---

[32]     *See* Complaint ¶ 29; *Motion for Entry of an Order Approving a Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (ECF No. 1499, the "Gemini Settlement Motion") ¶ 9; *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (ECF No. 1031, the "Disclosure Statement") § IV.C.

[33]     Gemini Settlement Motion ¶ 9.

[34]     Gemini Settlement Motion ¶ 14.

"Foreclosure Claim").[35]  After additional motion practice in the Gemini GBTC Action and the commencement of other litigation between GGC and Gemini, on February 28, 2024, the Debtors and Gemini announced that they had reached an agreement in principle to settle all disputes between them (the "Gemini Settlement").[36]  The Gemini Settlement was reached prior to judicial resolution of the Foreclosure Claim.  On March 19, 2024, the Debtors filed the Gemini Settlement Motion, seeking this Court's approval of a settlement agreement among the Debtors, certain of their creditor groups, and Gemini (ECF No. 1499, Exhibit B, the "Gemini Settlement Agreement").

28.    As relevant to the present action, the Gemini Settlement Agreement provided that as part of the settlement consideration to be provided by GGC, Gemini would retain the GBTC Shares for distribution to the Gemini Earn Program lenders.[37]  Nothing in the Gemini Settlement Agreement contemplated any payments, distributions or other amounts that would be received by GGC in respect of what had been the TAC Collateral.  Indeed, the Complaint acknowledges that what GGC received in respect of the Gemini Settlement Agreement was a "reduction of its obligation to the Gemini Lenders on a 'coin-for-coin basis' for each asset delivered to the Gemini Lenders," [38] and DCG pleads no other fact to suggest that any other form of settlement consideration was "received" by GGC.

29.    DCG did not object to the Gemini Settlement Motion, and the Bankruptcy Court approved the Gemini Settlement.[39]  On May 9, 2024, the effective date of the Gemini Settlement

---

[35]    See Adversary Complaint, Adv. Pro. No. 23-01192 (SHL) (ECF No. 1).

[36]    Feb. 28, 2024 Hr'g Tr. at 140:15-141:3.

[37]    See Gemini Settlement Agreement § 6.1.

[38]    Complaint ¶ 68.

[39]    See Order Approving Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders and the Official Committee Of Unsecured Creditors (ECF No. 1598).

occurred."[40]

**V.   TAC Recoveries, Transfer to GGC, and Agreed Promissory Note Reductions**

30.   On June 13, 2024, DCG and GGC executed a letter (the "First Promissory Note Payment Letter") in which DCG (i) represented and warranted that it had received an "interim distribution in the amount of $32,019,672.95 [the "First TAC Recovery Payment"] from the Joint Liquidators [for the TAC estate] on account of DCG's claim against TAC"; and (ii) "provide[d] GGC with notice that it intend[ed] to transfer the First TAC Recovery Payment to GGC" "[p]ursuant to Section 1.6 of the Promissory Note."[41]   DCG also agreed in an amended "Schedule of Repayments" that the Promissory Note Balance would be reduced in the amount of the First TAC Recovery Payment, and that the remaining balance would remain outstanding.   To that end, the First Promissory Note Payment Letter attached the Promissory Note, including an updated Schedule of Repayments, a blank form of which had been included in the original Promissory Note.[42]   The updated schedule memorialized the "Principal Amount of Note Before Repayment," the "Repayments of Principal," and the agreed "Unpaid Principal Amount After Payment," all as of the June 13, 2024 date on which DCG transferred the First TAC Recovery Payment.

31.   In the following months, TAC made three more distributions to DCG as follows:

   a. A second interim distribution in the amount of $29,780,550.15 (the "Second TAC Recovery Payment"), as represented and warranted by DCG in a letter dated July 17, 2024 (the "Second Promissory Note Payment Letter");[43]

---

[40]   *See Notice of Settlement Effective Date and Completion of the Genesis Distribution Pursuant to the Settlement Agreement Among the Debtors, Gemini Trust Company, LLC, the Ad Hoc Group of Genesis Lenders, and the Official Committee of Unsecured Creditors* (ECF No. 1676).

[41]   The First Promissory Note Letter is attached to the Valencia Declaration as **Exhibit 1**.

[42]   *See* First Promissory Note Letter at Exhibit A.

[43]   The Second Promissory Note Letter is attached to the Valencia Declaration as **Exhibit 2**.

14

b.  A third interim distribution in the amount of $24,126,776.92 (the "Third TAC Recovery Payment"), as represented and warranted by DCG in a letter dated October 22, 2024 (the "Third Promissory Note Payment Letter");[44] and

c.  A fourth interim distribution in the amount of $20,011,161.05 (the "Fourth TAC Recovery Payment" and collectively with the First TAC Recovery Payment, the Second TAC Recovery Payment, and the Third TAC Recovery Payment, the "TAC Recovery Payments"), as represented and warranted by DCG in a letter dated February 6, 2025 (the "Fourth Promissory Note Payment Letter" and collectively with the First Promissory Note Letter, the Second Promissory Note Letter, and the Third Promissory Note Letter, the "Promissory Note Letters").[45]

32.  The updated Schedule of Repayments included in the version of the Promissory Note that was attached to the Fourth Promissory Note Payment Letter, which was the latest Promissory Note Letter executed by the parties, provides the following:

SCHEDULE OF REPAYMENTS

TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
| June 13, 2024 | $1,119,395,018.34[1] | $32,019,672.95 | $1,087,375,345.39 |
| July 17, 2024 | $1,090,144,542.98[2] | $29,780,550.15 | $1,060,363,992.83 |
| October 23, 2024 | $1,063,101,978.22[3] | $24,126,776.92 | $1,038,975,201.30 |
| February 7, 2025 | $1,041,601,335.40[4] | $20,011,161.05 | $1,021,590,174.35 |

33.  The Promissory Note Letters all included identical acknowledgements and agreements by GGC and DCG that, upon GGC's receipt of the payment being documented in the relevant letter, "the Principal Amount of the Promissory Note shall be reduced immediately and automatically (on a dollar-for-dollar basis) in the amount of the [relevant payment] pursuant to Section 1.6.2 of the Promissory Note," which section provides that "the Principal Amount [of the Promissory Note] shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by [GGC] of any TAC Recovery." The payments made by DCG under the

---

[44]   The Third Promissory Note Letter is attached to the Valencia Declaration as **Exhibit 3**.

[45]   The Fourth Promissory Note Letter is attached to the Valencia Declaration as **Exhibit 4**.

15

Promissory Note and documented in the Promissory Note Letters and the amended Schedule of Repayments (the "TAC Recovery Payments") total approximately $106 million.

## VI.   DCG's Failure to Timely Assert or Disclose the Claims

34.   On April 4, 2023, the Court entered an order establishing, as relevant here, May 22, 2023 as the final deadline for filing proofs of claim based on prepetition claims (the "Bar Date").[46]

35.   On May 22, 2023, DCG filed proofs of claim nos. 464, 487 and 511 against Holdco, GGC and GAP (the "Proofs of Claim").  In the Proofs of Claim, DCG says that "[a]fter [TAC] defaulted on its loans to GAP …, DCG stepped in to help the Debtors" by issuing the Promissory Note.[47]  Further, DCG says,

> "As recovery on GAP's loans to [TAC] was highly uncertain, DCG effectively assumed the Debtors' risk of loss on their remaining loans to [TAC] with no obligation to do so.  Under the 2032 Promissory Note, DCG promised to pay GGC $1.1 billion, with a 10-year maturity and a 1% per annum interest rate."[48]

DCG also purports to reserve the right to assert certain claims against the Debtors in the event the TAC estate were to recover the Foreclosed Assets or any proceeds thereof *from DCG*, including "through common law rights of contribution, reimbursement, and/or subrogation … [and] claims against the Debtors under law and equity, including without limitation, fraud, misrepresentation, negligence and breach of contract."[49]  But at no point in this reservation of rights does DCG mention anything approximating its current claim, an action to reduce the principal amount of the Promissory Note by an increase in the value of the Foreclosed Assets.

36.   On October 25, 2023, the Debtors filed the *Amended Disclosure Statement with*

---

[46]   *See Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* (ECF No. 200).

[47]   Proofs of Claim ¶ 9.

[48]   Proofs of Claim ¶ 10.

[49]   Proofs of Claim ¶ 11.

16

*Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al.* (ECF No. 839, the "October Disclosure Statement"). The October Disclosure Statement includes more than 30 mentions of the Promissory Note, which it describes as having a face value of $1.1 billion, including listing "proceeds from … the [Promissory] Note" as one of the sources of consideration that will be used to make distributions under the Amended Plan.[50] The October Disclosure Statement also includes financial projections with accompanying notes that describe the methods used by the Debtors' financial advisors to determine the present value of the Promissory Note.[51]

37. The October Disclosure Statement, at DCG's request, includes an exhibit drafted by DCG (the "DCG Response Exhibit") stating DCG's positions on all of the Debtors' assertions in the October Disclosure Statement, including a section titled "DCG Response to Claims in Connection with the [Promissory] Note,"[52] which includes no mention of any potential claim by DCG that the value of the Promissory Note might be reduced as a result of an increase in the value of the Foreclosed Assets. The DCG Response Exhibit also includes a section addressing the TAC MLA A&A Agreement, in which DCG disclaims all possible liability in connection with the Foreclosed Assets, and states that DCG "did not receive" "the proceeds of [the] foreclosure" and "did not otherwise benefit from [the] foreclosure … in any shape or form."[53] As of the date of the filing of the October Disclosure Statement and the DCG Response Exhibit, the value of the GBTC Shares alone had risen to approximately $830 million, an increase of approximately $370 million since the date of the Foreclosure,[54] but nowhere in the DCG Response Exhibit did DCG mention

---

[50]    October Disclosure Statement at 13, 101.

[51]    October Disclosure Statement, Exhibit D.

[52]    October Disclosure Statement, Exhibit E.

[53]    *Id.*

[54]    The trading price for GBTC on October 25, 2023 was 26.79. *See* Bloomberg L.P., Grayscale Bitcoin Trust ETF (GBTC) Historical Stock Price, Bloomberg Terminal (Aug. 28, 2025).

a potential claim for a reduction in the principal amount of the Promissory Note resulting from an increase in the value of the Foreclosed Assets.

38.     On October 31, 2023, DCG filed *Digital Currency Group, Inc.'s Limited Objection and Reservation of Rights to the Debtors' Amended Disclosure Statement* (ECF No. 867, the "DS Objection"), raising further objections to the October Disclosure Statement, specifically noting the rise in digital asset prices,[55] and demanding specific inline additions to the October Disclosure Statement (the "Inline Additions") in addition to the DCG Response Exhibit, but again making no mention of a potential claim that the value of the Promissory Note might be reduced if the value of the Foreclosed Assets increased (which had, in fact, occurred).

39.     On November 7 and 17, the Court held a hearing to consider the approval of the October Disclosure Statement and addressed the DS Objection.  DCG rose to object on the grounds that the October Disclosure Statement should not be approved without the addition of the Inline Additions.  The Court required the Debtors to add hyperlinks throughout the document to the DCG Response Exhibit.[56]  Although it had the opportunity both before and at this hearing, DCG never raised the arguments or Claims it now belatedly asserts.

40.     On November 17, 2023, the Debtors filed the *Amended Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al.* (ECF No. 950, the "Amended Disclosure Statement") which included a revised version of the DCG Response Exhibit (the "Revised DCG Response Exhibit") and, in accordance with the Court's direction, links throughout the Amended Disclosure Statement to the DCG Disclosure Statement Response.

41.     The Amended Disclosure Statement continues to include more than 30 mentions of

---

[55]     DS Objection ¶¶ 3-4.

[56]     *See* Nov. 7, 2023 Hr'g Tr. 74:10-11.

the Promissory Note, lists "proceeds from … the DCG Note" as one of the sources of consideration for distributions under the Amended Plan,[57] and includes financial projections with accompanying notes describing the Debtors' valuation of the Promissory Note.[58] By the date the Amended Disclosure Statement was filed, the value of the GBTC Shares alone had risen even further, to approximately $900 million,[59] but the Revised DCG Response Exhibit again includes no mention of a potential claim for reduction of the principal amount of the Promissory Note resulting from an increase in the value of the Foreclosed Assets.

42. On November 28, 2023, the Debtors filed the *Amended Chapter 11 Plan* (ECF No. 989, as further revised, amended, restated, supplemented, altered or modified from time to time, the "Plan"). On December 6, 2023, the Court entered an order approving the Amended Disclosure Statement,[60] and on December 6, 2023, the Debtors filed a final solicitation version of the Disclosure Statement which included the DCG Disclosure Statement Response at Exhibit F. On the basis, *inter alia*, of the submission by DCG, the Court approved the Disclosure Statement for solicitation on December 6, 2023, finding it provided "adequate information" as required by Section 1125 of the Bankruptcy Code.[61]

43. On February 6, 2024, DCG filed its *Objection to Confirmation of the Debtors' Amended Plan* (ECF No. 1257, the "DCG Confirmation Objection"), in which it raised extensive objections to the Plan, including the value of the estate's assets, with an emphasis on the impact

---

[57] Amended Disclosure Statement at 16.

[58] Amended Disclosure Statement, Exhibit D.

[59] The trading price for GBTC on November 17, 2023 was 28.99. *See* Bloomberg L.P., Grayscale Bitcoin Trust ETF (GBTC) Historical Stock Price, Bloomberg Terminal (Aug. 28, 2025).

[60] *Order Authorizing Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (ECF No. 1027, the "Disclosure Statement Order").

[61] Disclosure Statement Order at 2.

19

of rising market prices for digital assets on the aggregate value of the estate's assets, which included the GBTC Shares. In support of its objection, DCG's financial advisor also filed a fact declaration stating that the face amount of the Promissory Note was $1.1 billion.[62] Neither the DCG Confirmation Objection, the Verost Declaration, nor DCG's oral arguments included any mention by DCG of a potential claim that the balance of the Promissory Note could be reduced if GGC were to dispose of the Foreclosed Assets at a gain.

44.     The Court held an evidentiary hearing on February 26, 27, and 28, 2024 to consider the confirmation of the Plan, with closing arguments held on March 18, 2024. On May 17, 2024, the Court issued its *Memorandum of Decision* (ECF No. 1691) approving the Plan, and on May 31, 2024, entered the *Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Amended Joint Chapter 11 Plan and (II) Granting Related Relief* (ECF No. 1736).

## VII.     The Present Adversary Proceeding

45.     On August 5, 2025, DCG received a payment from TAC in connection with its claim in the TAC liquidation proceedings (the "August 2025 TAC Payment").[63] DCG did not remit the August 2025 TAC Payment to GGC, as it had done with prior TAC Recovery Payments.[64]

46.     Instead, on August 14, 2025, DCG commenced the present adversary proceeding by filing the Complaint, (i) seeking a declaratory judgment that the balance of the Promissory Note has been reduced to zero (the "Note Reduction Claim") and (ii) requesting, on the basis of three

---

[62]     *Declaration of Adam W. Verost in Support of Digital Currency Group, Inc.'s and DCG International Investment Ltd.'s Objection to Confirmation of the Amended Joint Plan of Genesis Global Holdco, LLC, et al.*, (ECF No. 1139, the "Verost Declaration"), ¶ 13.

[63]     Complaint ¶ 71.

[64]     *Id.* In the event the Court grants this Motion and dismisses DCG's Complaint, if DCG does not promptly remit to GGC, pursuant to its obligations under the Promissory Note, the August 2025 TAC Payment, any additional payments that may have been received by DCG in the interim ("Interim TAC Payments"), and any future payments from TAC ("Future TAC Payments"), GGC will file an action asserting, as applicable, claims for payment of the Interim TAC Payments, Future TAC Payments, and associated damages.

different non-contractual legal theories, return of the TAC Recovery Payments (the "Repayment Claims" and together with the Note Reduction Claim, the "Claims").

**LEGAL STANDARD**

47.     Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in adversary proceedings by Bankruptcy Rule 7012, a bankruptcy court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6); Fed R. Bankr. P. 7012.  "To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A motion to dismiss should be granted where "the claims alleged therein are time-barred," *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012), or "are compulsory counterclaims which should have been asserted in the original action."  *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979).  A claim must also be dismissed under the doctrine of waiver where a party has "intentional[ly] relinquish[ed] or abandon[ed] … a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993), which waiver "may be inferred from the conduct of parties."  *U.S. D.I.D. Corp. v. Windstream Commc'n, Inc.*, 775 F.3d 128, 136 (2d Cir. 2014).  A motion to dismiss should also be granted where the party "took an inconsistent position in a prior proceeding and that position was adopted by the first tribunal in some manner."  *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000).  Finally, a motion to dismiss should further be granted where the "'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach."  *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639 (S.D.N.Y. 2020).

**ARGUMENT**

21

## I.   DCG'S CLAIMS ARE UNTIMELY

48.   The Claims are untimely because neither they, nor any similar claims, were included in any of DCG's Proofs of Claim or otherwise asserted prior to the Bar Date.  DCG may not compensate for its failure to timely assert the Claims through an adversary proceeding commenced after the Bar Date.[65]

49.   DCG makes no effort to connect the Claims to any statement in the Proofs of Claim, which is no surprise because there is no language in the Proofs of Claim on which to base any such argument.[66]  The Proofs of Claim contain a short discussion of the Promissory Note, but only in the context of a reservation of rights to assert certain claims against the Debtors in the event of a recovery *by TAC from DCG* of the Foreclosed Assets or any proceeds thereof—whereas here, DCG seeks to recover the increased value of the Foreclosed Assets from Genesis and to claw back the approximately $106 million in TAC Recovery Payments.[67]

50.   The Proofs of Claim also (i) contain a reservation of rights to "assert any additional claims" and (ii) attach the Promissory Note, the Intercompany Payables A&A Agreement and the

---

[65]   *See Agra v. Dolci (In re Major Model Mgmt. Inc.)*, No. 22-10169 (MG), 2023 WL 5338580, at *6 (Bankr. S.D.N.Y. Aug. 18, 2023) (barring a claim raised in litigation made over one year after the applicable bar date when the party "took no action" to file a proof of claim related to that claim); *In re FRG, Inc.*, 121 B.R. 710, 714 (Bankr. E.D. Pa. 1990) ("Clearly, a creditor cannot circumvent the temporal proscription of a bar date by the facile device of filing an adversary proceeding against a debtor after the bar date has run.").

[66]   Similarly, to the extent DCG later seeks to argue that the Claims were not asserted prior to the Bar Date because they did not exist as of the Bar Date, the Claims were at the very least contingent claims that should have been asserted as such in the Proofs of Claim.  Given the unambiguous language in the Promissory Note requiring DCG to transfer to GGC all TAC Recoveries upon their receipt by DCG – language that DCG correctly understood when it made four separate repayments pursuant thereto – the Claims would have been contingent upon (i) DCG's repayment of the TAC Recoveries on the basis of their prior reading and (ii) the appreciation in value of the Foreclosed Assets. The possibility that the Foreclosed Assets might appreciate in value was eminently knowable by DCG as of the Bar Date, such that the Claims should have been asserted (if at all) as contingent claims in DCG's Proofs of Claim.  *See In re SVB Financial Group*, 660 B.R. 60, 95 (Bankr. S.D.N.Y. 2024) (rejecting requests to file late-filed proofs of claims where reasonable diligence would have made creditors aware that certain claims could be asserted against them); *In re Motors Liquidation Co.*, 598 B.R. 744, 757 (Bankr. S.D.N.Y. 2019) (finding that a creditor had a contingent claim where it "knew that future liability was at least probable if not entirely predictable" and therefore, it was incumbent on the creditor to file a proof of claim by the bar date).

[67]   Proofs of Claim ¶ 11.

22

TAC MLA A&A Agreement.  Neither of these is sufficient.  Generically purporting to reserve the right to later assert claims is not the same thing as asserting those claims—otherwise bar dates would lose their significance. *See Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 120 (2d Cir. 2005) (affirming bankruptcy court's denial of motion to allow late-filed claim in spite of a reservation of rights to "reserve [] the right to amend, supplement, or otherwise modify" the original proof of claim) (quotations and citation omitted).  And merely attaching a contract to a proof of claim does not serve to preserve all conceivable claims under that contract. *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, at *10 (Bankr. S.D.N.Y. May 19, 2023) (holding that contractual claim was not preserved merely by attaching underlying contract to proof of claim); *see generally In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) (holding that attaching a notes indenture to proof of claim was insufficient to provide reasonable notice of claim arising from such indenture).

51.     DCG's failure to even attempt to connect its exceptionally late Claims to its Proofs of Claim speaks volumes:  The present Claims simply were not timely preserved and the Court should deny the Claims as untimely filed.[68]

## II.     THE CLAIMS WERE NOT ASSERTED AS COMPULSORY COUNTERCLAIMS IN THE 2024 ADVERSARY PROCEEDING AND THEREFORE HAVE BEEN FORFEITED

52.     The Claims raised by DCG for the first time in the present proceeding should be dismissed because they arise from the same transaction that is the subject of the 2024 Adversary Proceeding – *i.e.* the transaction that was documented in the form of the June-July 2022 Agreements, which also constitutes a single integrated contract – and therefore would have been

---

[68]     Moreover, DCG has tellingly not sought to avail itself of the only basis that would now permit it to pursue the Claims:  a finding of excusable neglect.  This much is unsurprising:  Given the passage of more than two years since the Bar Date, and the rest of the factual record, there is no conceivable basis for a claim of excusable neglect.

required to be asserted in that proceeding as compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure ("Rule 13(a)"), made applicable in adversary proceedings by Bankruptcy Rule 7013. Because DCG did not raise the Claims in that action, the Claims have been forfeited.

### A. The June-July 2022 Agreements are a Single Transaction, and a Single Integrated Contract, for Purposes of Rule 13(a)

53.     The June-July 2022 Agreements constitute a single transaction by which the parties, by way of three separate documents, memorialized their contractual response to the TAC collapse. This transaction included DCG's assumption of the Intercompany Payables, DCG's agreement in the Promissory Note to pay the face amount of the Intercompany Payables to GGC (after ten years), and DCG's assumption of the benefits and burdens of the TAC Loans.

54.     The first two instruments that document this transaction, the Promissory Note and the Intercompany Payables A&A Agreement, were both executed on the same day, June 30, 2022. Indeed, the Intercompany Payables A&A Agreement states that "contemporaneously with the entry into this Agreement, [DCG] is issuing a promissory note to GGC … ."[69] The TAC MLA A&A Agreement, which was executed two weeks later on July 14, 2022, was a necessary final step to give effect to certain core provisions of the Promissory Note.[70]

55.     The TAC MLA A&A Agreement constitutes a part of the same transaction as the Promissory Note and the Intercompany Payables A&A Agreement because the Promissory Note includes provisions that are logically connected with—and in fact do not make sense in the absence of—the assignment that took place pursuant to the TAC MLA A&A Agreement. Namely, the

---

[69]     Intercompany Payables A&A Agreement at 1.

[70]     DCG has itself previously acknowledged the interconnected nature of the June-July 2022 Agreements: In its Proofs of Claim, it describes the Promissory Note, and then in the following sentence, says that "[i]n connection therewith" (i.e. in connection with the Promissory Note), the parties proceeded to execute the TAC MLA A&A Agreement. Proofs of Claim ¶ 9.

24

Promissory Note imposes obligations on DCG that DCG would not be able to fulfill in the absence of the assignment that the TAC MLA A&A Agreement effectuated. Conversely, the TAC MLA A&A Agreement is logically connected with the Promissory Note because it exists only to enable DCG to fulfill its obligations under the Promissory Note, and makes little sense in the absence of the Promissory Note.

56.     The terms of the Promissory Note make this logical relationship clear. The Promissory Note provides that "[e]ach of [DCG] and GAP hereby agrees to promptly pay or transfer over … to [GGC] any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof …".[71] This provision obliges DCG to pay to GGC any amounts that DCG receives in respect of the TAC Loans or the TAC Collateral. Further, the Promissory Note provides that its principal amount "shall be reduced … upon the receipt by [GGC] of any TAC Recovery, whether from GAP, [DCG], TAC or any other person or entity …"[72] which addresses the parties' obligations in the event of receipt by DCG of a TAC Recovery. There is no provision in the Promissory Note (or the Intercompany Payables A&A Agreement) that transfers to DCG any of GAP's or GGC's rights pursuant to the TAC Loans or the TAC Collateral, or that grants DCG any rights that would entitle it to a TAC Recovery. Only upon the execution of the TAC MLA A&A Agreement, under which GAP assigned to DCG "all of its lending activities with [TAC], including any outstanding loans … [and] all of its rights and obligations under the Pledge Agreements and related Collateral under the Agreements and the Pledge Agreements,"[73] did DCG gain rights to the TAC Loans and the remaining TAC Collateral, and therefore the right to pursue TAC Recoveries in order to ultimately

---

[71]     Promissory Note § 1.6.1.

[72]     Promissory Note § 1.6.2.

[73]     TAC MLA A&A Agreement at 1.

reduce its indebtedness under the Promissory Note. As such, the June-July 2022 Agreements (comprised of the Promissory Note, the Intercompany Payables A&A Agreement, and the TAC MLA A&A Agreement) constitute a single transaction between the parties.

57.     Not only do the June-July 2022 Agreements constitute a single transaction; for the foregoing reasons, they also constitute a single integrated contract. "[A]n integrated contract is one which represents the entire understanding of the parties to the transaction."[74] "[A]ll writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even when they [are] executed on different dates."[75] Furthermore, separate contracts may be read as a single integrated agreement despite the inclusion of an "entire agreement" clause in one of the writings.[76] In order to find that the Claims arise from the same "transaction" as the DCG Counterclaim in the 2024 Adversary Proceeding for purposes of Rule 13(a), however, the Court need not find that the June-July 2022 Agreements constitute a single integrated agreement, in light of the logical relationship between the Claims and the DCG Counterclaim.

**B.  The Claims Were Not Brought as Compulsory Counterclaims in the 2024 Adversary Proceeding, and Have Thus Been Forfeited**

58.     Under Rule 13(a), a compulsory counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and does not require adding another party over whom the court cannot acquire jurisdiction." Compulsory counterclaims must

---

[74]     *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) (internal quotations omitted); *see also* Restatement (Second) of Contracts § 209(1) (defining an integrated agreement as one "constituting a final expression of one or more terms of an agreement").

[75]     *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005); *see also Novick v. AXA Network, LLC*, 642 F.3d 304, 313 (2d Cir. 2011) (noting that the fact that the "loan had been promised to [the plaintiff] to induce him to enter into the [prior agreement]" may indicate the loan was integral to the prior agreement, despite the interval of time between execution).

[76]     *See, e.g., In re HBL SNF, LLC*, No. 21-22623 (SHL), 2022 WL 1612221 (Bankr. S.D.N.Y. May 20, 2022) (reading as one integrated agreement multiple writings which were intended to effectuate a common purpose, notwithstanding the inclusion of a merger clause in one of the agreements).

be raised in a responsive pleading, or else they are forfeited.  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004).

59.     The 2024 Adversary Proceeding and the DCG Counterclaim asserted therein were focused entirely on GGC's and DCG's differing interpretations of parties' entitlements to the TAC Collateral under the June-July 2022 Agreements.  Specifically, GGC asserted in its complaint that, under the TAC MLA A&A Agreement, DCG had assumed GAP's obligations under the TAC Loans, and therefore must pay the $33 million Allowed TAC Claim Amount that arose from the settlement agreement between the Debtors, TAC, and DCG concerning the TAC Loans.  DCG filed the DCG Counterclaim, asserting (for the very first time) that, pursuant to the same TAC MLA A&A Agreement, DCG had obtained all right, title, and interest in the Foreclosed Asserts (including the GBTC Shares).[77]

60.     Like its prior Counterclaim, DCG's Claims in this action concern the entitlement to the TAC Collateral under the Promissory Note, which (as established *supra*) is part of a single transaction—indeed, a single integrated contract—of which the Intercompany Payables A&A Agreement and the TAC MLA A&A Agreement are the other components.  The Counterclaim, like DCG's Claims in this action, turns on the definition of "TAC Collateral" under the June-July 2022 Agreements.  The Claims in this action thus relate to the same "transaction," under Rule 13(a), that is the subject matter of the claims and counterclaims asserted in the 2024 Adversary Proceeding.[78]

---

[77]     The Counterclaim cannot be reconciled with the fact that but for the Foreclosure and the application of the value of the Foreclosed Assets to TAC's indebtedness to GAP, the balance of the TAC Loans and therefore the balance of the Intercompany Payables would have remained approximately $2.4 billion as of the date of the Promissory Note, rather than the $1.1 billion outstanding balance that the parties expressly acknowledged and agreed in the Promissory Note and the Intercompany Payables A&A Agreement.

[78]     Even if the Court does not find that the June-July 2022 Agreement constitute a single integrated contract, it should find that they constitute a single *transaction* for purposes of Rule 13(a).

61.     To determine if a counterclaim is compulsory, courts in the Second Circuit focus on the logical relationship between the counterclaim and the main claim. *Aquavella*, 615 F.2d at 22. If the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit," the counterclaim is compulsory. *Id.*

62.     There can be no question that the facts of the present Claims are inextricably connected to the claims and counterclaim asserted in the 2024 Adversary Proceeding, for the simple reason that the present Claims and requested relief are logically inconsistent, and irreconcilable, with relief sought regarding certain of the TAC Collateral in the DCG Counterclaim in the 2024 Adversary Proceeding.  In the 2024 Counterclaim, DCG asserted that it was contractually entitled to the Foreclosed Assets, including the GBTC Shares, and had been so entitled since the execution of the TAC MLA A&A Agreement.  Here, DCG asserts to the contrary that any appreciation in the value of the Foreclosed Assets, which were property of GGC, should accrue to DCG's benefit to reduce its obligations under the Promissory Note.  DCG cannot have it both ways:  It cannot simultaneously be the case *both* that the Foreclosed Assets belong to DCG (in which case DCG would be entitled to the return of those assets or their proceeds), *and* that the Promissory Note provides that GGC may dispose of the Foreclosed Assets and apply their value to DCG's obligations thereunder.  Because the relief sought in the two actions is logically irreconcilable, considerations of fairness (not to mention judicial economy) dictate that the issues would have to be resolved in a single proceeding.  When DCG chose not to bring the Claims in the 2024 Adversary Proceeding, it forfeited the right to belatedly do so here.

63.     Finally, DCG's Claims in this action do not involve any additional party.  While DCG has named GAP as a defendant in the present action, where GAP is not a party to the 2024

28

Adversary Proceeding, GAP's nominal inclusion serves no purpose in the present action. Without a doubt, GAP is a party to each of the June-July 2022 Agreements, but DCG seeks no relief from GAP in the present action: Each of Counts I-IV in its complaint are expressly lodged only "Against GGC."[79] GAP is not the Holder of the Promissory Note and has no entitlement to any of the TAC Distributions.[80] As such, naming GAP as a defendant in the present action does not exempt the Claims from being compulsory counterclaims under Rule 13(a).

## III.   THE CLAIMS ARE BARRED BY THE DOCTRINE OF WAIVER

64.    DCG waived the right to assert the Claims when it repeatedly executed the Promissory Note Letters and, pursuant to those letters (and, as DCG admitted, pursuant to the requirements of the Promissory Note itself), delivered to GGC approximately $106 million in TAC Recovery Payments and agreed on the remaining balance of the Promissory Note.

65.    Waiver is the "intentional relinquishment or abandonment of a known right." *Olano*, 507 U.S. at 733. DCG has not argued, nor can it argue, that it knew any fact as of the filing of the Complaint that it did not know when it made each of the four TAC Recovery Payments. The only supposed "TAC Recovery" by GGC that is supported by any pleaded facts whatsoever is the supposed "TAC Recovery" that GGC received in connection with the Gemini Settlement. That settlement, the terms of which were public as early as March 2024, was approved by this Court in April 2024 and became effective in May 2024, all before DCG executed the First Promissory Note Letter and made the first TAC Recovery Payment in June 2024.

---

[79]     Complaint at 25-29.

[80]     *See* Promissory Note at 1 (listing GAP as party to the Promissory Note "solely for purposes of the agreement set forth in Section 1.6 of [the Promissory] Note," where Section 1.6 describes GAP's obligations in respect of potential TAC Recoveries). The only reason that GAP was not a party to the prior action, despite its involvement in the underlying events, is because, on February 7, 2024, GAP assigned to GGC all of its rights and obligations under the TAC MLA A&A Agreement, such that GGC was the proper (and only) plaintiff in the 2024 Adversary Proceeding.

66.     Waiver need not be express, but "may be inferred from the conduct of parties."[81] Waiver is inferred "where the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them." *Id.* DCG waived the right to assert its present argument that the Promissory Note balance had been reduced to zero when it agreed <u>four times</u> that TAC Recoveries it received from the TAC liquidation were required to be paid pursuant to the terms of the Promissory Note, and that after application of those payments, more than $1 billion in principal remained due and payable on the Promissory Note.

67.     There is no way to interpret DCG's decision to agree that distributions from TAC were required to be paid pursuant to the Promissory Note and to acknowledge the outstanding principal amount under the Promissory Note except as a waiver of its right to later argue that the outstanding principal amount was actually zero, as a result of events that had already taken place as of the execution of the relevant documents.  The Claims are barred by the doctrine of waiver.

## IV.   **THE CLAIMS ARE BARRED BY THE DOCTRINE OF JUDICIAL ESTOPPEL**

68.     DCG is judicially estopped from asserting the Claims because it took the position countless times during the Debtors' Chapter 11 Cases that the principal amount owed under the Promissory Note was $1.1 billion, with nary a mention of the idea that the principal amount might suddenly be reduced to zero upon GGC's disposition of the Foreclosed Assets.  Indeed, DCG's own financial advisor, in the context of its opposition to the Plan, stated plainly that "[t]he Debtors have an approximately $1.1 billion note due June 30, 2032 from DCG," without noting any basis on which that $1.1 billion obligation had been or could be reduced other than through payments to GGC;[82] and this Court approved the Plan, which itself included numerous references to the "DCG

---

[81]     *U.S. D.I.D. Corp. v. Windstream Commun., Inc.*, 775 F.3d 128, 136 (2d Cir. 2014).

[82]     Verost Declaration ¶ 13.

Note," defined as an "unsecured $1.1 billion promissory note …".[83]  Most critically, in the context of DCG's response to the Debtors' Disclosure Statement, the Court adopted DCG's positions, finding that inclusion of DCG's positions provided adequate information for creditors to vote.

69.     Judicial estoppel is appropriate where (1) the party seeking to make a claim has previously taken an inconsistent position regarding the claim, and (2) the Court has adopted that position in some manner.[84]  As an equitable doctrine, judicial estoppel "prevents a party from prevailing on one phase of a case on an argument and then adopting a contradictory argument in another phase."[85]  Courts in the Second Circuit have dismissed late asserted and previously undisclosed claims in bankruptcy proceedings on the basis of judicial estoppel.[86]

70.     The Claims, of which DCG had never breathed a word until the filing of the Complaint and which are contrary to every statement DCG made in the Chapter 11 Cases about the Promissory Note, easily meets the standard for judicial estoppel.  Most importantly, the Claims are inconsistent with the lengthy responses DCG filed to multiple iterations of the Debtors' Disclosure Statement (finally taking the form of the Revised DCG Response Exhibit),[87] which DCG asserted was crucial information for creditors to know in order to have adequate information to vote on the Plan, and which the Court adopted by directing the Debtors to include the Revised DCG Response Exhibit in the Amended Disclosure Statement that ultimately was distributed to the Debtors' creditors with the Plan solicitation materials.

---

[83]     Plan at Art. I.A.57.

[84]     *In re Rhythms NetConnections Inc.*, 300 B.R. 404, 410-11 (Bankr. S.D.N.Y. 2003).  *See also Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000) ("In this Circuit, '[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceedings and (2) that position was adopted by the first tribunal in some manner.'").

[85]     *In re Rhythms NetConnections*, 300 B.R. at 410-11.

[86]     *Id.*

[87]     *See supra* ¶¶ 37-40.

71.     According to DCG, the Revised DCG Response Exhibit includes DCG's views regarding, among other things, every misstatement or omission DCG believed was contained in the Disclosure Statement itself.  DCG represented to this Court that such information must be included in the Disclosure Statement in order for it to provide creditors with adequate information to consider the Plan.[88]

72.     Although the Amended Disclosure Statement informed creditors that the Promissory Note had a principal amount of $1.1 billion, and the Revised DCG Response Exhibit purported to add additional information wherever DCG felt that context on its positions was lacking in the Debtors' narrative, DCG included not a single word about the theories underlying the Claims that would reduce that principal amount to zero.  The Court relied on the full contents of the Amended Disclosure Statement, including the extensive Revised DCG Response Exhibit, in finding that creditors were provided adequate information for purposes of soliciting the Plan, and entered the Disclosure Statement Order on that basis.  The doctrine of judicial estoppel dictates that DCG cannot now be permitted to take a contrary position.[89]

73.     DCG's failure to raise the Claims regarding the Foreclosed Assets until now, despite having convinced the Court to include in the Amended Disclosure Statement an extensive discussion of its perspective on a panoply of other issues in the case, is exactly the type of inequitable gamesmanship that the doctrine of judicial estoppel is designed to prevent.

## V.     THE PLAIN LANGUAGE OF THE PROMISSORY NOTE PRECLUDES THE RELIEF SOUGHT

---

[88]     *See* Nov. 7, 2023 Hr'g Tr. 71:3-13, J. Saferstein for DCG ("[W]e think that given that this is the key element of this plan is litigation, creditors when they're voting on it in order to have adequate information should know both sides.  Right?  They should say we like this plan or we don't like this plan because of the litigation ... We think it provides adequate information to creditors to see both sides and the risks.  By voting in favor of this plan, what are they voting on and what are the risks to them[.]").

[89]     *See Reciprocal Merch. Servs., Inc. v. All Advert. Assocs., Inc.*, 163 B.R. 689, 696 (S.D.N.Y. 1994) (The purpose of judicial estoppel is to "prevent[] litigants from playing 'fast and loose' with the courts.") (citing *In re Galerie des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1986)).

32

74.     The language of the Promissory Note is unambiguous in its definition of the key terms upon which the Claims rely, namely the definitions of "TAC Collateral" and "TAC Recovery." The June-July 2022 Agreements as a whole, in turn, are complete and clear on their face as to their individual and collective effects.

75.     When a contract is "complete, clear and unambiguous on its face," it must be enforced according to the plain meaning of its terms.[90] If an agreement "on its face is reasonably susceptible to only one meaning, a court is not free to alter the contract."[91] Because the Promissory Note is clear and unambiguous in its definition of the key terms on which the Claims rely, and because those definitions preclude the relief sought in the Claims, the Claims must be dismissed.

**A. The Claims Rely on an Obviously Wrong Interpretation of "TAC Collateral"**

76.     Under the plain language of the Promissory Note, "TAC Collateral" does not encompass the GBTC Shares. As a result, the Claims fail, because (i) they rely on the assertion that a TAC Recovery has supposedly reduced the value of the Promissory Note to zero; and (ii) the only alleged TAC Recovery adequately pled in the Complaint depends upon the GBTC Shares being "among the TAC Collateral,"[92] which is definitionally precluded by the language of the Promissory Note (because the GBTC Shares had ceased to be "collateral" in any sense upon GAP's Foreclosure, two weeks prior to the execution of the Promissory Note).[93]

---

[90]     *Gemini Tr. Co., LLC v. Genesis Glob. Cap.*, LLC, et al. (In re Genesis Glob. Holdco, LLC), No. 23-10063 (SHL), 2024 WL 478062, at *6 (Bankr. S.D.N.Y. Feb. 7, 2024) (citation omitted).

[91]     *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (quoting *Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 570 (2002)); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation.").

[92]     Complaint ¶ 63.

[93]     *See supra* ¶ 12 n.13 (citing DCG's acknowledgement of the Foreclosure in DCG Counterclaim, which precludes any later argument that the assets subject to the Foreclosure remained "collateral" in any sense after the Foreclosure).

33

77.     "TAC Collateral" first appears in the third recital to the Promissory Note, and is defined in the fourth recital, which read as follows:

> WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");
>
> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

The first recital explains that the parties agree that the outstanding Intercompany Payables resulting from the TAC collapse total $1.1 billion.  The language of the recital is clear that the parties agree that this amount is "*after giving effect* to all repayments and recoveries in respect of the TAC Loans" (namely, all amounts that TAC had repaid on the TAC Loans prior to the collapse, plus the approximately $1.2 billion worth of Foreclosed Assets whose value was applied to reduce the aggregate outstanding amounts under the TAC Loans from more than $2 billion); and "*taking into account* the value of any potential realization on any TAC Collateral".[94]  In other words, the $1.1 billion figure is *net* of all amounts that had been received to date in respect of the TAC Loans, and all amounts expected to be received pursuant to the TAC Collateral.[95]  "TAC Collateral" is defined in the next recital as "collateral provided by TAC to secure certain of the TAC Loans," and the recital contemplates that to the extent any value is realized in respect of the TAC Collateral, such value will be realized in the first instance by GAP.

78.     DCG argues unconvincingly that "collateral provided by TAC" encompasses not only the collateral that existed as of the date the Promissory Note was signed, but also the GBTC

---

[94]     Emphasis added.

[95]     DCG itself acknowledged in a pleading in the 2024 Adversary Proceeding that the "$1.2 billion [value of the Foreclosed Assets was] carved out from the parties' agreements."  DCG Reply ¶ 22.

34

Shares and the rest of the Foreclosed Assets. This interpretation defies logic and, more importantly, finds no support in the language of the Promissory Note itself.

79.     "Collateral" refers to assets in which a party has a security interest.[96] When the Promissory Note was signed, GAP had no security interest in the GBTC Shares or any of the Foreclosed Assets; because that security interest was extinguished when GAP foreclosed and the Foreclosed Assets became GAP's property, the GBTC Shares were neither "collateral" nor "TAC Collateral." The language of the third recital is also clear that the $1.1 billion agreed Intercompany Payables figure is net of ("taking account of") not only the present value of the TAC Collateral, but "the value of any potential realization" on the TAC Collateral. If DCG's interpretation is to be credited, and the TAC Collateral was meant to include the Foreclosed Assets such that the principal amount of the Promissory Note could be ratcheted back if the Foreclosed Assets appreciated in value, then the Promissory Note is missing a number of key terms. If the parties had intended to reduce DCG's Promissory Note obligations by appreciation in the value of the Foreclosed Assets, the Promissory Note would have at minimum needed to provide a mechanism for effectuating such reduction, including an agreement as to how the parties would agree on subsequent valuation of the Foreclosed Assets, the trigger dates on which such a reduction would be effectuated, and the corresponding reductions in the Promissory Note remaining balance. None of this is included in the Promissory Note.

80.     DCG's argument that the definition of TAC Collateral includes assets that were no longer collateral fails for another reason: It lacks a limiting principle. TAC and GAP (and, before 2020, GGC) had an extensive lending and borrowing relationship that spanned years. Under

---

[96]     *See* U.C.C. § 9-102(a)(12) ("'Collateral' means the property subject to a security interest."); *see also DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*, No. 17-cv-962 (JMF), 2019 WL 13414939, at *7 (S.D.N.Y. Mar. 11, 2019) (finding that once a purchaser acquired the relevant assets, "those assets no longer constituted Collateral within the meaning of the [agreement].").

DCG's reading, not only would "TAC Collateral" include the Foreclosed Assets (such that any value received by GGC in respect of the Foreclosed Assets would reduce the value of the Promissory Note); TAC Collateral would also include any assets "provided by TAC to secure certain of the TAC Loans" *at any point*, even if those assets had ceased to be collateral for any reason. This absurd outcome logically follows from DCG's interpretation but cannot be the case, not least because it finds no more support in any other provision of the Promissory Note than DCG's bare assertion that the Foreclosed Assets somehow remained "collateral" for purposes of the definition of "TAC Collateral."

**B.   The Claims Rely on an Obviously Wrong Interpretation of "TAC Recovery"**

81.     The Claims are premised on DCG's assertion that GGC has received "TAC Recoveries" in excess of the $1.1 billion original principal amount of the Promissory Note. That assertion, in turn, is premised on DCG's assertion that GGC received a "TAC Recovery" in respect of the GBTC Shares in connection with the Gemini Settlement Agreement.[97]  The plain language of the Promissory Note precludes this argument:  The Gemini Settlement Agreement provided GGC no "payment, repayment, distribution, proceeds or other amount….in cash, securities, or other property" such that there was no "TAC Recovery" as defined in the Promissory Note.

82.     "TAC Recovery" is defined in § 1.6.1 of the Promissory Note, which provides:

Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

---

[97]     Complaint ¶¶ 63-69.  DCG also asserts that GGC received certain unspecified "Other TAC Recoveries," with no factual support whatsoever.  Because DCG has not sufficiently alleged facts even plausibly state a claim that "Other TAC Recoveries" were received, GGC seeks dismissal of the Claims to the extent they rely on the alleged receipt of "GGC's Other TAC Recoveries."  *See* ¶¶ 87-88 hereof.

36

A "TAC Recovery," according to this definition, may take the form of a "payment, repayment, distribution, proceeds, or other amount" that is "recei[ved] by the Holder" (GGC) in the form of "cash, securities or other property."[98]

83.     DCG pleads no facts to support an assertion that GGC received any payment, repayment, distribution, proceeds, or other amount in respect of the GBTC Shares connection with the Gemini Settlement Agreement, much less any facts to support an assertion that any such receipt took the form of cash, securities, or other property.  This is because GGC did not receive anything that falls into any of these categories in connection with the Gemini Settlement Agreement at all.

84.     DCG also does not – and cannot – point to any language in the Gemini Settlement Agreement that provides for the receipt *by* GGC, *from* Gemini, of any "cash, securities, or other property" that could operate to reduce the balance of the Principal Amount of the Promissory Note pursuant to § 1.6.2.  In fact, the transfer of property went in the other direction:  The Gemini Settlement Agreement provides that Gemini would apply the GBTC Shares and certain other assets towards satisfying Gemini's obligations to creditors under the Earn Program; in exchange, GGC received, *inter alia*, a release of those creditor claims.[99]  There was no distribution from Gemini to GGC – or from any other entity to GGC – of "cash, securities, or other property" in connection with the Gemini Settlement Agreement.  Therefore, on DCG's own allegations, there could have been no "TAC Recovery" in connection with the Gemini Settlement Agreement.  Because all four of the Claims rely on DCG's assertion that there *was* such a TAC Recovery, they must be dismissed.

## VI.   DCG HAS NOT PLAUSIBLY PLED A "MISTAKE" AS BASIS FOR THE RELIEF SOUGHT IN COUNT III

85.     In Count III, DCG asserts that when it made the TAC Recovery Payments to GGC,

---

[98]     Promissory Note §§ 1.6.1-1.6.2.

[99]     Gemini Settlement Motion ¶ 2-3.

it did so under the "mistaken belief" that the Promissory Note balance had not already been reduced to zero, such that the TAC Recovery Payments should be returned under a theory of "Restitution of Mistaken Payment."[100]  DCG asserts that *GGC* was "aware that the TAC Recoveries from TAC Collateral exceeded the Principal Amount of the Promissory Note,"[101] but pleads no facts allegedly available to GGC that were not also available to DCG.  Indeed, the only fact that DCG alleges today that it claims not to have known when it made the TAC Recovery Payments is that GGC supposedly received a "TAC Recovery" connected to the GBTC Shares when the Gemini Settlement Agreement became effective in May 2024.  The record of these proceedings makes clear that DCG had full knowledge of the Gemini Settlement Agreement and its terms prior to DCG's first TAC Recovery Payment:  It was filed publicly, approved by public order of the Court, and described extensively in the Debtors' publicly-filed plan.[102]  The fact that DCG did not concoct its current theory about the Promissory Note's alleged reduction to zero until recently does not constitute a "mistake" that can give rise to a claim for restitution.[103]

## VII.    DCG HAS NOT SUFFICIENTLY ALLEGED FACTS RELATING TO "GGC'S OTHER TAC RECOVERIES" TO SUPPORT A CLAIM

86.    In support of its Claims, DCG pleads three categories of "TAC Recoveries." Among these is a category DCG describes as "GGC's Other TAC Recoveries."[104]  DCG states that it "does not have transparency into Genesis's [purported] liquidation of the TAC Collateral" other

---

[100]    Complaint ¶¶ 91-99.

[101]    Complaint ¶ 94.

[102]    *See supra* ¶¶ 26-29.

[103]    The caselaw dealing with the "mistake of fact" doctrine, for which restitution is an available remedy, relates almost exclusively to mistakes such as a payment to the wrong payee or in the wrong amount. *See, e.g.*, *Mfrs. Hanover Tr. Co. v. Chem. Bank,* 559 N.Y.S.2d 704, 707 (1st Dept.1990) (applying mistake of fact doctrine and ruling in favor of bank that made mistaken payment pursuant to erroneous wire instructions).  GGC is aware of no case granting restitution on the basis of the scant facts pled by DCG, much less where the "mistaken" party later executed a series of binding contracts agreeing to the facts that it later asserts were mistaken.

[104]    Complaint ¶ 70.

than the GBTC Shares, but nonetheless, DCG believes that GGC has "liquidated that other TAC Collateral."[105]  Here, DCG appears to be erroneously referring to the Foreclosed Assets (other than the GBTC Shares) when it refers to "that other TAC Collateral," which is incorrect because the Foreclosed Assets are definitionally excluded from "TAC Collateral."[106]  Setting that aside, DCG provides not a single fact to identify what it refers to as "GGC's Other TAC Recoveries," how those alleged recoveries were realized, what assets and parties they involved, or how they allegedly resulted in GGC's receipt of "cash, securities, or other property" in support of DCG's "belief" that other TAC Recoveries exist and have accordingly reduced the Promissory Note's principal amount.

87.     Complaints that plead "only facts that are 'merely consistent with' a defendant's liability" or that offer "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to satisfy Rule 12(b)(6)'s plausibility standard.[107]  Detailed factual allegations are not required, but the complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[108]  A complaint with "naked assertions" of fact that are devoid of "further factual enhancement" will not suffice either.[109]  The Supreme Court has adopted a two-pronged approach for evaluating the sufficiency of a complaint: (1) eliminate conclusory allegations and (2) examine the remaining well-pleaded factual allegations to determine whether they plausibly give rise to an entitlement to relief.[110]  After eliminating conclusory allegations from the single two-sentence paragraph in which DCG asserts

---

[105]     *Id.*

[106]     *See supra* ¶¶ 16; 76-80.

[107]     *Weisfelner v. Fund 1 (In re Lyondell* Chem*. Co.)*, 554 B.R. 655, 673 (Bankr. S.D.N.Y. 2016).

[108]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[109]     *Id.* at 557.

[110]     *Ashcroft v. Iqbal*, 556 U.S. 662, 663-664 (2009).

that there must be other TAC Recoveries,[111] the reader is left with nothing. As a result, the Claims

should be dismissed to the extent they rely on bare allegations of "GGC's Other TAC Recoveries."

## VIII. GAP MUST BE DISMISSED FROM THE ACTION BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM AGAINST GAP

88.     Although the Complaint names GAP as one of two defendants, together with GGC,

none of the Claims are lodged against GAP or concern it in any way. Count I, the Note Reduction

Claim, is expressly lodged "Against GGC" and no other party.[112] DCG states that the live

controversy giving rise to the claim is between "DCG, on the one hand, and GGC and GAP, on

the other hand, as to whether the TAC Recoveries have adjusted to zero the Principal Amount of

the Promissory Note."[113] But there is no controversy between DCG and GAP, because GAP is not

the Holder of the Promissory Note, and has no entitlement to TAC Recoveries. To the contrary,

GAP is obligated pursuant to the Promissory Note to pay over any TAC Recoveries to GGC.[114]

89.     Counts II, III, and IV, the Repayment Claims, are similarly expressly lodged

"Against GGC" and no other party.[115] There is no mention of GAP in DCG's articulation of any

of these three counts.[116] Courts regularly dismiss complaints as to defendants against whom no

relief is sought (and as to whom, therefore, the plaintiff has failed to state a claim).[117] Because

DCG fails to state a claim against GAP, GAP must be dismissed from this action.

---

[111]     Complaint ¶ 70.

[112]     Complaint at 25.

[113]     Complaint ¶ 78.

[114]     Promissory Note § 1.6.1.

[115]     Complaint at 26, 27, 28.

[116]     Complaint ¶¶ 82-90; 91-99; 100-108.

[117]     *See Hartford Accident & Indem. Co. v. Hop-On Int'l. Corp.*, 568 F. Supp. 1568 (S.D.N.Y. 1983) (dismissing complaint against defendant where no relief was sought against that defendant); *Salyers v. A.J. Blosenski, Inc.*, 731 F.Supp.3d 670, 684 (E.D. Pa. 2024) ("To survive a motion to dismiss … a complaint must 'plead [] sufficient facts to show that the plaintiff is entitled to relief *from a particular defendant*.'").

## CONCLUSION

For the foregoing reasons, Genesis respectfully requests that the Court dismiss the

Complaint.

Dated: September 17, 2025
      New York, New York

Respectfully submitted,

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to GGC and GAP*

41

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>      Wind-Down Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>Jointly Administered |
| Digital Currency Group, Inc.,<br><br><br>      Plaintiff,<br><br>  -against-<br><br>Genesis Global Capital, LLC<br>Genesis Asia Pacific Pte. Ltd.,<br><br>      Defendants. | Adv. Proc. No. 25-01129 (SHL) |

**DECLARATION OF ARACELY VALENCIA**
**IN SUPPORT OF MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT AGAINST**
**GENESIS GLOBAL CAPITAL, LLC AND GENESIS ASIA PACIFIC PTE LTD.**

I, Aracely Valencia, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am an associate at the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel to the Wind-Down Debtors in the above-captioned chapter 11 case.

2.     I respectfully submit this declaration in support of Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.'s *Memorandum of Law in Support of Defendants' Motion to*

---

[1]     The Wind-Down Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

*Dismiss Complaint Against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.* (the

"Memorandum").[2]

3.      A true and correct copy of the First Promissory Note Letter, dated June 13, 2024,

is attached hereto as Exhibit 1.

4.      A true and correct copy of the Second Promissory Note Letter, dated July 17,

2024, is attached hereto as Exhibit 2.

5.      A true and correct copy of the Third Promissory Note Letter, dated October 22,

2024, is attached hereto as Exhibit 3.

6.      A true and correct copy of the Fourth Promissory Note Letter, dated February 6,

2025, is attached hereto as Exhibit 4.

Dated: September 17, 2025
       New York, New York

                                        Respectfully submitted,


                                        */s/ Aracely Valencia*
                                        Aracely Valencia
                                        avalencia@cgsh.com
                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                        One Liberty Plaza
                                        New York, New York  10006
                                        Telephone: 212-225-2000
                                        Facsimile: 212-225-3999

                                        *Counsel to GGC and GAP*

---

[2]      Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Memorandum.

2

## EXHIBIT 1

**First Promissory Note Letter**

**EXECUTED VERSION**

June 13, 2024

**To:**    **Genesis Global Capital, LLC**
175 Greenwich Street, Floor 38,
New York, NY 10007

**RE: Promissory Note Payment (Initial Distribution by Three Arrows Capital Ltd. (in Liquidation))**

To whom it may concern:

Reference is made to (i) that certain Promissory Note issued by Digital Currency Group, Inc. ("**DCG**") to Genesis Global Capital, LLC ("**GGC**"), dated as of June 30, 2022 (the "**Promissory Note**") and (ii) that certain Settlement Agreement by and among Genesis Global Holdco, LLC and its affiliated debtors and debtors-in-possession in the jointly-administered chapter 11 cases proceeding under the caption *In re Genesis Global Holdco, LLC, et al*. Case No. 23-10063 (SHL) ("**Genesis Chapter 11 Cases**"); DCG; Three Arrows Capital Ltd. (in Liquidation) ("**TAC**"); and Christopher Farmer and Russell Crumpler of Teneo (BVI) Limited, in their respective capacities as the duly authorized joint liquidators of the 3AC Debtor (the "**Joint Liquidators**") appointed in the British Virgin Islands liquidation of TAC (the "**TAC Settlement Agreement**").  Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Promissory Note or the TAC Settlement Agreement, as applicable.

DCG hereby represents and warrants that on June 10, 2024, DCG received an interim distribution in the amount of $32,019,672.95 from the Joint Liquidators on account of DCG's claim against TAC (the "**First TAC Recovery Payment**"), the value of which reflects DCG's claim value for the initial distribution from TAC in light of the TAC Settlement Agreement, which was approved by the Bankruptcy Court for the Southern District of New York in the Genesis Chapter 11 Cases on November 30, 2023 and went effective as of December 22, 2023.

Pursuant to Section 1.6 of the Promissory Note, DCG hereby provides GGC with notice that it intends to transfer the First TAC Recovery Payment to GGC by wire transfer on June 13, 2024.  The parties acknowledge and agree that, upon GGC's receipt of the First TAC Recovery Payment, the Principal Amount of the Promissory Note shall be reduced immediately and automatically (on a dollar-for-dollar basis) in the amount of the First TAC Recovery Payment pursuant to Section 1.6.2 of the Promissory Note, which shall be reflected in the Promissory Note's Schedule of Repayments pursuant to Section 1.4 of the Promissory Note. The Promissory Note with the updated Schedule of Repayments is attached hereto as **Exhibit A**.

Nothing herein or in any correspondence shall prejudice either party's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the Promissory Note, the June A&A Agreement, the A&A Agreement, the Loan Documents, any instruments or agreements referred to therein and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved.

**Digital Currency Group, Inc.**            **Genesis Global Capital, LLC**

DocuSigned by:

*Mark Shifke*
595D869CA28A435...

Name:  Mark Shifke
Title:   Chief Financial Officer

DocuSigned by:

*A. Derar Islim*
112CB3D00F63428...

Name: A. Derar Islim
Title: Interim Chief Executive Officer

**EXECUTED VERSION**

**<u>EXHIBIT A</u>**

**Promissory Note (with revised Schedule of Repayments as of June 13, 2024)**

PAYMENT OF THIS NOTE AND OF THE OBLIGATIONS HEREUNDER ARE SUBORDINATED TO THE EXTENT AND IN THE MANNER PROVIDED FOR IN THAT CERTAIN INTERCOMPANY SUBORDINATION AGREEMENT (THE "**SUBORDINATION AGREEMENT**") BY AND AMONG THE OBLIGOR (AS HEREINAFTER DEFINED), THE SUBSIDIARIES OF THE OBLIGOR PARTY THERETO FROM TIME TO TIME, AND SB CORPORATE FUNDING LLC, AS ADMINISTRATIVE AGENT. THE SUBORDINATION AGREEMENT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF AS IF SET FORTH HEREIN IN ITS ENTIRETY.

## PROMISSORY NOTE

$1,100,000,000.00                                                                    June 30, 2022

THIS PROMISSORY NOTE (this "**Note**") is made as of the date first written above by the undersigned, DIGITAL CURRENCY GROUP, INC., a Delaware corporation (the "**Obligor**"), to GENESIS GLOBAL CAPITAL, LLC, a Delaware limited liability company (together with any successors or assigns or any subsequent holder of this Note, the "**Holder**"), and, solely for purposes of the agreements set forth in Section 1.6 of this Note, GENESIS ASIA PACIFIC PTE. LTD., a corporation organized and existing under the laws of Singapore ("**GAP**").

## WITNESSETH

WHEREAS, GAP heretofore has made or assumed loans and other financial accommodations (collectively, the "**TAC Loans**") provided from time to time to Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("**TAC**");

WHEREAS, the TAC Loans were funded with working capital provided from time to time by the Holder, evidenced by book-entry intercompany transfers from the Holder to GAP and resulting in non-interest-bearing accounts payable from GAP to the Holder (the "**Intercompany Payables**");

WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");

WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans;

WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof;

ACTIVE/117864363.5

WHEREAS, contemporaneously with the issuance of this Note, GAP assigned to the Obligor, and the Obligor assumed from GAP, the Assumed Liability pursuant to that certain Assignment and Assumption Agreement, dated as of even date herewith, between GAP and the Obligor (the "**Assignment**"); and

WHEREAS, the Obligor is issuing this Note to the Holder to evidence the Obligor's obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Note by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

FOR VALUE RECEIVED, the Obligor promises to pay to the Holder on the Maturity Date (as hereinafter defined), the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, if applicable, due solely to the payment of PIK Interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**"), in lawful money of the United States of America in immediately available funds, and to pay interest from the date of issuance of this Note on the Principal Amount from time to time outstanding at a rate per annum and payable on such dates as determined pursuant to the terms of this Note.

**SECTION 1.          TERMS OF PAYMENT**

1.1     Maturity Date.  The unpaid Principal Amount of this Note, together with all accrued and unpaid interest as set forth in this Note, shall be paid in full on or before June 30, 2032 (the "**Maturity Date**").  If any day on which a payment is due pursuant to the terms of this Note is not a day on which banks in the State of New York are generally open (a "**Business Day**"), such payment shall be due on the next Business Day following.

1.2     Interest.

1.2.1     The Principal Amount outstanding from time to time shall bear interest at a rate equal to one percent (1.00%) per annum.

1.2.2     Interest with respect to this Note shall be paid quarterly in arrears on the last Business Day of each March, June, September and December of each calendar year, commencing September 30, 2022 (each, an "**Interest Payment Date**"), either (a) in cash or (b) at the option of the Obligor, or at any time cash payments are not permitted by the terms of the Subordination Agreement, in kind by adding an amount equal to the accrued interest for such quarterly interest period to the then-outstanding Principal Amount (interest so paid under this clause (b), "**PIK Interest**").  Once paid, any PIK Interest shall constitute principal of this Note and shall accrue interest as such.

1.2.3     Under no circumstances shall the rate of interest chargeable under this Note be in excess of the maximum amount permitted by applicable law.  If for any reason any such

2

ACTIVE/117864363.5

excess interest is charged and paid, then the excess amount shall be promptly refunded by the Holder.

1.2.4    Interest on this Note shall be computed on the basis of the actual number of days elapsed over a year of 365 days (366 days in a leap year).  In computing such interest, the date this Note is issued shall be included and the date of payment of any Principal Amount shall be excluded.

1.3    Optional Prepayments.  The Principal Amount, together with any accrued and unpaid interest thereon, may be prepaid, at Obligor's option, at any time prior to the Maturity Date, in whole or in part, without premium or penalty. All payments received by Holder hereunder will be applied first to interest and the balance to the Principal Amount. No amount repaid or prepaid hereunder may be reborrowed.

1.4    Recordation of Payments. The Holder is hereby authorized to record all repayments or prepayments under this Note on the schedule attached hereto, or otherwise in its books and records, such schedule and/or books and records constituting *prima facie* evidence (absent manifest error) of the principal amount of this Note; provided, however, that the failure of the Holder to make such a notation or any error in such notation shall not affect the obligations of the Obligor to the Holder under this Note.

1.5    Form of Payment. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Holder may designate from time to time, or if no such designation is made.

1.6    TAC Loans.

1.6.1    Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

1.6.2    The parties hereto agree that the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by the Holder of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, by set-off or otherwise.

1.6.3    Each of GAP and the Holder agrees that it shall use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery.

1.6.4    Each of GAP and the Holder agrees that the Obligor's obligations to repay the Principal Amount, together with interest thereon, in accordance with the terms hereof are subject to performance by GAP and the Holder with its obligations under this Section 1.6.

3

ACTIVE/117864363.5

**SECTION 2.**         **MISCELLANEOUS**

2.1     <u>Amendments and Waivers; Transfers; Successor and Assigns</u>.  No amendment, modification, termination, waiver or consent to departure of any provision of this Note shall in any event be effective without the prior written consent of the Holder and the Obligor.  This Note may not be assigned or transferred by the Holder to any person or entity without the consent of the Obligor, and any such assignment or transfer without the Obligor's prior written consent shall be null and void in all respects.  The Obligor shall not be permitted to assign or transfer any of its rights, liabilities or obligations hereunder without the prior written consent of the Holder, and any such assignment or transfer without the Holder's prior written consent shall be null and void in all respects.  This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

2.2     <u>Applicable Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law.  The Holder and the Obligor hereby submit to the exclusive jurisdiction of the State and Federal courts located in the State of New York.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

2.3     <u>Entirety; No Strict Construction; No Third Party Beneficiaries</u>.  This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Holder and the Obligor and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

2.4     <u>Further Assurances</u>.  Each of the parties hereto agrees from time to time, as and when requested by any party hereto, to execute and deliver or cause to be executed and delivered, all such documents, instruments and agreements and to take or cause to be taken such further or other action as such party may reasonably deem necessary or desirable in order to carry out the intent and purposes of this Note and any other documents or agreements executed or otherwise delivered in connection herewith.

2.5     <u>Waivers</u>. The Obligor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

4

2.6    <u>Severability</u>.  If any provision of this Note is held by a court of competent jurisdiction to be void or unenforceable in whole or in part, the remaining provisions of this Note shall continue in full force and effect.

[*SIGNATURES FOLLOW*]

ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

**OBLIGOR**

DIGITAL CURRENCY GROUP, INC.

By: _____
Name:  Barry E. Silbert
Title:  Chief Executive Officer

Acknowledged and Agreed:

**HOLDER**

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____
Name:
Title:

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

### OBLIGOR

DIGITAL CURRENCY GROUP, INC.

By: _____

Name:

Title:

Acknowledged and Agreed:

### HOLDER

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____

Name:   S. Michael Moro

Title:    CEO

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

**Solely for purposes of Section 1.6 of the Note:**

GENESIS ASIA PACIFIC PTE. LTD.

By: _____

Name: S. Michael Moro

Title: Director

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

SCHEDULE OF REPAYMENTS
TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
| June 13, 2024 | $1,119,395,018.34* | $32,019,672.95 | $1,087,375,345.39 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

 * Reflects PIK Interest added to the Principal Amount through the most recent Interest Payment Date on 3/29/2024.

ACTIVE/117864363.5

**EXHIBIT 2**

**Second Promissory Note Letter**

*Execution Version*

July 17, 2024

**To:** **Genesis Global Capital, LLC**
175 Greenwich Street, Floor 38,
New York, NY 10007

**RE: Promissory Note Payment (Second Distribution by Three Arrows Capital Ltd. (in Liquidation))**

To whom it may concern:

Reference is made to (i) that certain Promissory Note issued by Digital Currency Group, Inc. ("**DCG**") to Genesis Global Capital, LLC ("**GGC**"), dated as of June 30, 2022 (the "**Promissory Note**") and (ii) that certain Settlement Agreement and Release by and among Genesis Global Holdco, LLC and its affiliated debtors and debtors-in-possession in the jointly-administered chapter 11 cases proceeding under the caption *In re Genesis Global Holdco, LLC, et al*. Case No. 23-10063 (SHL) ("**Genesis Chapter 11 Cases**"); DCG; Three Arrows Capital Ltd. (in Liquidation) ("**TAC**"); and Christopher Farmer and Russell Crumpler of Teneo (BVI) Limited, in their respective capacities as the duly authorized joint liquidators of the 3AC Debtor (the "**Joint Liquidators**") appointed in the British Virgin Islands liquidation of TAC (the "**TAC Settlement Agreement**"), which TAC Settlement Agreement was approved by the U.S. Bankruptcy Court for the Southern District of New York (the "**US Bankruptcy Court**") in the Genesis Chapter 11 Cases on November 30, 2023 and went effective as of December 22, 2023.  Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Promissory Note or the TAC Settlement Agreement, as applicable.

DCG hereby represents and warrants that on June 10, 2024, DCG received an interim distribution in the amount of $32,019,672.95 from the Joint Liquidators on account of DCG's claim against TAC (the "**First TAC Recovery Payment**"), the value of which reflects DCG's claim value for the initial distribution from TAC in light of the TAC Settlement Agreement.  On June 13, 2024, DCG transferred the First TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the June 13, 2024 Promissory Note First TAC Payment Notice.

DCG hereby represents and warrants that on July 16, 2024, DCG received a second interim distribution in the amount of $29,780,550.15 from the Joint Liquidators on account of DCG's claim against TAC (the "**Second TAC Recovery Payment**"), the value of which reflects DCG's claim value for the second distribution from TAC in light of the TAC Settlement Agreement.

Pursuant to Section 1.6 of the Promissory Note, DCG hereby provides GGC with notice that it intends to transfer the Second TAC Recovery Payment to GGC by wire transfer on July 17, 2024.  The parties acknowledge and agree that, upon GGC's receipt of the Second TAC Recovery Payment, the Principal Amount of the Promissory Note shall be reduced immediately and automatically (on a dollar-for-dollar basis) in the amount of the Second TAC Recovery Payment pursuant to Section 1.6.2 of the Promissory Note, which shall be reflected in the Promissory Note's Schedule of Repayments pursuant to Section 1.4 of the Promissory Note.  The Promissory Note with the updated Schedule of Repayments is attached hereto as **Exhibit A**.

Nothing herein or in any correspondence shall prejudice either party's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the Promissory Note, the June A&A Agreement, the A&A Agreement, the Loan Documents, any instruments or agreements referred to therein and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved.

WEIL:\99497493\2\41531.0004

Docusign Envelope ID: 5B6F4BAC-FEEE-47FB-B6BC-3C15D15D6DD5

*Execution Version*

**Digital Currency Group, Inc.**          **Genesis Global Capital, LLC**

DocuSigned by:

_____
921946C6DACD41B...

Name:  Mark Shifke
Title:    Chief Financial Officer

DocuSigned by:

_____
112CB3D00F63428...

Name: A. Derar Islim
Title: Interim Chief Executive Officer

WEIL:\99497493\2\41531.0004

Docusign Envelope ID: 5B6F4BAC-EEEF-47EB-B6BC-3C15D15D6DD5

*Execution Version*

## <u>EXHIBIT A</u>

**Promissory Note (with revised Schedule of Repayments as of July 17, 2024)**

WEIL:\99497493\2\41531.0004

PAYMENT OF THIS NOTE AND OF THE OBLIGATIONS HEREUNDER ARE SUBORDINATED TO THE EXTENT AND IN THE MANNER PROVIDED FOR IN THAT CERTAIN INTERCOMPANY SUBORDINATION AGREEMENT (THE "**SUBORDINATION AGREEMENT**") BY AND AMONG THE OBLIGOR (AS HEREINAFTER DEFINED), THE SUBSIDIARIES OF THE OBLIGOR PARTY THERETO FROM TIME TO TIME, AND SB CORPORATE FUNDING LLC, AS ADMINISTRATIVE AGENT. THE SUBORDINATION AGREEMENT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF AS IF SET FORTH HEREIN IN ITS ENTIRETY.

## PROMISSORY NOTE

$1,100,000,000.00                                                                                          June 30, 2022

THIS PROMISSORY NOTE (this "**Note**") is made as of the date first written above by the undersigned, DIGITAL CURRENCY GROUP, INC., a Delaware corporation (the "**Obligor**"), to GENESIS GLOBAL CAPITAL, LLC, a Delaware limited liability company (together with any successors or assigns or any subsequent holder of this Note, the "**Holder**"), and, solely for purposes of the agreements set forth in Section 1.6 of this Note, GENESIS ASIA PACIFIC PTE. LTD., a corporation organized and existing under the laws of Singapore ("**GAP**").

WITNESSETH

WHEREAS, GAP heretofore has made or assumed loans and other financial accommodations (collectively, the "**TAC Loans**") provided from time to time to Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("**TAC**");

WHEREAS, the TAC Loans were funded with working capital provided from time to time by the Holder, evidenced by book-entry intercompany transfers from the Holder to GAP and resulting in non-interest-bearing accounts payable from GAP to the Holder (the "**Intercompany Payables**");

WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");

WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans;

WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof;

ACTIVE/117864363.5

WHEREAS, contemporaneously with the issuance of this Note, GAP assigned to the Obligor, and the Obligor assumed from GAP, the Assumed Liability pursuant to that certain Assignment and Assumption Agreement, dated as of even date herewith, between GAP and the Obligor (the "**Assignment**"); and

WHEREAS, the Obligor is issuing this Note to the Holder to evidence the Obligor's obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Note by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

FOR VALUE RECEIVED, the Obligor promises to pay to the Holder on the Maturity Date (as hereinafter defined), the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, if applicable, due solely to the payment of PIK Interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**"), in lawful money of the United States of America in immediately available funds, and to pay interest from the date of issuance of this Note on the Principal Amount from time to time outstanding at a rate per annum and payable on such dates as determined pursuant to the terms of this Note.

## SECTION 1.          TERMS OF PAYMENT

1.1     Maturity Date.  The unpaid Principal Amount of this Note, together with all accrued and unpaid interest as set forth in this Note, shall be paid in full on or before June 30, 2032 (the "**Maturity Date**").  If any day on which a payment is due pursuant to the terms of this Note is not a day on which banks in the State of New York are generally open (a "**Business Day**"), such payment shall be due on the next Business Day following.

1.2     Interest.

1.2.1    The Principal Amount outstanding from time to time shall bear interest at a rate equal to one percent (1.00%) per annum.

1.2.2    Interest with respect to this Note shall be paid quarterly in arrears on the last Business Day of each March, June, September and December of each calendar year, commencing September 30, 2022 (each, an "**Interest Payment Date**"), either (a) in cash or (b) at the option of the Obligor, or at any time cash payments are not permitted by the terms of the Subordination Agreement, in kind by adding an amount equal to the accrued interest for such quarterly interest period to the then-outstanding Principal Amount (interest so paid under this clause (b), "**PIK Interest**").  Once paid, any PIK Interest shall constitute principal of this Note and shall accrue interest as such.

1.2.3    Under no circumstances shall the rate of interest chargeable under this Note be in excess of the maximum amount permitted by applicable law.  If for any reason any such

2

excess interest is charged and paid, then the excess amount shall be promptly refunded by the Holder.

1.2.4    Interest on this Note shall be computed on the basis of the actual number of days elapsed over a year of 365 days (366 days in a leap year).  In computing such interest, the date this Note is issued shall be included and the date of payment of any Principal Amount shall be excluded.

1.3    Optional Prepayments.  The Principal Amount, together with any accrued and unpaid interest thereon, may be prepaid, at Obligor's option, at any time prior to the Maturity Date, in whole or in part, without premium or penalty. All payments received by Holder hereunder will be applied first to interest and the balance to the Principal Amount. No amount repaid or prepaid hereunder may be reborrowed.

1.4    Recordation of Payments. The Holder is hereby authorized to record all repayments or prepayments under this Note on the schedule attached hereto, or otherwise in its books and records, such schedule and/or books and records constituting *prima facie* evidence (absent manifest error) of the principal amount of this Note; provided, however, that the failure of the Holder to make such a notation or any error in such notation shall not affect the obligations of the Obligor to the Holder under this Note.

1.5    Form of Payment. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Holder may designate from time to time, or if no such designation is made.

1.6    TAC Loans.

1.6.1    Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

1.6.2    The parties hereto agree that the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by the Holder of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, by set-off or otherwise.

1.6.3    Each of GAP and the Holder agrees that it shall use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery.

1.6.4    Each of GAP and the Holder agrees that the Obligor's obligations to repay the Principal Amount, together with interest thereon, in accordance with the terms hereof are subject to performance by GAP and the Holder with its obligations under this Section 1.6.

3

**SECTION 2.**          **MISCELLANEOUS**

2.1      <u>Amendments and Waivers; Transfers; Successor and Assigns</u>.  No amendment, modification, termination, waiver or consent to departure of any provision of this Note shall in any event be effective without the prior written consent of the Holder and the Obligor.  This Note may not be assigned or transferred by the Holder to any person or entity without the consent of the Obligor, and any such assignment or transfer without the Obligor's prior written consent shall be null and void in all respects.  The Obligor shall not be permitted to assign or transfer any of its rights, liabilities or obligations hereunder without the prior written consent of the Holder, and any such assignment or transfer without the Holder's prior written consent shall be null and void in all respects.  This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

2.2      <u>Applicable Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law.  The Holder and the Obligor hereby submit to the exclusive jurisdiction of the State and Federal courts located in the State of New York.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

2.3      <u>Entirety; No Strict Construction; No Third Party Beneficiaries</u>.  This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Holder and the Obligor and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

2.4      <u>Further Assurances</u>.  Each of the parties hereto agrees from time to time, as and when requested by any party hereto, to execute and deliver or cause to be executed and delivered, all such documents, instruments and agreements and to take or cause to be taken such further or other action as such party may reasonably deem necessary or desirable in order to carry out the intent and purposes of this Note and any other documents or agreements executed or otherwise delivered in connection herewith.

2.5      <u>Waivers</u>. The Obligor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

ACTIVE/117864363.5

2.6     <u>Severability</u>.  If any provision of this Note is held by a court of competent jurisdiction to be void or unenforceable in whole or in part, the remaining provisions of this Note shall continue in full force and effect.

[*SIGNATURES FOLLOW*]

5

ACTIVE/117864363.5

Docusign Envelope ID: 5B6F4BAC-FEEF-47FB-B6BC-3C15D15D6DD5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

**OBLIGOR**

DIGITAL CURRENCY GROUP, INC.

By: _____
Name:  Barry E. Silbert
Title:  Chief Executive Officer

Acknowledged and Agreed:

**HOLDER**

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____
Name:
Title:

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

## OBLIGOR

DIGITAL CURRENCY GROUP, INC.

By: _____

Name:

Title:

Acknowledged and Agreed:

## HOLDER

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____

Name:    S. Michael Moro

Title:    CEO

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

Solely for purposes of Section 1.6 of the Note:

GENESIS ASIA PACIFIC PTE. LTD.

By: _____

Name: S. Michael Moro

Title: Director

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

ACTIVE/117864363.5

SCHEDULE OF REPAYMENTS
TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
| June 13, 2024 | $1,119,395,018.34* | $32,019,672.95 | $1,087,375,345.39 |
| July 17, 2024 | $1,090,144,542.98** | $29,780,550.15 | $1,060,363,992.83 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

\* Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 3/29/2024.

\*\* Reflects PIK Interest added to the Principal Amount through the most recent Interest Payment Date on 6/28/2024.

ACTIVE/117864363.5

## EXHIBIT 3

**Third Promissory Note Letter**

*Execution Version*

October 22, 2024

**To:**  **Genesis Global Capital, LLC**
175 Greenwich Street, Floor 38
New York, NY 10007

**RE: Promissory Note Payment (Third Distribution by Three Arrows Capital Ltd. (in Liquidation))**

To whom it may concern:

Reference is made to (i) that certain Promissory Note issued by Digital Currency Group, Inc. ("**DCG**") to Genesis Global Capital, LLC ("**GGC**"), dated as of June 30, 2022 (the "**Promissory Note**") and (ii) that certain Settlement Agreement and Release by and among Genesis Global Holdco, LLC and its affiliated debtors and debtors-in-possession in the jointly-administered chapter 11 cases proceeding under the caption *In re Genesis Global Holdco, LLC, et al*. Case No. 23-10063 (SHL) ("**Genesis Chapter 11 Cases**"); DCG; Three Arrows Capital Ltd. (in Liquidation) ("**TAC**"); and Christopher Farmer and Russell Crumpler of Teneo (BVI) Limited, in their respective capacities as the duly authorized joint liquidators of the 3AC Debtor (the "**Joint Liquidators**") appointed in the British Virgin Islands liquidation of TAC (the "**TAC Settlement Agreement**"), which TAC Settlement Agreement was approved by the U.S. Bankruptcy Court for the Southern District of New York (the "**US Bankruptcy Court**") in the Genesis Chapter 11 Cases on November 30, 2023 and went effective as of December 22, 2023. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Promissory Note or the TAC Settlement Agreement, as applicable.

DCG hereby represents and warrants that on June 10, 2024, DCG received an interim distribution in the amount of $32,019,672.95 from the Joint Liquidators on account of DCG's claim against TAC (the "**First TAC Recovery Payment**"), the value of which reflects DCG's claim value for the initial distribution from TAC in light of the TAC Settlement Agreement. On June 13, 2024, DCG transferred the First TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the June 13, 2024 Promissory Note First TAC Payment Notice.

DCG hereby represents and warrants that on July 16, 2024, DCG received a second interim distribution in the amount of $29,780,550.15 from the Joint Liquidators on account of DCG's claim against TAC (the "**Second TAC Recovery Payment**"), the value of which reflects DCG's claim value for the second distribution from TAC in light of the TAC Settlement Agreement. On July 17, 2024, DCG transferred the Second TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the July 17, 2024 Promissory Note Second TAC Payment Notice.

DCG hereby represents and warrants that on October 21, 2024, DCG received a third interim distribution in the amount of $24,126,776.92 from the Joint Liquidators on account of DCG's claim against TAC (the "**Third TAC Recovery Payment**"), the value of which reflects DCG's claim value for the third distribution from TAC in light of the TAC Settlement Agreement.

Pursuant to Section 1.6 of the Promissory Note, DCG hereby provides GGC with notice that it intends to transfer the Third TAC Recovery Payment to GGC by wire transfer on October 23, 2024. The parties acknowledge and agree that, upon GGC's receipt of the Third TAC Recovery Payment, the Principal Amount of the Promissory Note shall be reduced immediately and automatically (on a dollar-for-dollar basis) in the amount of the Third TAC Recovery Payment pursuant to Section 1.6.2 of the Promissory Note, which shall be reflected in the Promissory Note's Schedule of Repayments pursuant to Section 1.4 of the Promissory Note. The Promissory Note with the updated Schedule of Repayments is attached hereto as **Exhibit A**.

Nothing herein or in any correspondence shall prejudice either party's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the Promissory Note, the June A&A Agreement, the A&A Agreement, the Loan Documents, any instruments or agreements referred to therein

*Execution Version*

and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved.


**Digital Currency Group, Inc.**          **Genesis Global Capital, LLC**


Signed by:

*Mark Shifke*
—595D869CA28A435...
    Name:  Mark Shifke
    Title:    Chief Financial Officer

DocuSigned by:

*Mark Renzi*
—84CE61A361C74C2...
    Name: Mark Renzi
    Title: Plan Administrator

*Execution Version*

## EXHIBIT A

**Promissory Note (with revised Schedule of Repayments as of October 23, 2024)**

PAYMENT OF THIS NOTE AND OF THE OBLIGATIONS HEREUNDER ARE SUBORDINATED TO THE EXTENT AND IN THE MANNER PROVIDED FOR IN THAT CERTAIN INTERCOMPANY SUBORDINATION AGREEMENT (THE "**SUBORDINATION AGREEMENT**") BY AND AMONG THE OBLIGOR (AS HEREINAFTER DEFINED), THE SUBSIDIARIES OF THE OBLIGOR PARTY THERETO FROM TIME TO TIME, AND SB CORPORATE FUNDING LLC, AS ADMINISTRATIVE AGENT. THE SUBORDINATION AGREEMENT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF AS IF SET FORTH HEREIN IN ITS ENTIRETY.

## PROMISSORY NOTE

$1,100,000,000.00                                                                    June 30, 2022

THIS PROMISSORY NOTE (this "**Note**") is made as of the date first written above by the undersigned, DIGITAL CURRENCY GROUP, INC., a Delaware corporation (the "**Obligor**"), to GENESIS GLOBAL CAPITAL, LLC, a Delaware limited liability company (together with any successors or assigns or any subsequent holder of this Note, the "**Holder**"), and, solely for purposes of the agreements set forth in Section 1.6 of this Note, GENESIS ASIA PACIFIC PTE. LTD., a corporation organized and existing under the laws of Singapore ("**GAP**").

### WITNESSETH

WHEREAS, GAP heretofore has made or assumed loans and other financial accommodations (collectively, the "**TAC Loans**") provided from time to time to Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("**TAC**");

WHEREAS, the TAC Loans were funded with working capital provided from time to time by the Holder, evidenced by book-entry intercompany transfers from the Holder to GAP and resulting in non-interest-bearing accounts payable from GAP to the Holder (the "**Intercompany Payables**");

WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");

WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans;

WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof;

ACTIVE/117864363.5

WHEREAS, contemporaneously with the issuance of this Note, GAP assigned to the Obligor, and the Obligor assumed from GAP, the Assumed Liability pursuant to that certain Assignment and Assumption Agreement, dated as of even date herewith, between GAP and the Obligor (the "**Assignment**"); and

WHEREAS, the Obligor is issuing this Note to the Holder to evidence the Obligor's obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Note by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

FOR VALUE RECEIVED, the Obligor promises to pay to the Holder on the Maturity Date (as hereinafter defined), the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, if applicable, due solely to the payment of PIK Interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**"), in lawful money of the United States of America in immediately available funds, and to pay interest from the date of issuance of this Note on the Principal Amount from time to time outstanding at a rate per annum and payable on such dates as determined pursuant to the terms of this Note.

**SECTION 1.        TERMS OF PAYMENT**

1.1    Maturity Date.  The unpaid Principal Amount of this Note, together with all accrued and unpaid interest as set forth in this Note, shall be paid in full on or before June 30, 2032 (the "**Maturity Date**").  If any day on which a payment is due pursuant to the terms of this Note is not a day on which banks in the State of New York are generally open (a "**Business Day**"), such payment shall be due on the next Business Day following.

1.2    Interest.

1.2.1    The Principal Amount outstanding from time to time shall bear interest at a rate equal to one percent (1.00%) per annum.

1.2.2    Interest with respect to this Note shall be paid quarterly in arrears on the last Business Day of each March, June, September and December of each calendar year, commencing September 30, 2022 (each, an "**Interest Payment Date**"), either (a) in cash or (b) at the option of the Obligor, or at any time cash payments are not permitted by the terms of the Subordination Agreement, in kind by adding an amount equal to the accrued interest for such quarterly interest period to the then-outstanding Principal Amount (interest so paid under this clause (b), "**PIK Interest**").  Once paid, any PIK Interest shall constitute principal of this Note and shall accrue interest as such.

1.2.3    Under no circumstances shall the rate of interest chargeable under this Note be in excess of the maximum amount permitted by applicable law.  If for any reason any such

2

excess interest is charged and paid, then the excess amount shall be promptly refunded by the Holder.

1.2.4    Interest on this Note shall be computed on the basis of the actual number of days elapsed over a year of 365 days (366 days in a leap year).  In computing such interest, the date this Note is issued shall be included and the date of payment of any Principal Amount shall be excluded.

1.3    Optional Prepayments.  The Principal Amount, together with any accrued and unpaid interest thereon, may be prepaid, at Obligor's option, at any time prior to the Maturity Date, in whole or in part, without premium or penalty. All payments received by Holder hereunder will be applied first to interest and the balance to the Principal Amount. No amount repaid or prepaid hereunder may be reborrowed.

1.4    Recordation of Payments. The Holder is hereby authorized to record all repayments or prepayments under this Note on the schedule attached hereto, or otherwise in its books and records, such schedule and/or books and records constituting *prima facie* evidence (absent manifest error) of the principal amount of this Note; provided, however, that the failure of the Holder to make such a notation or any error in such notation shall not affect the obligations of the Obligor to the Holder under this Note.

1.5    Form of Payment. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Holder may designate from time to time, or if no such designation is made.

1.6    TAC Loans.

1.6.1    Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

1.6.2    The parties hereto agree that the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by the Holder of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, by set-off or otherwise.

1.6.3    Each of GAP and the Holder agrees that it shall use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery.

1.6.4    Each of GAP and the Holder agrees that the Obligor's obligations to repay the Principal Amount, together with interest thereon, in accordance with the terms hereof are subject to performance by GAP and the Holder with its obligations under this Section 1.6.

3

ACTIVE/117864363.5

**SECTION 2.**            **MISCELLANEOUS**

2.1      <u>Amendments and Waivers; Transfers; Successor and Assigns</u>.  No amendment, modification, termination, waiver or consent to departure of any provision of this Note shall in any event be effective without the prior written consent of the Holder and the Obligor.  This Note may not be assigned or transferred by the Holder to any person or entity without the consent of the Obligor, and any such assignment or transfer without the Obligor's prior written consent shall be null and void in all respects.  The Obligor shall not be permitted to assign or transfer any of its rights, liabilities or obligations hereunder without the prior written consent of the Holder, and any such assignment or transfer without the Holder's prior written consent shall be null and void in all respects.  This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

2.2      <u>Applicable Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law.  The Holder and the Obligor hereby submit to the exclusive jurisdiction of the State and Federal courts located in the State of New York.  THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

2.3      <u>Entirety; No Strict Construction; No Third Party Beneficiaries</u>.  This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Holder and the Obligor and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

2.4      <u>Further Assurances</u>.  Each of the parties hereto agrees from time to time, as and when requested by any party hereto, to execute and deliver or cause to be executed and delivered, all such documents, instruments and agreements and to take or cause to be taken such further or other action as such party may reasonably deem necessary or desirable in order to carry out the intent and purposes of this Note and any other documents or agreements executed or otherwise delivered in connection herewith.

2.5      <u>Waivers</u>. The Obligor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

4

2.6     <u>Severability</u>.  If any provision of this Note is held by a court of competent jurisdiction to be void or unenforceable in whole or in part, the remaining provisions of this Note shall continue in full force and effect.


[*SIGNATURES FOLLOW*]

5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

**OBLIGOR**

DIGITAL CURRENCY GROUP, INC.

By: _____
Name:  Barry E. Silbert
Title:  Chief Executive Officer

Acknowledged and Agreed:

**HOLDER**

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____
Name:
Title:

[*SIGNATURES CONTINUE ON NEXT PAGE*]

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

## OBLIGOR

DIGITAL CURRENCY GROUP, INC.

By: _____

Name:

Title:

Acknowledged and Agreed:

## HOLDER

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____

Name:    S. Michael Moro

Title:    CEO

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*
ACTIVE/117864363.5

Docusign Envelope ID: DB498F8-3CDD-45F4-AE29-4923GE7E9E60

**Solely for purposes of Section 1.6 of the Note:**


GENESIS ASIA PACIFIC PTE. LTD.

By: _____

Name: S. Michael Moro

Title: Director


*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

ACTIVE/117864363.5

## SCHEDULE OF REPAYMENTS
## TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
| June 13, 2024 | $1,119,395,018.34* | $32,019,672.95 | $1,087,375,345.39 |
| July 17, 2024 | $1,090,144,542.98** | $29,780,550.15 | $1,060,363,992.83 |
| October 23, 2024 | $1,063,161,548.96*** | $24,126,776.92 | $1,039,034,772.04 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 3/29/2024.

** Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 6/28/2024.

*** Reflects PIK Interest added to the Principal Amount through the most recent Interest Payment Date on 9/30/2024.

**EXHIBIT 4**

**Fourth Promissory Note Letter**

*Execution Version*

February 6, 2025

**To:**     **Genesis Global Capital, LLC**
            175 Greenwich Street, Floor 38
            New York, NY 10007

**RE: Promissory Note Payment (Fourth Distribution by Three Arrows Capital Ltd. (in Liquidation))**

To whom it may concern:

Reference is made to (i) that certain Promissory Note issued by Digital Currency Group, Inc. ("**DCG**") to Genesis Global Capital, LLC ("**GGC**"), dated as of June 30, 2022 (the "**Promissory Note**") and (ii) that certain Settlement Agreement and Release by and among Genesis Global Holdco, LLC and its affiliated debtors and debtors-in-possession in the jointly-administered chapter 11 cases proceeding under the caption *In re Genesis Global Holdco, LLC, et al*. Case No. 23-10063 (SHL) ("**Genesis Chapter 11 Cases**"); DCG; Three Arrows Capital Ltd. (in Liquidation) ("**TAC**"); and Christopher Farmer and Russell Crumpler of Teneo (BVI) Limited, in their respective capacities as the duly authorized joint liquidators of the 3AC Debtor (the "**Joint Liquidators**") appointed in the British Virgin Islands liquidation of TAC (the "**TAC Settlement Agreement**"), which TAC Settlement Agreement was approved by the U.S. Bankruptcy Court for the Southern District of New York (the "**US Bankruptcy Court**") in the Genesis Chapter 11 Cases on November 30, 2023 and went effective as of December 22, 2023. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Promissory Note or the TAC Settlement Agreement, as applicable.

DCG hereby represents and warrants that on June 10, 2024, DCG received an interim distribution in the amount of $32,019,672.95 from the Joint Liquidators on account of DCG's claim against TAC (the "**First TAC Recovery Payment**"), the value of which reflects DCG's claim value for the initial distribution from TAC in light of the TAC Settlement Agreement. On June 13, 2024, DCG transferred the First TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the June 13, 2024 Promissory Note First TAC Payment Notice.

DCG hereby represents and warrants that on July 16, 2024, DCG received a second interim distribution in the amount of $29,780,550.15 from the Joint Liquidators on account of DCG's claim against TAC (the "**Second TAC Recovery Payment**"), the value of which reflects DCG's claim value for the second distribution from TAC in light of the TAC Settlement Agreement. On July 17, 2024, DCG transferred the Second TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the July 17, 2024 Promissory Note Second TAC Payment Notice.

DCG hereby represents and warrants that on October 21, 2024, DCG received a third interim distribution in the amount of $24,126,776.92 from the Joint Liquidators on account of DCG's claim against TAC (the "**Third TAC Recovery Payment**"), the value of which reflects DCG's claim value for the third distribution from TAC in light of the TAC Settlement Agreement. On October 23, 2024, DCG transferred the Third TAC Recovery Payment to GGC, with a corresponding reduction to the Promissory Note as set forth in the October 22, 2024 Promissory Note Third TAC Payment Notice.

DCG hereby represents and warrants that on January 27, 2025, DCG received a fourth interim distribution in the amount of $20,011,161.05 from the Joint Liquidators on account of DCG's claim against TAC (the "**Fourth TAC Recovery Payment**"), the value of which reflects DCG's claim value for the fourth distribution from TAC in light of the TAC Settlement Agreement.

Pursuant to Section 1.6 of the Promissory Note, DCG hereby provides GGC with notice that it intends to transfer the Fourth TAC Recovery Payment to GGC by wire transfer on February 7, 2025. The parties acknowledge and agree that, upon GGC's receipt of the Fourth TAC Recovery Payment, the Principal Amount of the Promissory Note shall be reduced

*Execution Version*

immediately and automatically (on a dollar-for-dollar basis) in the amount of the Fourth TAC Recovery Payment pursuant to Section 1.6.2 of the Promissory Note, which shall be reflected in the Promissory Note's Schedule of Repayments pursuant to Section 1.4 of the Promissory Note.  The Promissory Note with the updated Schedule of Repayments is attached hereto as **Exhibit A**.

Nothing herein or in any correspondence shall prejudice either party's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the Promissory Note, the June A&A Agreement, the A&A Agreement, the Loan Documents, any instruments or agreements referred to therein and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved.

**Digital Currency Group, Inc.**          **Genesis Global Capital, LLC**

Signed by:

*Mark Shifke*
595D869CA28A435...

Name:  Mark Shifke
Title:    Chief Financial Officer

DocuSigned by:

*Mark Renzi*
84CE61A361C74C2...

Name: Mark Renzi
Title: Plan Administrator

*Execution Version*

## EXHIBIT A

**Promissory Note (with revised Schedule of Repayments as of February 7, 2025)**

PAYMENT OF THIS NOTE AND OF THE OBLIGATIONS HEREUNDER ARE SUBORDINATED TO THE EXTENT AND IN THE MANNER PROVIDED FOR IN THAT CERTAIN INTERCOMPANY SUBORDINATION AGREEMENT (THE "**SUBORDINATION AGREEMENT**") BY AND AMONG THE OBLIGOR (AS HEREINAFTER DEFINED), THE SUBSIDIARIES OF THE OBLIGOR PARTY THERETO FROM TIME TO TIME, AND SB CORPORATE FUNDING LLC, AS ADMINISTRATIVE AGENT. THE SUBORDINATION AGREEMENT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART HEREOF AS IF SET FORTH HEREIN IN ITS ENTIRETY.

## PROMISSORY NOTE

$1,100,000,000.00                                                                                          June 30, 2022

THIS PROMISSORY NOTE (this "**Note**") is made as of the date first written above by the undersigned, DIGITAL CURRENCY GROUP, INC., a Delaware corporation (the "**Obligor**"), to GENESIS GLOBAL CAPITAL, LLC, a Delaware limited liability company (together with any successors or assigns or any subsequent holder of this Note, the "**Holder**"), and, solely for purposes of the agreements set forth in Section 1.6 of this Note, GENESIS ASIA PACIFIC PTE. LTD., a corporation organized and existing under the laws of Singapore ("**GAP**").

### WITNESSETH

WHEREAS, GAP heretofore has made or assumed loans and other financial accommodations (collectively, the "**TAC Loans**") provided from time to time to Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("**TAC**");

WHEREAS, the TAC Loans were funded with working capital provided from time to time by the Holder, evidenced by book-entry intercompany transfers from the Holder to GAP and resulting in non-interest-bearing accounts payable from GAP to the Holder (the "**Intercompany Payables**");

WHEREAS, as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined)) as of such date, is $1,100,000,000.00 (the "**Assumed Liability**");

WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans;

WHEREAS, notwithstanding the foregoing, the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof;

ACTIVE/117864363.5

WHEREAS, contemporaneously with the issuance of this Note, GAP assigned to the Obligor, and the Obligor assumed from GAP, the Assumed Liability pursuant to that certain Assignment and Assumption Agreement, dated as of even date herewith, between GAP and the Obligor (the "**Assignment**"); and

WHEREAS, the Obligor is issuing this Note to the Holder to evidence the Obligor's obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Note by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto agree as follows:

FOR VALUE RECEIVED, the Obligor promises to pay to the Holder on the Maturity Date (as hereinafter defined), the principal sum of ONE BILLION ONE HUNDRED MILLION AND 00/100 DOLLARS ($1,100,000,000.00), or such lesser amount as shall equal the outstanding principal balance hereunder (as such amount may increase from time to time, if applicable, due solely to the payment of PIK Interest (as hereinafter defined) pursuant to the terms hereof, the "**Principal Amount**"), in lawful money of the United States of America in immediately available funds, and to pay interest from the date of issuance of this Note on the Principal Amount from time to time outstanding at a rate per annum and payable on such dates as determined pursuant to the terms of this Note.

## SECTION 1.          TERMS OF PAYMENT

1.1     Maturity Date.  The unpaid Principal Amount of this Note, together with all accrued and unpaid interest as set forth in this Note, shall be paid in full on or before June 30, 2032 (the "**Maturity Date**").  If any day on which a payment is due pursuant to the terms of this Note is not a day on which banks in the State of New York are generally open (a "**Business Day**"), such payment shall be due on the next Business Day following.

1.2     Interest.

1.2.1    The Principal Amount outstanding from time to time shall bear interest at a rate equal to one percent (1.00%) per annum.

1.2.2    Interest with respect to this Note shall be paid quarterly in arrears on the last Business Day of each March, June, September and December of each calendar year, commencing September 30, 2022 (each, an "**Interest Payment Date**"), either (a) in cash or (b) at the option of the Obligor, or at any time cash payments are not permitted by the terms of the Subordination Agreement, in kind by adding an amount equal to the accrued interest for such quarterly interest period to the then-outstanding Principal Amount (interest so paid under this clause (b), "**PIK Interest**").  Once paid, any PIK Interest shall constitute principal of this Note and shall accrue interest as such.

1.2.3    Under no circumstances shall the rate of interest chargeable under this Note be in excess of the maximum amount permitted by applicable law.  If for any reason any such

2

excess interest is charged and paid, then the excess amount shall be promptly refunded by the Holder.

    1.2.4 Interest on this Note shall be computed on the basis of the actual number of days elapsed over a year of 365 days (366 days in a leap year). In computing such interest, the date this Note is issued shall be included and the date of payment of any Principal Amount shall be excluded.

    1.3 <u>Optional Prepayments</u>. The Principal Amount, together with any accrued and unpaid interest thereon, may be prepaid, at Obligor's option, at any time prior to the Maturity Date, in whole or in part, without premium or penalty. All payments received by Holder hereunder will be applied first to interest and the balance to the Principal Amount. No amount repaid or prepaid hereunder may be reborrowed.

    1.4 <u>Recordation of Payments</u>. The Holder is hereby authorized to record all repayments or prepayments under this Note on the schedule attached hereto, or otherwise in its books and records, such schedule and/or books and records constituting *prima facie* evidence (absent manifest error) of the principal amount of this Note; <u>provided</u>, <u>however</u>, that the failure of the Holder to make such a notation or any error in such notation shall not affect the obligations of the Obligor to the Holder under this Note.

    1.5 <u>Form of Payment</u>. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Holder may designate from time to time, or if no such designation is made.

    1.6 <u>TAC Loans</u>.

    1.6.1 Each of the Obligor and GAP hereby agrees to promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property (each, a "**TAC Recovery**"), for application to the Principal Amount then remaining unpaid, until paid in full.

    1.6.2 The parties hereto agree that the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis) upon the receipt by the Holder of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, by set-off or otherwise.

    1.6.3 Each of GAP and the Holder agrees that it shall use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery.

    1.6.4 Each of GAP and the Holder agrees that the Obligor's obligations to repay the Principal Amount, together with interest thereon, in accordance with the terms hereof are subject to performance by GAP and the Holder with its obligations under this <u>Section 1.6</u>.

3

**SECTION 2.**         **MISCELLANEOUS**

2.1     <u>Amendments and Waivers; Transfers; Successor and Assigns</u>.  No amendment, modification, termination, waiver or consent to departure of any provision of this Note shall in any event be effective without the prior written consent of the Holder and the Obligor.  This Note may not be assigned or transferred by the Holder to any person or entity without the consent of the Obligor, and any such assignment or transfer without the Obligor's prior written consent shall be null and void in all respects.  The Obligor shall not be permitted to assign or transfer any of its rights, liabilities or obligations hereunder without the prior written consent of the Holder, and any such assignment or transfer without the Holder's prior written consent shall be null and void in all respects.  This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

2.2     <u>Applicable Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law.  The Holder and the Obligor hereby submit to the exclusive jurisdiction of the State and Federal courts located in the State of New York.   THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED PARTIES.

2.3     <u>Entirety; No Strict Construction; No Third Party Beneficiaries</u>.   This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Holder and the Obligor and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

2.4     <u>Further Assurances</u>.  Each of the parties hereto agrees from time to time, as and when requested by any party hereto, to execute and deliver or cause to be executed and delivered, all such documents, instruments and agreements and to take or cause to be taken such further or other action as such party may reasonably deem necessary or desirable in order to carry out the intent and purposes of this Note and any other documents or agreements executed or otherwise delivered in connection herewith.

2.5     <u>Waivers</u>. The Obligor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

4

2.6    <u>Severability</u>.  If any provision of this Note is held by a court of competent jurisdiction to be void or unenforceable in whole or in part, the remaining provisions of this Note shall continue in full force and effect.


[*SIGNATURES FOLLOW*]

5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

**OBLIGOR**

DIGITAL CURRENCY GROUP, INC.


By: _____
Name:  Barry E. Silbert
Title:  Chief Executive Officer


Acknowledged and Agreed:

**HOLDER**


GENESIS GLOBAL CAPITAL, LLC


By: Genesis Global Holdco, LLC, its sole member


By: _____
Name:
Title:

[*SIGNATURES CONTINUE ON NEXT PAGE*]

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

ACTIVE/117864363.5

IN WITNESS WHEREOF, the Obligor has executed and delivered this Note as of the date first above written.

**OBLIGOR**

DIGITAL CURRENCY GROUP, INC.

By: _____

Name:

Title:

Acknowledged and Agreed:

**HOLDER**

GENESIS GLOBAL CAPITAL, LLC

By: Genesis Global Holdco, LLC, its sole member

By: _____

Name:    S. Michael Moro

Title:    CEO

*[SIGNATURES CONTINUE ON NEXT PAGE]*

Docusign Envelope ID: 7F62950E-BF59-459F-A00F-B6996594A8B6

**Solely for purposes of Section 1.6 of the Note:**

GENESIS ASIA PACIFIC PTE. LTD.

By: _____

Name:  S. Michael Moro

Title:  Director

*[Promissory Note – Digital Currency Group, Inc. to Genesis Global Capital, LLC]*

ACTIVE/117864363.5

*Execution Version*

## SCHEDULE OF REPAYMENTS

## TO NOTE OF DIGITAL CURRENCY GROUP, INC.

| Date | Principal Amount of Note Before Payment | Repayments of Principal | Unpaid Principal Amount After Payment |
|---|---|---|---|
| June 13, 2024 | $1,119,395,018.34[1] | $32,019,672.95 | $1,087,375,345.39 |
| July 17, 2024 | $1,090,144,542.98[2] | $29,780,550.15 | $1,060,363,992.83 |
| October 23, 2024 | $1,063,101,978.22[3] | $24,126,776.92 | $1,038,975,201.30 |
| February 7, 2025 | $1,041,601,335.40[4] | $20,011,161.05 | $1,021,590,174.35 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

[1] Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 3/29/2024.

[2] Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 6/28/2024.

[3] Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 9/30/2024.

[4] Reflects PIK Interest added to the Principal Amount through the Interest Payment Date on 12/31/2024.