**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC *et al.*, | Case No. 23-10063 (SHL) |
| Wind-Down Debtors. | Jointly Administered |
| DIGITAL CURRENCY GROUP, INC. | |
| Plaintiff, | |
| - against - | Adv. Pro. No. 25-01129 (SHL) |
| GENESIS GLOBAL CAPITAL, LLC; and GENESIS ASIA PACIFIC PTE. LTD. | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 7

LEGAL STANDARDS ................................................................................................................. 11

ARGUMENT ................................................................................................................................. 12

I.    The Complaint States a Claim for a Declaration That TAC Recoveries
      Have Reduced the Promissory Note's Principal Amount to Zero ................................... 12

      A.    Under the Plain Language of the Promissory Note,
            TAC Recoveries Have Reduced the Principal Amount to Zero ........................... 13

      B.    Genesis's Interpretation of "TAC Collateral" Is
            Contrary to the Promissory Note's Unambiguous Terms .................................... 17

      C.    Genesis's Interpretation of "TAC Recoveries" Is
            Contrary to the Promissory Note's Unambiguous Terms .................................... 21

II.   The Complaint States Equitable Claims for
      Repayment of TAC Recoveries that DCG Paid to GGC .................................................. 21

III.  Genesis's Affirmative Defenses Lack Merit .................................................................... 23

      A.    DCG's Claims Are Timely ................................................................................... 23

      B.    DCG Did Not "Forfeit" Its Claims in
            Connection with the 2024 Adversary Proceeding ............................................... 27

      C.    DCG Did Not "Waive" Its Claims ....................................................................... 32

      D.    DCG's Claims Are Not Judicially Estopped ....................................................... 34

IV.   Genesis's Request That the Court Consider
      Certain Allegations in Isolation Violates
      Well-Established Standards Governing This Motion ........................................................ 38

V.    GAP Is a Proper Party to this Action .............................................................................. 39

CONCLUSION .............................................................................................................................. 40

# TABLE OF AUTHORITIES

CASES

PAGE(S)

*All Am. Tel. Co., Inc. v. AT & T Corp.*,
328 F. Supp. 3d 342 (S.D.N.Y. 2018) ............................................................... 35, 38

*Angell v. U.S. Army Corps of Eng'rs*,
149 F. App'x 34 (2d Cir. 2005) ......................................................................... 28

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .............................................................................. 39

*In re Avianca Holdings S.A.*,
127 F.4th 414 (2d Cir. 2025) ............................................................................ 23, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 12

*Boykin v. KeyCorp*,
521 F.3d 202 (2d Cir. 2008) .............................................................................. 39

*Braman v. Pub. Emp. Risk Mgmt. Ass'n, Inc.*,
2025 WL 894957 (N.D.N.Y. Mar. 24, 2025) ................................................... 37

*Briggs v. United States*,
2008 WL 4667117 (N.D. Cal. 2010) ................................................................ 30

*DeLuca v. AccessIT Group, Inc.*,
695 F. Supp. 2d 54 (S.D.N.Y. 2010) ................................................................ 33

*DeRosa v. Nat'l Envelope Corp.*,
595 F.3d 99 (2d Cir. 2010) ................................................................................ 38

*In re Ditech Holding Corp.*,
2021 WL 5048131 (Bankr. S.D.N.Y. Oct. 29, 2021) ...................................... 36, 37

*DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*,
2019 WL 13414939 (S.D.N.Y. Mar. 11, 2019) ............................................... 19

*Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*,
2012 WL 4474587 (S.D.N.Y. Sept. 28, 2012) ................................................. 32

*Emps. Ins. of Wausau v. United States*
764 F.2d 1572 (Fed. Cir. 1985) ........................................................................ 29

*Evercrete Corp. v. H-Cap Ltd.*,
429 F. Supp. 2d 612 (S.D.N.Y. 2006) .............................................................. 36

*Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*,
49 F.4th 105 (2d Cir. 2022) ................................................................................ 34

*Flynn v. McGraw Hill LLC*,
120 F.4th 1157 (2d Cir. 2024) .................................................................... 13, 17

*Friedl v. City of New York*,
210 F.3d 79 (2d Cir. 2000) ................................................................................ 12

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*,
20 N.Y.3d 438 (2013) ........................................................................................ 30

*Harris v. City of New York*,
186 F.3d 243 (2d Cir. 1999) .............................................................................. 25

*Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*,
208 F.R.D. 59 (S.D.N.Y. 2002) ......................................................................... 27

*Karupaiyan v. Experis IT*,
2022 WL 4280529 (S.D.N.Y. Sept. 15, 2022) .................................................. 12

*In re Knight-Celotex, LLC*,
695 F.3d 714 (7th Cir. 2012) ............................................................................. 35

*In re Lehman Bros. Holdings Inc.*,
479 B.R. 268 (S.D.N.Y. 2012) .......................................................................... 30

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*,
646 F. Supp. 1442 (S.D.N.Y. 1986) .................................................................. 12

*Macklin v. Lexington Ins. Co.*,
2020 WL 5796814 (S.D.N.Y. Sept. 29, 2020) .................................................. 38

*Macri v. Newburgh Enlarged City Sch. Dist.*,
2004 WL 1277990 (S.D.N.Y. June 8, 2004) .................................................... 34

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
265 F.R.D. 106 (S.D.N.Y. 2010) ...................................................................... 33

*Mfrs. Hanover Tr. Co. v. Chem. Bank*,
160 A.D.2d 113 (1st Dep't 1990) ...................................................................... 22

*Matrixx Initiatives Inc. v. Siracusano*,
563 U.S. 27 (2011) ............................................................................................. 38

*McCormack v. IBM*,
145 F. Supp. 3d 258 (S.D.N.Y. 2015) ............................................................... 12

*Meng v. New Sch.*,
686 F. Supp. 3d 312 (S.D.N.Y. 2023) ............................................................... 32

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
112 F.4th 144 (2d Cir. 2024) .............................................................................. 25

*Midland Funding, LLC v. Johnson*,
581 U.S. 224 (2017) .................................................................................... 23, 24

*Moore v. Hadestown Broadway LLC*,
722 F. Supp. 3d 229 (S.D.N.Y. 2024) ............................................................ 12, 23

*In re Motors Liquidation Co.*,
598 B.R. 744 (Bankr. S.D.N.Y. 2019) ................................................................. 26

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*,
723 F.3d 192 (2d Cir. 2013) ............................................................................... 33

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......................................................................................... 34

*NRA v. Vullo*
602 U.S. 175 (2024) .......................................................................................... 38

*In re Oi Brasil Holdings Cooperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017) ................................................................. 35

*In re Platinum-Beechwood Litig.*,
390 F. Supp. 3d 483 (S.D.N.Y. 2019) ................................................................. 29

*Randolph Found. v. Duncan*,
2002 WL 32862 (S.D.N.Y. Jan. 11, 2002) ........................................................... 40

*RCG, LLC v. Am. Broadband Commc'n, LLC*,
2011 WL 2162974 (S.D.N.Y. May 31, 2011) ....................................................... 31

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*,
156 F. App'x 349 (2d Cir. 2005) ........................................................................ 23

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ............................................................................... 12

*In re SemCrude, L.P.*,
443 B.R. 472 (Bankr. D. Del. 2011) .................................................................... 27

*Speed Prods. Co. v. Tinnerman Prods.*,
222 F.2d 61 (2d Cir. 1955) ................................................................................ 27

*In re Tronox Inc.*,
2015 WL 3799702 (Bankr. S.D.N.Y. June 17, 2015) ............................................. 27

*Trs. of N.Y.C. Dist. Council Carpenters Pension Fund v. MI Installers & Furniture Servs.*,
2013 WL 1385791 (S.D.N.Y. 2013) .................................................................... 29

iv

*United States v. Aquavella*,
   615 F.2d 12 (2d Cir. 1979) ................................................................. 28

*World Trade Ctrs. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*,
   2018 WL 6628840 (S.D.N.Y. Dec. 18, 2018) ..................................... 30

*Zedner v. United States*,
   547 U.S. 489 (2006) ................................................................. 34, 37

STATUTES & RULES

11 U.S.C. § 101(5) ................................................................. 5, 24, 26

11 U.S.C. § 1125 ................................................................. 36

28 U.S.C. § 2072(b) ................................................................. 27

Fed. R. Civ. P. 8 ................................................................. 39–40

Fed. R. Civ. P. 8(c) ................................................................. 12

Fed. R. Civ. P. 12(b)(6) ................................................................. 11–12, 33

Fed. R. Civ. P. 13(a) ................................................................. 6, 27–29, 31

Fed. R. Bankr. P. 7012(b) ................................................................. 11

Fed. R. Bankr. P. 7013 ................................................................. 25

OTHER AUTHORITIES

6 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
   § 1411 (3d ed. 2025) ................................................................. 29

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
   § 4477.3 (3d ed. 2025) ................................................................. 37

10 Collier on Bankruptcy
   ¶ 7013.04 (16th ed. 2025) ................................................................. 25

## PRELIMINARY STATEMENT[1]

1.      In this lawsuit, DCG seeks a declaration that it has no further obligations under a Promissory Note that it extended to Genesis in June 2022.  Amidst unprecedented turbulence in cryptocurrency markets, DCG voluntarily extended this Note to backstop Genesis against potential loss from the June 2022 default of a large Genesis borrower, Three Arrows Capital, Ltd. ("TAC").  The Note had an initial Principal Amount of $1.1 billion that was "reduced immediately and automatically (on a dollar-for-dollar basis)" by all "TAC Recover[ies]."

2.      As set forth in the Complaint, TAC Recoveries by Genesis to date have exceeded the initial $1.1 billion Principal Amount by hundreds of millions of dollars, and the Principal Amount of the Promissory Note has therefore been reduced "immediately and automatically" to zero.  Genesis ultimately suffered no loss from TAC's default; rather Genesis has profited by hundreds of millions of dollars (which Genesis is entitled to keep).  Thus, the Note fulfilled its function of backstopping Genesis's then-***potential*** loss of $1.1 billion from TAC's default as of June 30, 2022—potential loss that has now been reduced to (and below) zero.  Further, DCG is entitled to recover from Genesis overpayments made, pursuant to a full reservation of its rights, on the mistaken belief that the payments were owed to GGC under the Note.[2]

3.      In moving to dismiss DCG's Complaint, Genesis rushes headlong from the Promissory Note's plain language.  Indeed, the first four principal points in Genesis's moving brief comprise (meritless) affirmative defenses that seek to avoid this Court's consideration of

---

[1] Unless otherwise indicated, all emphasis has been added and all citations, internal quotations, alterations and footnotes have been omitted from quotations in this brief.  In citations, "Compl." refers to DCG's Complaint, "Note" refers to the Promissory Note appended as Exhibit 1 to the Complaint, "Br." refers to Genesis's moving brief, and "Decl." refers to the Declaration of Aracely Valencia in support of Genesis's motion.  Citations in the form "ECF #__" refer to documents filed in the above-captioned bankruptcy case in which this adversary proceeding was brought.

[2] Notwithstanding the foregoing, DCG does not intend to seek "claw back" of any past individual creditor recoveries from the Genesis estate.

1

the Note's provisions altogether.  There is no stronger signal that the language of the Note unambiguously supports DCG's plain reading than Genesis's extended efforts to persuade the Court to stop short of reading the Note and applying its clear language.

4.      The Promissory Note's plain language clearly evidences that the parties addressed "expected" future recoveries by GAP on "collateral provided by TAC to secure certain of the TAC Loans (the 'TAC Collateral')."  Note recital 4.  Each such "payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after [June 30, 2022], whether in cash, securities or other property (each, a 'TAC Recovery')" would, "upon the receipt by" GGC, "reduc[e] immediately and automatically" the Principal Amount of the Note.  *Id.* § 1.6.1–1.6.2.  The reduction "immediately and automatically" occurred whether GGC received the TAC Recovery "from GAP, [DCG], TAC or any other person or entity, by set-off or otherwise."  *Id.* § 1.6.2.  Each TAC Recovery was to be applied "to the Principal Amount then remaining unpaid, ***until paid in full***."  *Id.* § 1.6.1.

5.      This straightforward repayment mechanism perfectly suited the Promissory Note's specific purpose, which was to address a potential "hole" in the quarter-end book value of GAP's equity from TAC's default.  At the end of June 2022,  the cryptocurrency assets that TAC had provided as collateral (Bitcoin ("BTC"), Ether ("ETH"), and shares of Grayscale Bitcoin Trust ("GBTC")) fell about $1.1 billion short of covering TAC's outstanding obligations to Genesis when valued at the then-depressed market prices.  Thus, the potential loss exposure (assuming no further realizations from TAC or from any of the collateral that TAC had posted) as of the end of the second quarter was thought to be approximately $1.1 billion, and the initial Principal Amount of the Note was therefore set at that amount.  *Id.*  recital 3.  The Note was intended to backstop any losses that were subsequently realized up to $1.1 billion.

6.      No such losses have occurred.  As set forth in the Complaint, GGC's subsequent receipt of TAC Recoveries after cryptocurrency prices eventually recovered has "paid in full" the Promissory Note's Principal Amount.  For example, the GBTC shares provided by TAC as collateral increased in value from about $428.5 million on June 30, 2022 to more than $2.1 billion in late May 2024—when, on information and belief, Genesis used most of them to offset and satisfy GGC's liabilities to certain creditors.  DCG alleges that the incremental amounts Genesis realized after issuance of the Note far exceeded the prior potential $1.1 billion collateral shortfall, and allowed Genesis to profit from TAC's default by recovering nearly $2.8 billion on the original $2.36 billion in TAC Loans.  Far from suffering any loss on TAC's default, Genesis profited from the TAC Collateral to the tune of approximately $440 million.

7.      In moving to dismiss, Genesis advances two supposedly "plain meaning" arguments that the Promissory Note's Principal Amount has not been paid in full.  Those arguments seek to bind DCG to Genesis's demonstrably untenable interpretation of the Note— which breaks from the plain language and the parties' contemporaneous understanding, as alleged in the Complaint.  Those arguments also seek to provide Genesis a double recovery on the amounts that it already has fully recovered on the TAC Loans.  For Genesis's interpretation to prevail on this motion, it would have to be the *only* plausible reading of the Note's language. But, as shown below, the Note's unambiguous language precludes Genesis's interpretation.

8.      In its first interpretive argument, Genesis contends that the GBTC shares were not "TAC Collateral" because—based on (inaccurate) allegations that Genesis seeks to introduce from outside the Complaint—GAP foreclosed on them before the Promissory Note was executed.  Genesis insists that because, for certain legal purposes, the cryptocurrency assets were no longer "collateral" after GAP allegedly foreclosed on them, they cannot be "TAC Collateral,"

3

as the parties used that term in the Note. Thus, according to Genesis, their disposition was not a TAC Recovery that "immediately and automatically" reduced the Note's Principal Amount.

9.      As an initial matter, Genesis's reliance on factual assertions outside the Complaint, such as Genesis's alleged foreclosure on certain collateral provided by TAC, renders its arguments not cognizable on a motion to dismiss. Those factual assertions are also beyond the four corners of the Promissory Note, and thus inappropriate for "plain meaning" arguments. In any event, Genesis's interpretation is contrary to the Note's unambiguous definition of TAC Collateral, which explicitly looks back to the status as "collateral" when "***provided*** by TAC to secure certain of TAC Loans." Under this definition, any subsequent foreclosure would not change the historical fact that TAC "provided" the collateral.

10.      Even if "TAC Collateral" were ambiguous, the alleged foreclosure would not rebut the Complaint's allegations that at all relevant times the parties considered the GBTC, BTC and ETH to be "TAC Collateral"—as evidenced, for example, by references to it as "TAC Collateral" in ***Genesis's*** general ledger for months after June 2022. Compl. ¶ 36. Indeed, Genesis is in no position to stand before this Court and deny that the parties, in fact, considered the GBTC to be "collateral" long after GAP allegedly foreclosed on it. In perhaps an inadvertent moment of candor, Genesis refers ***in its moving brief*** to the GBTC shares ***in April 2024***—i.e., long after GAP allegedly foreclosed on them—as "***collateral*** held by GGC on account of the $2.4 billion in loans to TAC." Br. ¶ 20. That is the natural, plain meaning of collateral, which the parties employed in the Promissory Note.

11.      In its second interpretive argument, Genesis contends that GGC's use of the GBTC shares to set off its liabilities to certain creditors was not a TAC Recovery because "in exchange, GGC received … a release" rather than a "payment, repayment, distribution, proceeds,

4

or other amount … in cash, securities, or other property." Br. ¶ 83–84 (quoting Note § 1.6.1). Genesis's argument is directly contrary to the Promissory Note's express provision that GGC can receive a "TAC Recovery"—that "immediately and automatically" upon receipt reduces the Note's Principal Amount—"from GAP, [DCG], TAC *or any other person or entity*, *by set-off* or otherwise." Note § 1.6.2. This is exactly what happened when GGC used most of the GBTC shares provided by TAC as collateral to set off its obligations to certain creditors in May 2024. Indeed, there is – and can be – no dispute that the "release" GGC received was linked to the reduction and ultimately, elimination, of an allowed claim that it otherwise would have been liable to pay. This is a textbook example of a setoff. Genesis's interpretation is also commercially unreasonable. Under that interpretation, any sale by GGC of the GBTC shares to repay creditors would be a TAC Recovery, but Genesis's use of the GBTC shares to set off its obligations to creditors was not. That bad faith attempted "gotcha" makes no business sense.

12. Genesis's affirmative defenses also lack merit. Genesis makes no attempt to show that its affirmative defenses – which it never acknowledges as such – overcome the general rule against entertaining affirmative defenses on a motion to dismiss, or to explain how the Court can consider any of the materials outside the Complaint on which Genesis's motion fundamentally relies. For this reason alone, those defenses should be disregarded at the pleading stage. In any event, those defenses are baseless.

13. In its first affirmative defense, Genesis argues that "DCG's Claims" are untimely because they were not asserted by the Bar Date. Br. ¶¶ 48–51. But the Bar Date applies only to a "claim" under Section 101(5) of the Bankruptcy Code, which "is a right to payment that arose before the filing of the petition." None of DCG's claims are "claims" under Section 101(5). DCG's declaratory judgment claim does not assert any right to payment. Instead, it requests a

5

declaration that TAC Recoveries have reduced the Principal Amount of the Promissory Note to zero. Thus, it is—like many claims under the Declaratory Judgment Act—a claim only in form, while in substance it is a defense. Under Genesis's argument, DCG would be time-barred from asserting any defense to a claim of liability under the Note, no matter how inconsistent the claim is with the Note's plain text. If Genesis claimed that DCG owed $1 trillion, DCG's defense would be "untimely." That absurdity shows why Genesis' argument is obviously wrong. DCG's equitable claims, on the other hand, also are not "claims" because they arose post-petition. In any event, Genesis has conceded, in its disclosure to creditors seeking their approval of its proposed Plan of Confirmation, that DCG's Proofs of Claim as "preserv[ed] [DCG's] rights in connection with, among other things, the [Promissory Note]."

14.     Genesis's second affirmative defense is that DCG "forfeited" its claims under Rule 13(a) because they were compulsory counterclaims in Genesis's 2024 Adversary Proceeding against DCG. But Rule 13(a) presents no obstacle to asserting a compulsory counterclaim in a separate suit. Rule 13(a) *defines* a compulsory counterclaim, but it is *res judicata* that bars a claim that was a compulsory counterclaim in a prior suit that already has been reduced to judgment. Because the prior proceeding was still pending when DCG filed its Complaint in the same bankruptcy case, *res judicata* presents no obstacle. In any event, DCG's claims were not compulsory counterclaims under Rule 13(a) for two independent reasons: they matured after DCG filed its amended answer in the 2024 Adversary Proceeding, and they did not arise from the same transactions and occurrences as GGC's claims. Genesis also argues that DCG's claims are inconsistent with DCG's counterclaim in the 2024 proceeding, but omits that DCG explicitly pleaded its counterclaim *in the alternative*, on premises that DCG disputed, solely to preserve its rights.

6

15. Genesis's third affirmative defense is waiver.  Genesis argues that in letters pursuant to which DCG paid the TAC Recoveries that DCG now seeks to recover from GGC, DCG waived its rights under Promissory Note, including by incorrectly stating the Note's remaining principal balance.  Br. ¶¶ 64–67.  In fact, these letters conclusively rebut Genesis's theory of waiver, which Genesis concedes requires a knowing and intentional relinquishment of a right.  Refuting any such intent, each letter expressly states that "[n]othing herein shall prejudice" DCG's rights under the Promissory Note, all of which "are hereby specifically reserved."  And because, under the Note's plain terms, no waivers are valid "without the prior written consent of the Holder [GGC] and the Obligor [DCG]," (Note §2.1), DCG's express preservation of its rights defeats Genesis's argument based on the face of the Note itself.

16. Genesis's final affirmative defense is judicial estoppel.  Br. ¶¶ 68–73.  That defense fails because none of DCG's supposedly inconsistent statements in the Genesis bankruptcy conflict with its claims in this adversary proceeding, and the Court did not accept or endorse any of these statements.  And it would be inequitable to bar DCG's claims on that basis.

17. For these reasons, and the additional reasons set forth below, the Court should deny Genesis's motion to dismiss in its entirely.

**STATEMENT OF FACTS**

18. Plaintiff DCG is a global investor, builder, and incubator committed to advancing decentralized ecosystems built on blockchain technology.  Compl. ¶¶ 1, 14.  To this end, DCG invests in cryptocurrency related companies, among other activities.  *Id.* ¶ 1.  Defendants GGC and GAP—DCG's wholly owned, indirect subsidiaries—were engaged in cryptocurrency brokerage and related activities, including lending to institutional and high net worth individual customers, prior to filing for bankruptcy in January 2023.  *Id.* ¶¶ 1, 15–17, 19.

19. In 2019 and 2020, Genesis made secured loans to TAC, a Singapore-based firm

7

that traded digital assets.  Compl. ¶ 21–22.  TAC provided to Genesis 35,585,040 GBTC shares, 33,348.3 BTC and 17,455.73 ETH as collateral.  *Id.* ¶ 23.  GAP funded its loans to TAC through intercompany loans from GGC to GAP, which were undocumented, bore no interest, had no maturity date, and gave GGC no right to require repayment on demand.  *Id.* ¶ 25.  In July 2020, GGC assigned all its agreements with TAC to GAP.  *Id.*

20.     In 2022 and 2023, cryptocurrency markets suffered a "crypto winter," characterized by lasting, steep declines in cryptocurrency values and serial failures of large players in the cryptocurrency space.  *Id.* ¶ 31.  After several market shocks, TAC collapsed in June 2022.  *Id.* ¶ 32.  On June 13, 2022, TAC failed to post to GAP about $334 million in required collateral.  *Id.* ¶ 33.  On June 27, 2022, TAC commenced a liquidation proceeding.  *Id.* ¶ 37.  As of June 30, 2022, the TAC collateral held by Genesis was worth about $1.1 billion total, consisting of 35,585,040 GBTC shares worth about $428.5 million, 33,348.3 BTC worth about $666 million, and 17,455.73 ETH worth about $19 million. *Id.* ¶ 35.

21.     As a result of TAC's default, GAP faced the risk of a significant "hole" in its book equity value for the quarter ended June 30, 2022.  *Id.* ¶ 38.  After exploring various ways to assist its subsidiary, DCG voluntarily assumed up to $1.1 billion of GAP's intercompany liability to GGC, reducing the liabilities on GAP's balance sheet by $1.1 billion.  *Id.* ¶ 39.  On June 30, 2022, DCG and GAP entered into an Assignment and Assumption Agreement (the "A&A") in which DCG assumed this liability.  *Id.* ¶ 40.

22.     The parties memorialized the terms of the Assumed Liability in a Promissory Note from DCG to GGC that backstopped the potential losses from the TAC default, up to $1.1 billion, to the extent that GAP did not eventually recover a sufficient amount from the TAC collateral or the TAC liquidation proceedings.  *Id*. ¶¶ 39–40.  The June 30, 2022 Note had a $1.1

8

billion initial Principal Amount, a ten-year maturity, and a 1% interest rate. *Id.* ¶ 41. Critically, the Note has a repayment provision specifically structured to ensure that GGC had recourse to a creditworthy counterparty (DCG) in the event that subsequent recoveries—either through further recoveries on the TAC Collateral or recoveries on the TAC Loans through the TAC liquidation proceedings or otherwise—were insufficient to pay the Principal Amount. *Id.* ¶ 42.

23.     Consistent with the issuance of the Promissory Note for this specific purpose, the Note contains a straightforward mechanism for automatically reducing its "Principal Amount" in response to TAC Recoveries, including the "expected recoveries" on the TAC Collateral (which subsequently materialized). *Id.* ¶ 43. The Note defines TAC Recovery to include a recovery on the TAC Collateral *or* the TAC Loans. *See id.* ¶ 45. The parties believed future realizations on the TAC Collateral might be the ***only*** TAC Recoveries that would reduce the Principal Amount:

> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "**TAC Collateral**"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

*Id.* ¶ 46 (quoting Note recital 4). The Note further provides for its "Principal Amount" to be "immediately and automatically" reduced "on a dollar-for-dollar basis" "upon the receipt by [GGC] of any TAC Recovery" from "any" person, "by set-off or otherwise." *Id.* ¶ 47 (quoting Note § 1.6.2). These reductions in Principal Amount obtain for every dollar of recovery that GGC receives in excess of the value of such TAC Collateral when the Note was issued. *Id.* ¶ 47. GAP and GGC are both required to use "commercially reasonable efforts … to maximize the TAC Recovery." *Id.* ¶ 48 (quoting Note § 1.6.3).

24.     The Promissory Note's terms reflect that Genesis's challenge was caused by TAC's insolvency (and lack of visibility into future recoveries from TAC) and by the depressed value of the TAC Collateral, and that DCG stood ready at the Maturity Date (or earlier, to the

9

extent that DCG received TAC Recoveries at a time when the Note still had a principal balance) to reduce whatever shortfall, if any, remained. *Id.* ¶ 53. Having recourse to DCG for any ultimate losses actually realized put Genesis in a far better position than merely having a claim of uncertain value in the TAC liquidation , plus additional recourse only to the then-profoundly depressed TAC Collateral. *Id.* DCG's promise to pay was a backstop, so the objective was not to provide Genesis with cash up front (which it did not at that time need). *Id.* The problem the Note solved was a threatened book equity problem, not an immediate liquidity need. *Id.*

25.    DCG did not request or receive the TAC Collateral as part of the Promissory Note transaction.[3] *Id.* ¶ 54. Instead, DCG issued the Note as a backstop in the event of any ultimate shortfall in recoveries from the TAC Collateral or the TAC liquidation proceedings, and Genesis kept the TAC Collateral and assumed an obligation to maximize recoveries on it. *Id.* This was highly favorable to Genesis because keeping the TAC Collateral allowed it to receive value from it much sooner than the Maturity Date of the Note. *Id.*

26.    The material assistance that DCG continued to provide to Genesis after June 2022 did not suffice to save Genesis from subsequent tectonic market shocks—including the November 2022 collapse of FTX, the world's largest digital asset exchange, and its affiliated trading firm, Alameda. *Id.* ¶¶ 55–56. The ensuing market contagion caused Genesis to halt its lending and borrowing business on November 16, 2022. *Id.* While GGC's direct credit exposure to FTX was not material, FTX's bankruptcy spawned a "tsunami" in the crypto world, causing broad and lasting effects including Genesis's bankruptcy filing on January 19, 2023 due to the "run on the bank" that ensued in November 2022 and caused Genesis to halt withdrawals. *Id.* ¶ 57. Even absent TAC's June 2022 default, GGC would have lacked sufficient capital to

---

[3] In the 2024 Adversary Proceeding, DCG preserved its rights via a counterclaim, but has always maintained that DCG is not entitled to the collateral itself.

10

withstand the unexpected and devastating market rout that followed FTX's collapse. *Id.* On January 19, 2023, GGC and GAP—along with their parent company, filed for bankruptcy. *Id.*

27. Since June 2022, cryptocurrency values have generally increased dramatically. Compl. ¶ 59. This increase has allowed Genesis to obtain the TAC Recoveries that have paid off the Promissory Note. For example, on April 19, 2024, this Court approved a settlement between Gemini, acting on behalf of the Gemini Lenders, and Genesis, that provided for GGC to deliver 30,905,782 GBTC shares from among the TAC Collateral (the "30.9M GBTC Shares") to Gemini by May 31, 2024, and authorized Gemini to use them to satisfy, through in-kind delivery, GGC's obligations to the Gemini Lenders. *Id.* ¶ 68. In exchange, GGC's obligation to the Gemini Lenders was reduced on a "coin-for-coin basis." *Id.* GGC thus used the 30.9M GBTC Shares to achieve a TAC Recovery far in excess of the value of the 30.9M GBTC Shares when the Note was executed. *Id.* The incremental recovery beyond the GBTC Shares' June 30, 2022 value "immediately and automatically" reduced the Note's Principal Amount by an amount far more than sufficient to adjust the Principal Amount to zero. Note § 1.6.2.

28. From time to time, DCG has received payments from TAC through the TAC liquidation proceedings. With the exception of the most recent payment, which DCG received on August 4, 2025, DCG has remitted to Genesis each payment from TAC as TAC Recoveries, under the misapprehension that the Principal Amount of the Promissory Note had not already been adjusted to zero. Compl. ¶ 72. Each of the four TAC Recoveries payments that DCG remitted to GGC was accompanied by DCG's express reservation of its rights. *Id.*

## LEGAL STANDARDS

29. To survive a motion to dismiss under Rule 12(b)(6), made applicable in adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, a complaint need only allege sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007).  On a motion to dismiss, the Court accepts "all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 n.7 (2d Cir. 2024), and may not "rel[y] on matters outside the pleading," including "factual allegations contained in legal briefs or memoranda."  *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000).

30.      "Affirmative defenses usually cannot be considered on a motion to dismiss." *Moore v. Hadestown Broadway LLC*, 722 F. Supp. 3d 229, 257 (S.D.N.Y. 2024).  An affirmative defense may be raised on a Rule 12(b)(6) motion ***only*** "if the defense appears on the face of the complaint …, documents incorporated by reference within the complaint[,] or documents that are integral to the complaint."  *Id.*  Untimeliness, *res judicata*, waiver, and estoppel are all affirmative defenses for this purpose.  *See Karupaiyan v. Experis IT*, 2022 WL 4280529, at *3 (S.D.N.Y. Sept. 15, 2022) (Because untimeliness is an affirmative defense, claims are not usually dismissed on this ground unless untimeliness is apparent from the face of the complaint or documents attached to the complaint"); *McCormack v. IBM*, 145 F. Supp. 3d 258, 270 (S.D.N.Y. 2015) (waiver); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1447 (S.D.N.Y. 1986) (estoppel); Fed. R. Civ. P. 8(c).

## ARGUMENT

**I.     The Complaint States a Claim for a Declaration
That TAC Recoveries Have Reduced the
Promissory Note's Principal Amount to Zero**

31.      When Genesis finally addresses the merits of DCG's request for a declaration under the Promissory Note, it proffers "plain meaning" interpretations of "TAC Collateral" and "TAC Recovery" that are contrary to the unambiguous terms of the Note.  Genesis thus fails to show, as it must in advancing "plain meaning" arguments on a motion to dismiss, that there is ***no*** other plausible reading of the Note's terms.

32.    As shown below, the Promissory Note unambiguously supports DCG's interpretation, and there is nothing in the Promissory Note from which the Court could conclude, as a matter of law, that Genesis's interpretation is correct.  But even if the Court were to conclude that DCG's interpretation is not unambiguously correct, there would be, at best for Genesis, ambiguity in the terms of the Note.  In that event, there are ample allegations in the Complaint as to extrinsic evidence that confirm DCG's reading of the Note—including the allegation (accepted as true on this motion) that all parties understood that TAC Collateral included the GBTC shares allegedly foreclosed on by Genesis before June 30, 2022, and that Genesis subsequently accounted for the GBTC shares as "TAC Collateral" in its books.

33.    The interpretive principles under governing New York law (*see* Note § 2.2) are well established.  "A contract is unambiguous where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024).  "Whether an agreement is ambiguous is a question of law for the courts, and ambiguity is determined by looking within the four corners of the document, ***not to outside sources***."  *Id.*  Where, as here, "the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, and the words and phrases used by the parties must be given their plain meaning."  *Id.*

**A.    Under the Plain Language of the Promissory Note,
<u>TAC Recoveries Have Reduced the Principal Amount to Zero</u>**

34.    As set forth in the Complaint, the plain terms of the Promissory Note provide that DCG was obligated to pay up to $1.1 billion ***only*** to the extent that recoveries from the collateral provided by TAC combined with any recoveries from the TAC liquidation proceeding or from any other person or entity by setoff or otherwise were insufficient to allow Genesis to recover the

13

shortfall in the collateral's value that existed on June 30, 2022.  Compl. ¶ 7.

35.     As explained in the Promissory Note's recitals,[4] loans from GAP to TAC ("TAC Loans") "were funded with working capital provided" by GGC, giving rise to an intercompany liability from GAP to GGC (the "Intercompany Payables").  *See* Note recitals 1 & 2.  After TAC defaulted, GAP faced a shortfall between its obligation to GGC and its ability to satisfy that obligation from the TAC Loans and the TAC Collateral.  *See id.* recitals 3 & 4.

36.     In response, DCG provided assistance to Genesis through the A&A and Promissory Note.  Pursuant to the A&A, DCG assumed GAP's intercompany liability to GGC.  *See* Note recital 6.  The parties "contemporaneously" entered into the Promissory Note to "evidence [DCG's] obligations in respect of the Assumed Liability and to memorialize the terms of the repayment thereof."  *Id.* recitals 6 & 7.  This wording reflects the parties' understanding that "the repayment of" the Assumed Liability was not solely, or even necessarily, "[DCG's] obligatio[n]," as discussed below.  For this purpose, the Promissory Note defines the "Assumed Liability" as "the aggregate principal amount of" GAP's intercompany liability to GGC as of June 30, 2022, "after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral (as hereinafter defined))."  *Id.* recitals 2 & 3.  Significantly, this language reflects that, at the time the Note was executed, the parties expressly contemplated that there was only "potential realization" of TAC Collateral—confirming that assets whose value was not yet fully realized were contemplated within the meaning of TAC Collateral.

37.     The parties agreed that the Assumed Liability equaled $1.1 billion as of June 30, 2022.  Note recital 3.  On this basis—and given that the Promissory Note "evidence[d] [DCG's]

---

[4] The recitals "are incorporated into the operative provisions of th[e] Note."  Note at 2.

obligations in respect of the Assumed Liability" and "memorialize[d] the terms of the repayment thereof," *Id.* recital 7—the parties set the Principal Amount of the Note at $1.1 billion as of June 30, 2022. *Id.* at 2.

38.     Significantly, the Promissory Note expressly provides for reduction in the Principal Amount (and the Assumed Liability) based on "***expected***" recoveries by GAP on the TAC Collateral (which subsequently materialized).  Note recital 4.  Indeed, the parties expressly acknowledged at the time they executed the Note their belief that subsequent realizations on the TAC Collateral, as opposed to recoveries on the TAC Loans from TAC's liquidation, might be the only way that the Principal Amount (and the Assumed Liability) would be reduced by TAC Recoveries:

> WHEREAS, TAC has defaulted on the TAC Loans and, except for expected recoveries from the realization by GAP of collateral provided by TAC to secure certain of the TAC Loans (the "TAC Collateral"), GAP has substantial doubts that it will be able to recover any additional amounts from TAC in respect of the TAC Loans.

*Id.* recital 4.[5]

39.     The mechanism set forth in the Promissory Note for reducing its Principal Amount is straightforward.  The Note expressly provides that "the Principal Amount hereof shall be reduced ***immediately and automatically*** (***on a dollar-for-dollar basis***) upon the receipt by [GGC] of any TAC Recovery, whether from GAP, the Obligor, TAC or any other person or entity, b***y set-off or otherwise***."  Note § 1.6.2.  The Note defines a "TAC Recovery" as "any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral after the date hereof, whether in cash, securities or other property."

---

[5] In fact, this is exactly how it has played out: GGC's recoveries on the TAC Collateral were far more than sufficient to adjust to zero the Principal Amount of the Promissory Note without regard to any recovery from TAC's liquidation.  Compl. ¶¶ 9, 69.

*Id.* § 1.6.1.  DCG and GAP are required "to promptly pay or transfer over" each TAC Recovery to GGC "for application to the Principal Amount then remaining unpaid, until paid in full."  *Id.* § 1.6.1.  The reference to "until paid in full" shows that the parties contemplated the possibility that the Note could be paid in full through TAC Recoveries.

40.  The Assumed Liability is reduced by the same straightforward mechanism.  *See* Note recital 5 ("[T]the Assumed Liability shall be reduced in accordance with the terms of Section 1.6 of this Note to reflect any repayment or other recoveries (including any further realization on the TAC Collateral) in respect of the TAC Loans after the date hereof[.]").

41.  It is through this unambiguous mechanism that the Promissory Note's Principal Amount was reduced to zero.  Among the "collateral provided by TAC to secure certain of the TAC Loans" were 35,585,040 GBTC shares.  Compl. ¶ 23; *see also id.* ¶¶ 35–36.  The shares were TAC Collateral under the definition of TAC Collateral as "collateral provided by TAC to secure certain of the TAC Loans."  Note recital 4.  Some time between April 19, 2024 and May 31, 2024, GGC used 30,905,782 of the GBTC shares (the "30.9 M GBTC Shares") among the TAC Collateral to offset its liability to the Gemini Lenders.  Compl. ¶¶ 29, 60, 63, 68–69; *see also id.* ¶¶ 27–30, 64–67.  This TAC Recovery "immediately and automatically" reduced the Note's Principal Amount because it was "an amount received in respect of … the TAC Collateral after [June 30, 2022] … in cash, securities or other property" that GGC received "by set-off or otherwise" from persons and entities "other" than GAP, DCG or TAC.  Note § 1.6.1–1.6.2.

42.  Although DCG does not know the precise value of the 30.9M GBTC Shares at the time GGC used them to realize a TAC Recovery, they were worth nearly $1.9 billion on May 31, 2024, for example—or nearly $1.5 billion more than their value at the end of June 2022.  Compl. ¶ 60.  On that basis, DCG alleges that this TAC Recovery alone was more than sufficient to

16

"pa[y] in full" the Promissory Note's then-Principal Amount. *Id.* (quoting Note § 1.6.1).

### B. Genesis's Interpretation of "TAC Collateral" Is Contrary to the Promissory Note's Unambiguous Terms

43.    Genesis argues that "TAC Collateral" did not include the GBTC shares "because the GBTC Shares had ceased to be 'collateral' in any sense upon GAP's Foreclosure [on them], two weeks prior to the execution of the Promissory Note." Br. ¶¶ 76. As shown below, that interpretation is contrary to the Note's plain language.

44.    As an initial matter, Genesis's arguments regarding the definition of "TAC Collateral" are rife with factual allegations, outside the four corners of the Promissory Note and the Complaint, regarding Genesis's foreclosure on certain collateral provided by TAC.[6] Thus, Genesis's acknowledgement that the Note's definitions of "TAC Collateral" and "TAC Recovery" are unambiguous (Br. ¶¶ 74–75) precludes reliance on those allegations to discern the Note's plain meaning. *See*, *e.g.*, *Flynn*, 120 F.4th at 1165.

45.    Genesis's interpretation of "TAC Collateral" also relies, in part, on the definition of "collateral" under the Uniform Commercial Code (UCC) as "the property subject to a security interest." Br. ¶ 79 & n.96. Genesis contends that under that definition, collateral loses its status as such on being foreclosed. Then, in a false step, Genesis argues that TAC Collateral therefore

---

[6] *See*, *e.g.*, Br. ¶ 12 (defining "Foreclosed Assets" as "certain of the TAC Collateral" on which GAP foreclosed, and asserting that "among the [otherwise unidentified] Foreclosed Assets" were 30,905,782 GBTC shares); *id.* ¶ 76 (alleging that GAP foreclosed on the GBTC shares "two weeks prior to the execution of the Promissory Note"); *id.* ¶ 77 (alleging that the "Foreclosed Assets" were worth $1.2 billion, and relying on that allegation to interpret the Note); *id*. ¶ 78 ("DCG argues unconvincingly that 'collateral provided by TAC' encompasses not only the collateral that existed as of the date the Promissory Note was signed, but also the GBTC Shares and the [unidentified] rest of the Foreclosed Assets.").

To support the allegations of foreclosure in its moving brief, Genesis cites filings in the 2024 Adversary Proceeding, including from DCG's counterclaim—which, as explained above, is pleaded in the alternative. *See surpra* ¶ 14. But TAC disputed the validity of GAP's foreclosure (*see* ECF #658 – Notice of Hearing on Debtors' Second Omnibus Objection ¶ 46; ECF # 658-1 – Attachment to Amended Proof of Claim Filed by TAC Joint Liquidators ¶¶ 19, 27), and TAC settled with Genesis and DCG without resolving that dispute (*see* ECF #906 – Notice of Genesis Debtors' Motion for Order Approving Settlement Agreement; ECF #1012 – Order Approving Settlement).

17

can include *only* collateral that Genesis possessed but had not yet foreclosed on when the Note was executed. But that simply does not follow from the definition. Instead, the unambiguous terms of the Promissory Note, as interpreted in the Complaint, are entirely consistent with the definition. Genesis concedes that the cryptocurrency assets provided by TAC were collateral in which Genesis had a security interest when TAC provided them. *Id.* (arguing that Genesis's "security interest" in the collateral provided by TAC "was extinguished when GAP foreclosed" on it). The Promissory Note explicitly acknowledges the "*collateral* provided by TAC to *secure* certain of the TAC Loans," Note recital 4, consistent with the collateral's status as "property subject to a security interest." None of this is disputed.

46.     Genesis insists that it somehow follows from the UCC definition that any assets on which Genesis foreclosed before the execution of the Promissory Note would no longer qualify as TAC Collateral, as the Note defines this term. That is a *non sequitur*. More important, it is directly contrary to the definition of "TAC Collateral," which unambiguously uses the past tense to refer back to when the "collateral [was] *provided* by TAC." Under this definition, foreclosure on the collateral after TAC provided it would not change the historical fact that TAC "*provided* [the collateral] to secure certain of the TAC loans." Genesis disregards the Note's use of "provided," which clearly points back to the status of the cryptocurrency assets as collateral when they were "provided by TAC." Genesis asks the Court to read into the Promissory Note a temporal limit such that TAC Collateral would include only "current" collateral (when the Note was executed), but the Note lacks a textual basis for such a limitation.[7]

---

[7] Veering far beyond the Promissory Note's text and the Complaint's allegations, Genesis argues that DCG's interpretation of "TAC Collateral" would embrace "any [hypothetical] assets 'provided by TAC to secure certain of the TAC Loans' *at any point*, even if those assets had ceased to be collateral for any reason." Br. ¶ 80 (emphasis in original). But Genesis's extra-contractual speculation is not a basis for a "plain meaning" interpretation of the Note. In any event, only recoveries "after" June 30, 2022 reduce DCG's obligations under the Note. *See* Note recital 5.

18

47.      Genesis's interpretation of TAC Collateral—which thus gains no support from the UCC definition—is otherwise contrary to the Promissory Note's unambiguous terms.  The Note was not, by its terms, a secured transaction.  None of the Note's provisions governing DCG's obligations to GGC or the reduction in the Note's Principal Amount through TAC Recoveries assign any significance to whether or not Genesis had an ongoing security interest in the collateral provided by TAC.  For example, the Note unambiguously expresses that the parties "expected recoveries from the realization by GAP of" TAC Collateral, and establishes a straightforward mechanism under which these TAC Recoveries reduce the Note's Principal Amount.  Note recital 4, § 1.6.  These provisions are silent on whether or when Genesis forecloses on the collateral provided by TAC.  Thus, these provisions leave no room for Genesis's attempt to obtain a windfall by realizing recoveries on "collateral provided by TAC to secure certain of the TAC Loans" and demanding $1.1 billion more from DCG.[8]

48.      Indeed, *Genesis's own moving brief* belies Genesis's insistence that the GBTC shares provided by TAC "no longer constituted collateral of any kind" after GAP allegedly foreclosed on them, and that the parties did not intend them to be "collateral provided by TAC" in drafting the Note.  In September 2025, GGC and GAP, both signatories to the Promissory Note, described the GBTC Shares *as of April 2024*—that is, long after GAP supposedly foreclosed on them—as "the *collateral* held by GGC on account of the $2.4 billion in loans to

---

[8] Genesis's own case (Br. at 35 n.96) undermines its reading of TAC Collateral.  In *DW Last Call Onshore, LLC v. Fun Eats & Drinks LLC*, the defendant was able to purchase certain assets of a debtor in bankruptcy "free of liens" only because the proceeds of their sale to the defendant satisfied the debtor's obligations to secured lenders, including the plaintiff.  2019 WL 13414939, at *7 (S.D.N.Y. Mar. 11, 2019).  The plaintiff then sought a second recovery from the defendant in the form of a pro rata share of the assets purchased by the defendant on the theory that they remained collateral, a theory rejected by the court.  See *id.* Genesis cites this case for the proposition that "once a purchaser acquired the relevant assets, those assets no longer constituted Collateral …," but omits that the proceeds of the asset sale were transmitted as required by contract—which is analogous to the outcome Genesis seeks to avoid here.  The court in *Last Call* then denied the plaintiff a double recovery.  This Court should likewise deny Genesis a double recovery from realizing on the TAC Collateral *and* demanding $1.1 billion more from DCG.

19

TAC." Br. ¶ 20. This reference to the GBTC Shares as "collateral"—consistent with natural usage of the term—confirms the parties' intent as set forth in the Note and as alleged in the Complaint, and exposes Genesis's contrary argument as a *post hoc* invention.

49.     Even if the definition of TAC Collateral were ambiguous (and it is not), and even if Genesis's allegations from outside the Complaint were cognizable (and they are not), Genesis's interpretation of the Promissory Note fails. Genesis resorts to parol evidence regarding "approximately $1.2 billion worth of Foreclosed Assets" to insist that, under the Note's third recital, in order to calculate the $1.1 billion Assumed Liability, this value must have been "applied to reduce the aggregate outstanding amounts under the TAC Loans from" the outstanding $2.36 billion in TAC Loans. Br. ¶ 77. But the recital itself indicates that the $1.1 billion calculation takes account of both "repayments and recoveries in respect of the TAC Loans" (which Genesis insists is how the "Foreclosed Assets" were counted) and "the value of any potential realization on any TAC Collateral"—which, as the Complaint alleges, including the GBTC Shares. *See*, *e.g.*, Compl. ¶ 63 (alleging that the GBTC Shares were "among the TAC Colalteral"). On this motion, DCG's allegations are accepted as true.

50.     Further, Genesis's interpretation is contrary to other parol evidence alleged in the Complaint, including that "Genesis's general ledger expressly labeled" assets including the GBTC Shares "as 'TAC Collateral,'" after June 2022, "which accords perfectly with Genesis's contemporaneous understanding and the unambiguous terms of the Promissory Note." And Genesis's interpretation is undermine by its reference to the GCTC Shares in April 2024 as "collateral." Br. ¶ 20. Therefore, even if "TAC Collateral" were ambiguous, Genesis's parol-evidence based interpretation of it cannot prevail on Genesis' motion to dismiss.

**C.      Genesis's Interpretation of "TAC Recoveries" Is
Contrary to the Promissory Note's Unambiguous Terms**

51.      Genesis argues that the (approximately $1.9 billion) benefit that "GGC received" from "apply[ing] the GBTC Shares … towards satisfying Gemini's obligations to" the Gemini Lenders (Br. ¶ 84) was not a TAC Recovery because GGC received "no 'payment, repayment, distribution, proceeds or other amount… in cash, securities, or other property.'"  *Id.* ¶ 81; *see also id.* ¶ 6.  Instead, "GGC received, *inter alia*, a release of those creditor claims."  *Id.* ¶ 84.

52.      Genesis disregards that the Promissory Note explicitly provides that GGC's "receipt" of a TAC Recovery "from GAP, the Obligor, TAC or ***any other person or entity***" can be "by set-off or otherwise."  Note § 1.6.2.  Moreover, GGC's receipt of a "TAC Recovery" from a third person by "set-off"—which is exactly what happened under the Gemini settlement—"immediately and automatically" reduces the Note's Principal Amount.  Genesis's contrary interpretation is precluded by this unambiguous language.

53.      Further, Genesis's interpretation is commercially unreasonable.  It defies business sense to conclude that a realization to Genesis from the TAC Collateral in the form of cash from third parties would "immediately and automatically" pay down the Note's Principal Amount, but that Genesis's use of TAC Collateral to satisfy its obligation to the Gemini Lenders by "set-off" of its obligations to third parties would not.  In both scenarios, Genesis realizes the same economic benefit.  Under these circumstances, Genesis is correct when it acknowledged that this "TAC Recovery [is] adequately pled."[9]  Br. ¶ 76.

**II.      The Complaint States Equitable Claims for
Repayment of TAC Recoveries that DCG Paid to GGC**

54.      In the Complaint, DCG pleads claims for repayment of the TAC Recoveries that it

---

[9] Genesis qualifies this concession only with an argument that the GBTC shares were not still "TAC Collateral," but as explained next, that interpretation does not arise from the plain meaning of the Promissory Note.  Br. ¶ 76.

21

paid to GGC under three legal theories: money had and received (Count II), mistaken payment (Count III), and unjust enrichment (Count IV).

55. Genesis does not argue that Counts II and IV fail to state a claim. Genesis therefore implicitly concedes that DCG has pleaded cognizable claims for money had and received and for unjust enrichment. Further, these claims are not subject to Genesis's affirmative defenses, as explained below. *See infra* Point III. Therefore, Genesis's motion to dismiss should, at a minimum, be denied as to these claims.

56. Genesis challenges Count III by arguing that DCG has not plausibly pleaded a mistake. Br. ¶ 85. Genesis concedes (*id.*) that DCG alleges that DCG paid approximately $106 million in TAC Recoveries to GGC while "[a]cting under the mistaken apprehension that the Principal Amount of the Promissory Note had not already been adjusted to zero." Compl. ¶ 94; *see also id.* ¶ 73 ("Over the life of the Promissory Note, DCG has (mistakenly, it turns out) sent nearly $106 million to GGC in TAC Recoveries."). DCG's apprehension that the Principal Amount had not already been adjusted to zero was, in fact, mistaken because, as shown above, the TAC Recovery in or about May 2024 paid the Note in full. *See supra* ¶¶ 34–42. In addition, Genesis has placed before the Court, as integral to the Complaint, DCG's payment letters— which *evidence* DCG's mistake in paying TAC Recoveries to GGC, and itemize the dates and amounts of the mistaken payments. *See* Br. Exs. 1–4; *infra* ¶ 81.

57. Genesis suggests that DCG should have known everything GGC knew about the TAC Recovery that paid the Note in full, including because the terms of the Gemini settlement agreement were publicly available. Br. ¶ 85. But as Genesis's own case explains, it is irrelevant whether "the mistake is due to the negligence of the payor." *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 117 (1st Dep't 1990); *see also*, *e.g.*, *RCN Telecom Servs., Inc. v. 202 Ctr.*

*St. Realty LLC.*, 156 F. App'x 349, 350 (2d Cir. 2005) ("In New York, money paid by mistake is recoverable, even if the mistake is due to the payor's own negligence.").

58.      Finally, Genesis proffers the purported "fact" that DCG supposedly "did not concoct its current theory about the Promissory Note's alleged reduction to zero until recently." Br. ¶ 85.  Genesis once again disregards the legal standards governing its motion to dismiss by improperly proffering allegations outside the Complaint.

### III.      Genesis's Affirmative Defenses Lack Merit

59.      None of Genesis's affirmative defenses[10] is cognizable on this motion to dismiss because none "appears on the face of the complaint …, documents incorporated by reference within the complaint[,] or documents that are integral to the complaint."  *Moore*, 722 F. Supp. 3d at 257.  In any event, each affirmative defense also fails on its merits.

### A.      DCG's Claims Are Timely

60.      Genesis's affirmative defense of untimeliness lacks merit.  Genesis argues that DCG's claims are untimely solely on the ground that DCG did not assert them prior to the Bar Date for "prepetition claims."  Br. ¶¶ 34, 48–51.  But none of DCG's claims are "claims" under the Bankruptcy Code or subject to the Bar Date under the applicable order.[11]  "A claim is (1) a right to payment (2) that arose before the filing of the petition."  *In re Avianca Holdings S.A.*, 127 F.4th 414, 424 (2d Cir. 2025); *see also Midland Funding, LLC v. Johnson*, 581 U.S. 224, 228 (2017) ("A 'claim' is a 'right to payment.'").  DCG's claims do not satisfy these requirements because (1) DCG's request for a declaration of non-liability under the Promissory Note (Count I) does not assert any right to payment against Genesis, and (2) DCG's equitable claims (Counts II–IV) are post-petition claims.

---

[10] As explained *supra* ¶ 30, untimeliness, *res judicata*, waiver, and estoppel are all affirmative defenses.

[11] *See* ECF #200 - *Order* (Apr. 4, 2023).

61. Genesis mischaracterizes DCG's Declaratory Judgment Act claim, which asserts no right to payment against Genesis. Instead, it seeks a declaration that TAC Recoveries have reduced the Promissory Note's Principal Amount to zero and, therefore, GGC is not entitled to any payment on the Note from DCG. If DCG were to voluntarily withdraw its declaratory claim and Genesis were to sue DCG on the Note, DCG plainly could raise the defense that TAC Recoveries have paid off the Note. Because DCG's declaratory claim asserts no right of payment against Genesis, it is not a "claim" under Section 101(5). For the same reason, it was not subject to the Bar Date,[12] and DCG was not required to file a Proof of Claim for it. *See*, *e.g.*, *Midland Funding*, 581 U.S. at 230 ("[A] proof of claim is a statement by the creditor that he or she has *a right to payment* …"). Genesis's reading—that DCG is barred from seeking a declaration regarding its payment obligations—would strip DCG of recourse to dispute *any* amounts Genesis might claim are owing under the Note, no matter how ludicrous or inconsistent with the Note's plain text. That absurd outcome cannot be right.

62. DCG's equitable claims for recovery of the TAC Recoveries that DCG paid to GGC after the Note's Principal Amount had been reduced to zero are *not* "claims" under the Bankruptcy Code because they did not "ar[i]se before the filing of the petition." *Avianca Holdings,* 127 F.4th at 424. The Bar Date applies *only* to a "Prepetition Claim,"[13] which includes only claims "that arose prior to the Petition Date."[14] Absent from Genesis's motion is any assertion, much less attempt to establish, that DCG's equitable claims arose prior to the

---

[12] *See* ECF #200 - *Order* ¶ 1, at 3 (Apr. 4, 2023) (incorporating Section 101(5)'s definition of a "claim").

[13] *See* ECF #200 - *Order* ¶ 10 (Apr. 4, 2023) (providing that the Bar Date applies to "[a]ny holder of a Prepetition Claim").

[14] ECF #135 – *Application* ¶ 10 (Mar. 16, 2023) (defining a "Prepetition Claim" as "a claim (as defined in section 101(5) of the Bankruptcy Code) [asserted] against the Debtors that *arose prior to the Petition Date*") (emphasis in the original); *see* ECF #200 – *Order* at 1 n.2 (Apr. 4, 2023) ("All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Application.").

Petition Date (i.e., January 19, 2023).

63.     In fact, the allegations of the Complaint establish that DCG's claims are post-petition claims that were not subject to the Bar Date, and therefore are timely. *See Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999) (stating that to overcome a defense of untimeliness, a complaint need only include "allegations consistent with a claim that would not be time-barred"). None of the TAC Recoveries that reduced the Principal Amount to zero, or DCG's mistaken payments of TAC Recoveries to GGC, occurred until more than a year after the Petition Date. Compl. ¶¶ 63–69, 78, 85, 94, 103. Therefore, DCG's equitable claims are not prepetition claims subject to the Bar Date.[15]

64.     In a footnote, Genesis makes an undeveloped argument that "DCG's Claims" were contingent claims "as of the Bar Date." Br. ¶ 49 n.66. Genesis's argument is not cognizable here because it rests on factual assertions outside the Complaint. *See*, *e.g.*, *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149–50 (2d Cir. 2024) ("[A]ffirmative defenses, like the statute of limitations, 'often require[ ] consideration of facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'"). The argument relies on an assertion about "Foreclosed Assets" and on a vague allusion to DCG's "prior reading." Br. ¶ 49 n.66. Those assertions are foreign to the Complaint.

65.     In any event, none of DCG's claims were contingent claims prior to Genesis's petition for bankruptcy. DCG's declaratory claim does not assert a right to payment, so it is not

---

[15] Genesis's position that DCG's claims were compulsory counterclaims to Genesis's claims in the 2024 Adversary Proceeding implicitly concedes that DCG's claims are post-petition claims. **Only** post-petition claims are **potentially** compulsory counterclaims to a debtor's claims. *See* Fed. R. Bankr. P. 7013; 10 Collier on Bankruptcy ¶ 7013.04 ("Thus, if a trustee [or debtor in possession] brings an adversary proceeding against a third party and that third party has a claim against the debtor that arose prepetition, the third party's claim need not be raised as a counterclaim in the answer to the trustee's [or debtor in possession's] complaint, even if the claim arises out of the same transaction or occurrence."). Nonetheless, Genesis is wrong that DCG's claims were compulsory counterclaims—including because, although they arose post-petition, they do not meet Rule 13's requirement that DCG "ha[d]" them "at the time" it served its amended answer. *See infra* Point III.B.2.

25

a "claim" under Section 101(5) regardless of when it arose.  And Genesis does not even attempt to explain how DCG's post-petition claims could qualify as contingent claims.

66.     The May 22, 2023 Bar Date Order[16] preceded Genesis's recovery on the 30.9 M GBTC Shares through the Gemini settlement by about a year, and preceded DCG's first payment to GGC on DCG's recoveries from the TAC liquidating estate by even longer.  Unlike in Genesis's case, "[a]ll events forming the basis for the claim" had *not* "occurred years before [the debtors'] bankruptcy," nor had DCG "contemplated" Genesis's confounding interpretation of the Promissory Note.  *See In re Motors Liquidation Co.*, 598 B.R. 744, 757 (Bankr. S.D.N.Y. 2019).

67.     Although DCG had no obligation to preserve its current claims in its Proofs of Claim, it nonetheless provided sufficient notice of its claims.  DCG's Proofs of Claim—which were filed on May 22, 2023— included specific reservations of rights as to the Promissory Note and, as Genesis acknowledges (Br. ¶ 50), attached the Promissory Note as exhibits.  They noted that DCG is entitled to recover any property or value from the BVI Proceeding, and "expressly reserve[d] all of [DCG's] rights to assert any additional claims, defenses, remedies, and causes of action, including without limitation," claims relating to the Note.  Indeed, in Genesis's disclosure to creditors in seeking their approval of Genesis's proposed Plan of Confirmation, Genesis described DCG's Proofs of Claim as "*preserving* [DCG's] rights in connection with, among other things, the [Promissory Note]."[17]  Because DCG could not foresee the future, DCG had no obligation to somehow detail the future events underlying its claims.  Genesis's argument that DCG was obligated to say more in its Proofs of Claim "ignore[s] the purpose and significance of [DCG's] explicit incorporation of the [Note] in its proofs of claim," *In re SemCrude, L.P.*, 443

---

[16]ECF #200 – *Order* (Apr. 4, 2024).

[17] *See* ECF #1031 – *Genesis's Amended Disclosure Statement* at 46 (Dec. 6, 2023).

B.R. 472, 474 (Bankr. D. Del. 2011), which is sufficient, together with DCG's reservation of rights, to preserve the right to seek compensation for whatever injuries relating to the Note later manifest. *See In re Tronox Inc.*, 2015 WL 3799702, at *8 (Bankr. S.D.N.Y. June 17, 2015).

### B.   DCG Did Not "Forfeit" Its Claims in Connection with the 2024 Adversary Proceeding

68.   Genesis argues DCG "forfeited" its claims by not asserting them in the 2024 Adversary Proceeding, in which they supposedly were compulsory counterclaims under Rule 13(a).  Br. ¶¶ 20–21, 24–25, 52–63.  Genesis is wrong that Rule 13(a) imposes any forfeiture on compulsory counterclaims, and is wrong that DCG's claims were compulsory counterclaims in the 2024 Adversary Proceeding.

### 1.   There Is No Basis to Dismiss DCG's Claims Under Rule 13(a)

69.   Regardless of whether DCG's claims were compulsory counterclaims in the 2024 Adversary Proceeding, DCG did not "forfeit" its claims under Rule 13(a).  "[T]he filing of a separate action in lieu of a compulsory counterclaim … is not a violation of Rule 13(a)." *Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*, 208 F.R.D. 59, 63 (S.D.N.Y. 2002).[18]

70.   Under governing precedent, *no* "*different legal effect* result[s] from pleading [a] claim in a second complaint," rather than "by an amendment in [a prior] action" in which it is a compulsory counterclaim, if "*at that time* no final judgment" had been entered in the prior proceeding.  *Speed Prods. Co. v. Tinnerman Prods.*, 222 F.2d 61, 68 (2d Cir. 1955).[19]  The absence of a final judgment in the earlier action at the time of the second complaint is

---

[18]Rule 13 has no substantive effect. *See* 28 U.S.C. § 2072(b).  If a claim is filed in the same court in which an action in which it is a compulsory counterclaim, "the court can just as easily achieve the same result" as a counterclaim "by consolidating the two actions." *Southridge*, 208 F.R.D. at 63.

[19] In *Tinnerman* the cases were consolidated after the second complaint was filed, causing the court to conclude there was "no difference" "[f]rom a practical viewpoint." *Id.*  But the court's conclusion there was no "different legal effect result[ing] from pleading the claim in a second complaint" did not rest on the subsequent consolidation, and instead rested on the fact that "*at th[e] time*" the claim was pleaded in the second complaint "no final judgment as to [the claim in the prior proceeding] had as yet been entered." *Id.*

27

dispositive, because the potential obstacle to an unasserted compulsory counterclaim is not, as Genesis insists, "forfeit[ure]," (Br. ¶¶ 58, 62), but instead *res judicata*. *See*, *e.g.*, *Angell v. U.S. Army Corps of Eng'rs*, 149 F. App'x 34, 36 (2d Cir. 2005).

71.     These principles are illustrated by *United States v. Aquavella*, 615 F.2d 12 (2d Cir. 1979), on which Genesis erroneously relies. Br. ¶ 47. In *Aquavella*, the government's claims were "compulsory counterclaims within the meaning of Rule 13(a), and … should have been adjudicated along with appellants' claims" in an earlier action—dubbed "the original action." 615 F.2d at 22. But the Second Circuit ***did not*** see that as any obstacle to adjudication of those claims on the merits. To the contrary, the court "remand[ed] with directions to the district court to dismiss the instant action, but ***to consider on the merits the government's claims as counterclaims raised in the still pending original action***." *Id.* at 23; *accord id.* at 14.

72.     The 2024 Adversary Proceeding was still pending when, on August 14, 2025, DCG filed its Complaint ***in the same bankruptcy case***. Under these circumstances, Genesis's argument that the 2024 Adversary Proceeding presents any obstacle to DCG's claims is directly contrary to Second Circuit precedent, including precedent on which Genesis relies.

### 2.      DCG's Claims Were Not Compulsory Counterclaims in the 2024 Adversary Proceeding

73.     DCG's claims were not compulsory counterclaims in the 2024 Adversary Proceeding because they had not yet accrued "at the time of [the] service" of DGC's pleadings in that action. Fed. R. Civ. P. 13(a)(1). Genesis makes no attempt to show, and cannot show, that any of DCG's claims existed on April 1, 2024, which was "the time" that DCG filed its amended answer in the 2024 Adversary Proceeding. *Id.*[20] DCG's declaratory claim did not accrue until

---

[20] *See* Amended Answer, *Genesis Global Capital, LLC, v. Digital Currency Group, Inc.*, Adv. Proc. No. 24-01312, ECF #8 (Bankr. S.D.N.Y. Apr. 1, 2024) (hereinafter "*GGC v. DCG*").

GGC received the TAC Recovery that reduced the Principal Amount of the Note to zero (no earlier than April 19, 2024, *see* Compl. ¶¶ 68–69) *and* GGC subsequently requested that DCG pay TAC Recoveries to it.  DCG's equitable claim did not accrue until GGC received the TAC Recovery that reduced the Principal Amount of the Note to zero *and* DCG subsequently paid TAC Recoveries to GGC (no earlier than June 13, 2024, *see* Decl. Ex. 1).  These events were all after DCG's amended answer, so none of DCG's claims was a compulsory counterclaim.  *See*, *e.g.*, *In re Platinum-Beechwood Litig.*, 390 F. Supp. 3d 483, 493 (S.D.N.Y. 2019); 6 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1411 (3d ed. 2025).

74.     Independently, DCG's claims are not compulsory counterclaims because they do not "aris[e] out of the transaction or occurrence that is the subject matter of the [***GGC's***] claim[s]" in the 2024 Adversary Proceeding.  Fed. R. Civ. P. 13(a)(1)(A).  GGC's own description of its claims confirms this.  *Id.*  GGC has represented that its claims "rest on a very simple core of undisputed facts and unambiguous agreements," including three agreements executed between July 14, 2022 and February 2024.[21]  Absent from GGC's description are the Promissory Note and any TAC Recovery that GGC realized, including TAC Recoveries paid by DCG to GGC—which are the basis for DCG's claims here.[22]  That DCG's claims arise out of different operative facts than GGC's claims suffices to defeat Genesis's Rule 13(a) argument. *See Emps. Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed. Cir. 1985) (noting that although the parties' claims "would have arisen out of the same contract," "[i]t does not necessarily follow [that] they arose out of the same transaction or occurrence"); *Briggs v. United*

---

[21] *GGC v. DCG*, ECF #9 – *Plaintiff's Motion for Judgment on the Pleadings* ¶ 1 (Apr. 4, 2024).

[22] While the TAC Loans are a backdrop for GGC's claims, they are neither the "subject matter" of those claims nor the transactions out of which DCG's claims arise.  *See*, *e.g.*, *Trs. of N.Y.C. Dist. Council Carpenters Pension Fund v. MI Installers & Furniture Serv*s., 2013 WL 1385791 at *4 (S.D.N.Y. 2013) (holding that a claim for a declaration against arbitration of a contract dispute and a lawsuit contending that defendants owed money under the same contract did not arise out of the same transaction or occurrence).

*States*, 2008 WL 4667117 at *5 (N.D. Cal. 2010) (claims from same contract did not arise from the "same 'transaction or occurrence'" because "the operative facts were not the same").

75.    Genesis tries to blur the clear distinctions between the subject matter of GGC's claims in the 2024 Adversary Proceedings and DCG's current claims by arguing that the July A&A underlying GCC's 2024 claims (which GGC refers to as the 2022 DCG-GAP A&A Agreement) is "a single integrated contract" with the Promissory Note and the A&A.  Br. ¶ 52. That is wrong because, in addition to the different dates of execution and the Note's integration clause (Note § 2.3), the July A&A contains a reference to the June 30, 2022 agreements that draws a bright line between the July A&A, on the one hand, and the Promissory Note and A&A, on the other hand – and thus affirmatively precludes any inference that the documents memorialize a unified transaction.[23]  "The fact that [the agreements] were executed about two weeks apart, … the inclusion of an integration clause in the [Promissory Note], and the lack of any cross-references between the [agreements that support integration] foreclose any reasonable inference that the parties intended the [agreements] to be read in conjunction with one another as the documentation of a unitary transaction."  *World Trade Ctrs. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 2018 WL 6628840, at *10 (S.D.N.Y. Dec. 18, 2018), *on reconsideration*, 2019 WL 2250338 (S.D.N.Y. May 23, 2019).[24]  At best for Genesis, there is ambiguity about whether writings are unified, which cannot be resolved on this motion by the allegations (from outside the Note and the Complaint) on which Genesis relies.  *RCG, LLC v. Am. Broadband Commc'n, LLC,*

---

[23] The July A&A distinguished the Promissory Note and A&A as, "in each case, entered into solely for purposes of internal accounting as an accommodation among affiliates without giving effect to any change in beneficial ownership of the loans or other interests purported to be transferred therein."  *GGC v. DCG* ECF #1 – Complaint Ex. 1 recital 5 (Jul. 14, 2022).

[24] *See also Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 20 N.Y.3d 438, 445 (2013) (mere reference to another agreement is "not enough to evidence clear intent for these two separate contracts to be read as one"); *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012) (reasoning that "it is plain that the two documents were intended to be read separately"), *aff'd*, 513 F. App'x 75 (2d Cir. 2013).

2011 WL 2162974, at *4 (S.D.N.Y. May 31, 2011) ("Any determination [of an ambiguous provision] will have to await further development of the record.").

76.     Genesis's final attempt to tie DCG's current claims to the 2024 Adversary proceeding is to argue that these claims arise from the same "transaction" as **DCG's** counterclaim.  Br. ¶ 60.  That argument is backwards because Rule 13(a) focuses on the relationship between a claim and "the **opposing party's**" claim.  And that backwards argument highlights why Genesis' Rule 13(a) argument is wrong.  Keep in mind that DCG's declaratory claim merely asserts a defense to a contract claim by Genesis.  If DCG's current declaratory claim did arise from the same transaction as DCG's prior counterclaim (and it does not), then Genesis's contract claim (to which DCG's declaratory claim asserts a defense) would have been a compulsory counterclaim to DCG's counterclaim in 2024.  It was not, including because TAC Recoveries had not yet paid off the Note **at the time**.  Which is exactly why DCG did not have its claims **at the time**, and therefore had no duty under Rule 13(a) to assert them.

77.     Finally, Genesis's argument that DCG's current claims are inconsistent with its counterclaim in the 2024 Adversary Proceeding is baseless.  Genesis disregards that DCG's supposedly inconsistent argument in the 2024 Adversary Proceeding is, as DCG explained, "simply an alternate legal theory," resulting from "GGC's filing of th[at] adversary proceeding … that broke from [the] shared understanding" of the agreements underlying that litigation.[25]  As DCG made clear, GGC's "untenable interpretation of the [July A&A] required DCG to file the Counterclaim" based on GGC's interpretation of the July A&A solely "in order to protect [DCG's] rights."[26]  Contrary to Genesis's accusation, DCG obviously is not seeking to

---

[25] *GGC v. DCG* ECF #26 – *Opposition Brief* ¶ 4 (May 16, 2024).

[26] *Id.*

31

benefit "twice" from the appreciation in value of the TAC Collateral.  Br. ¶ 21.

### C.    DCG Did Not "Waive" Its Claims

78.    Genesis also asserts the affirmative defense of waiver.  Genesis argues that DCG "waived the right to assert [its] Claims" by executing payment letters containing a statement of the remaining balance when paying TAC Recoveries to GGC.  Br. ¶ 64.  Waiver is an affirmative defense that Genesis bears the burden of establishing based on the allegations of the Complaint or other facts cognizable on this motion.  Genesis has failed to show that this is an exceptional case in which the affirmative defense of waiver is cognizable on a motion to dismiss.  To the contrary, the facts unambiguously show that DCG did not waive its claims.

79.    Genesis concedes that waiver "requires the intentional relinquishment of a known right."  Br. ¶ 4; *see also id.* ¶¶ 47, 65.  "Because in general, waiver defenses involve questions of fact, the issue of whether a given contract right has been waived is typically inappropriate for resolution on a motion to dismiss."  *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, 2012 WL 4474587, at *2 (S.D.N.Y. Sept. 28, 2012); *see also*, *e.g.*, *Meng v. New Sch.*, 686 F. Supp. 3d 312, 322 (S.D.N.Y. 2023) ("Given the factual nature of the waiver inquiry, the Court finds dismissal on this basis to be inappropriate" on a motion to dismiss.).

80.    Notably absent from Genesis's invocation of the affirmative defense of waiver is any argument that its defense is apparent from the face of the Complaint, or even any citation to the allegations of the Complaint.  In fact, the Complaint alleges that DCG's payments of TAC Recoveries were mistakes (Compl. ¶¶ 73, 95–96), and that "GGC did not acknowledge or inform DCG that the TAC Recoveries that it received from the TAC Collateral already had adjusted to zero the Principal Amount of the Promissory Note" (Compl. ¶¶ 85, 94, 103).  These allegations preclude any intent to knowingly waive DCG's explicit rights under the Promissory Note.  *See Eastman Chem. Co.*, 2012 WL 4474587 at *2; *Meng*, 686 F. Supp. 3d at 322.

81.     Instead, Genesis relies on letters accompanying DCG's payment of TAC

Recoveries to GGC.  Br. ¶ 63 n.80.  Genesis fails to explain how the Court can consider these

letters, which are nowhere mentioned in the Complaint, on Genesis's motion to dismiss.  *See*

*DeLuca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 60–61 (S.D.N.Y. 2010) (finding that the

party seeking to rely on documents outside the complaint had failed to show that the complaint

relied heavily upon the documents' terms and effects); *Madu, Edozie & Madu, P.C. v.*

*SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (same).  The only basis on

which the letters could be considered "integral" to the Complaint is that they *evidence* DCG's

mistake in paying TAC Recoveries to GGC.[27]  As such, the letters undermine Genesis's

affirmative defense of intentional waiver.  Nothing about including erroneous amounts for the

remaining balance evidences an intent to waive DCG's rights against GGC under the Promissory

Note.  Instead, those erroneous amounts were manifestations of DCG's mistake, which reinforce

DCG's allegation that it paid TAC Recoveries to GGC "under the mistaken apprehension that the

Principal Amount of the Promissory Note had not already been adjusted to zero."  Compl. ¶ 95.

82.     Moreover, clear language in the letters themselves conclusively rebuts any intent

by DCG to knowingly waive its rights under the Promissory Note.  Each letter expressly

provides that "[n]othing … herein shall prejudice" DCG's rights under the Promissory Note, all

of which "are hereby specifically reserved."[28]

83.     Drawing all reasonable inferences in DCG's favor, as required on this motion, the

---

[27] *See*, *e.g.*, *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 203 (2d Cir. 2013)
(distinguishing between "integral" documents on which plaintiff's claims are "solely" grounded, which can be
considered on a Rule 12(b)(6) motion, and documents that are "raised as an affirmative defense," which cannot).

[28] *See* Decl. Ex. 1 at 1 ("Nothing herein or in any correspondence shall prejudice either party's right to exercise any
rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the
Promissory Note … and/or applicable law, all of which rights, remedies, powers, claims and causes of action are
cumulative and all of which are hereby specifically reserved."); *accord id.* Ex. 2 at 1; *id.* Ex. 3 at 1–2; *id.* Ex. 4 at 2.

33

Complaint and the materials on which Genesis relies confirm that DCG *did not* intentionally waive its rights under the Promissory Note.

### D.      DCG's Claims Are Not Judicially Estopped

84.      Genesis also advances the affirmative defense of judicial estoppel. Genesis contends that DCG's (accurate) references to the Promissory Note's $1.1 billion Principal Amount in Genesis's bankruptcy proceedings are inconsistent with DCG's position that TAC Recoveries (subsequently) reduced the balance to zero. Br. ¶ 68. Genesis argues that the Court "adopted" DCG's reference to the Note's Principal Amount when the Court allowed DCG's positions with respect to certain disputes between DCG and Genesis to be included as an exhibit to Genesis's disclosure statement. *Id.* ¶¶ 68. But DCG's claims are not inconsistent with its prior statements and, in any event, this Court never "adopted" the statements. *See Macri v. Newburgh Enlarged City Sch. Dist.*, 2004 WL 1277990, at *13 (S.D.N.Y. June 8, 2004) (the party invoking judicial estoppel has the "burden" to show "the identical issue was necessarily decided in the prior action and is decisive of the present action").

85.      Under the doctrine of judicial estoppel:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*Zedner v. United States*, 547 U.S. 489, 504 (2006). Among the requirements are that "a party's later position must be clearly inconsistent with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). "[C]ourts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.*; *see Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 49 F.4th 105, 117 (2d Cir. 2022) (judicial

34

estoppel requires success "in persuading a court to accept [the] party's earlier position"). "The mere existence of a prior inconsistent position and adoption of that position by a tribunal, while necessary, are not sufficient, and a court must 'inquire into whether the particular factual circumstances of a case "tip the balance of equities in favor of doing so." *All Am. Tel. Co., Inc. v. AT & T Corp.*, 328 F. Supp. 3d 342, 360 (S.D.N.Y. 2018).

86.     Genesis argues that DCG's claims are "inconsistent" with statements by DCG "that the Promissory Note had a principal amount of $1.1 billion" contained in an exhibit to Genesis's December 6, 2023 Amended Disclosure Statement (the "Disclosure Statement"), and with statements made by DCG on October 31, 2023 in objecting to Genesis's October 25, 2023 Disclosure Statement.  Br. ¶¶ 70–73; *see id.* ¶¶ 37–40.  Genesis suggests that DCG's (accurate) statements of the Note's Principal Amount are inconsistent with DCG's claims in this action because DCG did not mention "the theories underlying" its current claims  *Id.* ¶ 72.  Similarly, Genesis argues that DCG's financial advisor, in opposing the Plan, identified the Note as "an approximately $1.1 billion note due June 30, 2032 from DCG,'" without explaining the Note's provision for reducing the Principal Amount through TAC Recoveries.  Br. ¶ 68.

87.     But Genesis has not established the requisite "clear inconsistency."  Accurately stating the Promissory Note's $1.1 billion Principal Amount is not inconsistent with subsequently noting the intervening reduction of that amount to zero.  *See*, *e.g.*, *In re Knight-Celotex, LLC*, 695 F.3d 714, 722–23 (7th Cir. 2012) (holding that for purposes of judicial estoppel silence about then-existing claims is not "clearly inconsistent" with the subsequent assertion of the claims); *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 205 (Bankr. S.D.N.Y. 2017) (recognizing that "silence in a prior proceeding provides a basis for judicial estoppel" where a debtor fails "to declare the existence of assets or potential assets" but

recognizing no obligation to disclose theories of liability).  Genesis's attempt to manufacture an inconsistency from **purported** silence as to DCG's subsequent claims is undermined by the clear disclosure in DCG's exhibit to Genesis's Disclosure Statement of the "risk that DCG will successfully prosecute its own causes of action or counterclaims against the Debtors, resulting in substantially lower recoveries to creditors" and by DCG's broad reservation of rights.[29]

88.      In any event, the Court did not adopt any of DCG's purportedly inconsistent statements.  Genesis argues that in approving the Disclosure Statement as containing adequate information, the Court relied on its "full contents … including the extensive Revised DCG Response Exhibit."  Br. ¶ 72; *see id.* ¶ 42 n.60.  But Genesis cites no case in which disclosure statement approval constituted acceptance for purposes of judicial estoppel.  To the contrary, that approval, on its face, did not constitute the Court's acceptance of any statement by DCG.  *Cf. In re Ditech Holding Corp.*, 2021 WL 5048131, at *10 (Bankr. S.D.N.Y. Oct. 29, 2021) ("In the bankruptcy context, [judicial] acceptance [of a debtor's representations in a disclosure statement] may be evidenced in the form of a discharge granted to the debtor, a confirmed plan, or some other judicial relief that was granted to the debtor in reliance upon the purported inconsistency or omission.").  The Court's order approving the Disclosure Statement found, as to its contents, only that it "contains adequate information within the meaning of section 1125 of the Bankruptcy Code."[30]  The order did not mention DCG or **any** of its statements.

89.      It strains credulity to argue that finding that the information in the Disclosure

---

[29] ECF #1031 – *Disclosure Statement* at 298–300 (Dec. 6, 2023).  DCG was no duty to object to, or otherwise address, any specific aspect of the Disclosure Statement, much less an interpretation of the Promissory Note not found in it.  *See Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 627 (S.D.N.Y. 2006) (holding that creditor's decision not to "object to the Disclosure Statement's provision that Evercrete New York had no tradename assets of value … does not demonstrate that [the creditor] advanced the position that the … mark had no value" for the purposes of judicial estoppel).  As Genesis has acknowledged, DCG responded **only** to specific assertions against DCG, none of which related to enforcing the Note.  *Id.* at 20–30, 39; ECF #942 – *Hr'g Tr.* at 69 (Nov. 7, 2023).

[30] ECF #1027 – *Order* ¶ A (Dec. 6, 2023); *see also id.* ¶¶ 1–2 (finding the Disclosure Statement provided "adequate information" including "sufficient notice" of the Plan's terms).

Statement was "adequate," the Court accepted or endorsed DCG's statements about the

Promissory Note, which were not mentioned at the Disclosure Statement hearing and took up

only one paragraph[31] in the 306-page solicitation version of the Disclosure Statement.[32] *See*

*Braman v. Pub. Emp. Risk Mgmt. Ass'n, Inc.*, 2025 WL 894957, at \*10 (N.D.N.Y. Mar. 24,

2025) (declining to apply "the extraordinary remedy of judicial estoppel" where "[t]here is

nothing in the bankruptcy court's … order which indicates that it relied on" a particular

statement by the party).  "[J]udicial estoppel is an extraordinary remedy that should rarely apply

to positions taken in Chapter 11 cases absent evidence that the bankruptcy court adopted or

accepted the truth of the [party's] position," and here it is plain that the Court did not accept

DCG's statements.  *In re Ditech*, 2021 WL 5048131, at \*10; *see* 18B Charles Alan Wright &

Arthur R. Miller, *Federal Practice & Procedure* § 4477.3 (3d ed. 1998) ("Doubts about

inconsistency often should be resolved by assuming there is no disabling inconsistency …."). It

borders on frivolous to contend that the Court accepted DCG's statements concerning the Note in

approving the adequacy of Genesis's Disclosure Statement as a whole.

90.    Any suggestion that the Court accepted DCG's statements by approving the Plan

is nonsensical.  Genesis invokes statements made by DCG's financial advisor "***in … opposition***

***to the Plan***," and notes that "this Court approved the Plan."  Br. ¶ 68.  The concession that the

Court approved the Plan ***over DCG's objection*** undermines the prerequisite for judicial estoppel

that DCG "succeed in maintaining [its] position" before the Court.  *Zedner*, 547 U.S. at 504.

91.    It would be inequitable to estop DCG from asserting its claims merely for

accurately stating the Promissory Note's Principal Amount without describing the mechanism

---

[31] ECF #1031 – Genesis's Amended Disclosure Statement, Ex. F at 2 (Dec. 6, 2023).

[32] ECF #942 – Hr'g Tr. (Nov. 7, 2023); see Br. ¶ 71 n.88.

for "immediately and automatically" reducing the Principal Amount through TAC Recoveries—which is clearly set forth in the Note. *See supra* ¶¶ 23, 39–40. If there was any duty to disclose this clear contractual mechanism to creditors, it fell on Genesis as Plan proponent, not DCG. Yet there was "nary a mention" of it in Genesis's Disclosure Statement. Br. ¶ 68.

92. Judicial estoppel does not lie because there was no "unfair advantage" to DCG or "unfair detriment" to Genesis. *Macklin v. Lexington Ins. Co.*, 2020 WL 5796814, at *4–5 (S.D.N.Y. Sept. 29, 2020). Genesis accuses DCG of "inequitable gamesmanship," but fails to show that DCG's prior statements unfairly advantaged DCG or prejudiced Genesis, which was fully aware of the unambiguous contract language from which it is now runs. Br. ¶ 73. Under these circumstances, equity compels allowing DCG to pursue its claims. *See DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (Judicial estoppel is limited to "situations where the risk of inconsistent results with its impact on judicial integrity is certain."); *All Am. Tel. Co.*, 328 F. Supp. 3d at 360 (a court "must inquire" into whether "the balance of equities" tip in favor of applying judicial estoppel).

## IV. Genesis's Request That the Court Consider Certain Allegations in Isolation Violates Well-Established Standards Governing This Motion

93. In paragraph 70 of the Complaint, DCG supplements it allegations regarding GGC's TAC Recovery using the 30.9M GBTC Shares with allegations, on information and belief, as to additional TAC Recoveries. Genesis asks the Court to consider paragraph 70 of the Complaint *in isolation* and dismiss DCG's claims "to the extent they rely on" it. Br. ¶¶ 86–87.

94. Genesis's request is contrary to black letter law that the Court must view "the complaint as a whole." *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 47 (2011); *see, e.g.*, *NRA v. Vullo*, 602 U.S. 175, 194–95 (2024) (assessing the complaint "as a whole" and not "in isolation"). Genesis cites no case taking the flawed approach it proposes.

38

95.     DCG does not base any claim *solely* on paragraph 70 of the Complaint.  Instead, each of DCG's claims rests on the Complaint as a whole.  Compl. ¶¶ 76, 82, 91, 100. DCG makes the allegations of paragraph 70 of the Complaint "on information and belief" because "DCG does not have [any] transparency into Genesis's liquidation of the TAC Collateral other than the 30.9M GBTC Shares."  Compl. ¶ 70.  Genesis's arguments confirm that although the details of other TAC Recoveries are not known to DCG, Genesis itself views them *the same as* the TAC Recoveries from the 30.9M GBTC Shares for purposes of reducing the Principal Amount of the Promissory Note.  For example, Genesis's arguments about "TAC Collateral" and "TAC Recoveries" do not distinguish among the TAC Recoveries alleged in paragraphs 61 through 70 of the Complaints.  Br. ¶¶ 13–16, 28, 81–84.  Thus, the parties' dispute equally implicates the TAC Recovery from the 30.9M GBTC Shares and the other TAC Recoveries.

96.     Considering DCG's Complaint as a whole, DCG adequately pleads Genesis's other TAC Recoveries under Rule 8.  The Complaint provides notice that the other TAC Recoveries "immediately and automatically" reduced the Promissory Note's Principal Amount. Note § 1.6.1–1.6.2.  Genesis does not deny it obtained TAC Recoveries other than that from the 30.9M GBTC Shares, and instead improperly attempts to exploit DCG's lack of visibility into those particular TAC Recoveries.  But the "plausibility standard … does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see also Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (upholding pleading on information and belief where a defendant's business practices were within its particular control).

## V.     <u>GAP Is a Proper Party to this Action</u>

97.     Genesis argues that GAP is not a proper party to this action and should be dismissed.  Br. ¶¶ 87–88.  But "[i]t is well established that a party to a contract which is the

39

subject of the litigation is considered a necessary party." *Randolph Found. v. Duncan*, 2002 WL 32862, at *5 (S.D.N.Y. Jan. 11, 2002) (citing cases). Genesis's cases do not involve dismissal of a contract party from an action asserting claims under that contract. Br. ¶ 89 n.117.

98.    Here, GAP is a party to the Promissory Note, specifically "for purposes of Section 1.6 of the Note." Note at 8. Section 1.6, which is at the heart of the parties' dispute, imposes obligations on GAP, including to "promptly pay or transfer over, and shall cause each of their respective affiliates to pay or transfer over, to the Holder any payment, repayment, distribution, proceeds or other amount received in respect of the TAC Loans or the TAC Collateral," and to "use commercially reasonable efforts, in a manner determined in its reasonable business judgment with the advice of counsel and advisors, to maximize the TAC Recovery." *Id.* § 1.6.1, 1.6.3. The Note also conditions DCG's obligations under it "to performance by GAP and [GGC] with its obligations under this Section 1.6." *Id.* § 1.6.4.

99.    GAP is named throughout the Complaint, including in Count I, which states that "[t]here is a concrete, live controversy between DCG, on the one hand, and GGC and GAP, on the other hand, as to whether the TAC Recoveries have adjusted to zero the Principal Amount of the Promissory Note." Compl. ¶ 25. This more than satisfies Rule 8, and Genesis cites no authority that dismissal would be appropriate in light of this. Further, GGC is properly identified in the parenthetical under Count I because DCG's declaratory claim is, in substance, a defense to liability to GGC under the Note. If, however, the Court nonetheless concludes that the omission of GAP from the parenthetical under Count I would be a basis for dismissal of GAP, then DCG respectfully requests leave to amend the Complaint to add GAP to the parenthetical.

## CONCLUSION

For these reasons, the Court should deny Genesis's motion to dismiss in its entirety.

40

Dated: New York, New York
      October 17, 2025

Respectfully submitted,

 /s/ Benjamin S. Kaminetzky
Benjamin S. Kaminetzky

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000
Marshall S. Huebner
Benjamin S. Kaminetzky
Elliot Moskowitz
David B. Toscano
Daniel J. Schwartz
marshall.huebner@davispolk.com
ben.kaminetzky@davispolk.com
elliot.moskowitz@davispolk.com
david.toscano@davispolk.com
daniel.schwartz@davispolk.com

*Counsel for Plaintiff*
 *Digital Currency Group, Inc.*

41