Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to GGC and GAP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>        Wind-Down Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL)<br><br>(Jointly Administered) |
| Digital Currency Group, Inc.,<br><br>        Plaintiff,<br><br>    -against-<br><br>Genesis Global Capital, LLC<br>Genesis Asia Pacific Pte. Ltd.,<br><br>        Defendants. | Adv. Pro. No. 25-01129 (SHL) |

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS COMPLAINT AGAINST
<u>GENESIS GLOBAL CAPITAL, LLC AND GENESIS ASIA PACIFIC PTE. LTD.</u>**

---

[1]      The Wind-Down Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Wind-Down Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

REPLY ............................................................................................................................... 3

I. DEFENDANTS' AFFIRMATIVE DEFENSES PROVIDE
SUFFICIENT GROUNDS TO DISMISS THE COMPLAINT ............................ 3

    A. The Repayment Claims are Untimely because They were
Not Preserved in the Proofs of Claim. ........................................ 3

    B. DCG Waived the Claims when it Executed the Promissory
Note Letters. ................................................................................ 5

    C. The Claims are Barred by Judicial Estoppel. ............................. 7

    D. The Claims were Compulsory Counterclaims in the 2024
Adversary Proceeding. ................................................................ 10

II. THE PLAIN LANGUAGE OF THE NOTE IS CONTRARY TO
DCG'S PROPOSED INTERPRETATION AND PRECLUDES
THE RELIEF SOUGHT ..................................................................................... 12

    A. The Definition of "TAC Collateral" Unambiguously
Excludes the GBTC Shares and the Other Foreclosed
Assets. ......................................................................................... 12

    B. Even if the GBTC Shares were "TAC Collateral," "TAC
Recovery" Unambiguously Excludes any Value Received
by GGC in Connection with the Gemini Settlement. ................. 15

III. DCG HAS NOT PLAUSIBLY PLEADED A "MISTAKE" IN
SUPPORT OF COUNT III OF ITS COMPLAINT ............................................ 17

IV. DCG HAS NOT ALLEGED FACTS TO SUPPORT A CLAIM
ARISING FROM "GGC'S OTHER TAC RECOVERIES" ................................ 18

V. GAP IS NOT A PROPER PARTY TO THIS ACTION ..................................... 19

CONCLUSION .................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boykin v. KeyCorp*,
    521 F.3d 202 (2d Cir. 2008).................................................................................... 19

*Dechberry v. New York City Fire Dep't*,
    124 F. Supp. 3d 131 (E.D.N.Y. 2015) ................................................................... 3, 10

*DeSouza v. Andy Frain Servs., Inc.*,
    No. 12-Civ. 1308, 2012 WL 3245496 (S.D.N.Y. Aug. 6, 2012) .................................. 6

*In re 491 Bergen St. Corp.*,
    No. 25-cv-4387 (LAK), 2025 WL 2831274 (S.D.N.Y. Oct. 6, 2025).......................... 6

*In re China XD Plastics Co. Ltd. Secs. Litig.*,
    No. 14-CV-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016)................... 6

*In re Knight-Celotex, LLC*,
    695 F.3d 714 (7th Cir. 2012) ................................................................................. 8, 9

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2023 WL 3574203 (Bankr. S.D.N.Y. May 19, 2023)............... 4

*In re Oi Brasil Holdings Cooperatief U.A.*,
    578 B.R. 169 (Bankr. S.D.N.Y. 2017)...................................................................... 9

*In re Sears Holdings Corp.*,
    No. 21 Civ. 5437 (NSR), 2022 WL 4482375 (S.D.N.Y. Sep. 27, 2022) .................... 7

*In re SemCrude, L.P.*,
    443 B.R. 472 (Bankr. D. Del. 2011)......................................................................... 4

*In re Tronox Inc.*,
    No. 09-10156 (MEW), 2015 WL 3799702 (Bankr. S.D.N.Y. June 17, 2015)............. 4

*ITT World Directories, Inc. v. CIA Editorial de Listas, S.A.*,
    525 F.2d 697 (2d Cir. 1975)..................................................................................... 17

*J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*,
    892 F. Supp. 486 (S.D.N.Y. 1995)........................................................................... 11

*RCN Telecom Serv., Inc. v. 202 Ctr. St. Realty LLC*,
    156 Fed. App'x. 349 (2d Cir. 2005)............................................................... 18

*Turner Network Sales, Inc. v. DISH Network LLC*,
    413 F. Supp. 3d 329 (S.D.N.Y. 2019).......................................................... 18

*United States v. Aquavella*,
    615 F.2d 12 (2d Cir. 1979)........................................................................... 11

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)............................................................ 3

*Wolff v. Rare Medium, Inc.*,
    No. 01 Civ. 4279 (VM), 2001 WL 1448476 (S.D.N.Y. Nov. 15, 2001) ...................... 12

## Rules and Statutes

Fed. R. Civ. P. 8............................................................................................. 19, 20

Fed. R. Civ. P. 19........................................................................................... 20

## Other Authorities

7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1604 (3d
ed. 2025) .................................................................................................... 20

1.      DCG's Claims in this action are a day late and a dollar short.  It seeks to advance a brand-new interpretation of the Note that wipes out its contractual obligations to GGC and grants it a free option to benefit from the appreciation of assets to which it has no entitlement, of which it conveniently never breathed a word before filing the Complaint.  In its Opposition,[2] it attempts to focus this Court's attention on its newfound, fantastical reading of the Note's key provisions, and to distract from Genesis' multiple affirmative defenses – all cognizable at the pleading stage – which provide ample alternative grounds for this Court to dismiss the Claims.

2.      *First*, the Court should dismiss the Repayment Claims on grounds that they are untimely claims for repayment from reorganized GGC that were not adequately asserted or preserved prior to the Bar Date.  These claims were, at the very least, contingent claims that were not preserved in DCG's Proofs of Claim, of which this Court can take judicial notice.  *Second*, the Court should dismiss both the Repayment Claims and the Note Reduction Claim on the grounds that they were waived when DCG expressly documented the repayments, and its ongoing obligations under the Note, in the four duly executed Promissory Note Letters.  These letters amend a key term of the Note and therefore may be considered at the pleading stage, given the centrality of the Note to DCG's Complaint.  *Third*, the Court should dismiss the Claims as barred by the doctrine of judicial estoppel:  DCG spilled reams of ink during the Debtors' Chapter 11 Cases, much of it about the Note, but said nothing about its newfound interpretation of that same document at any point until well after the Effective Date.  Even if the Court did not adopt the substance of DCG's positions, it found that their inclusion in the Disclosure Statement was required to provide creditors with adequate information.  To permit DCG to now advance a wholly

---

[2]      "Opposition" or "Opp." as used herein shall mean *Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss*, dated Oct. 17, 2025 (ECF No. 18).

contradictory theory, which was never voiced to creditors before they voted on the Plan, would render its prior disclosures at best half-truths. **Fourth**, the Court should find that the Claims were compulsory counterclaims in the 2024 Adversary Proceeding, which dealt directly with the Foreclosed Assets whose value is of central relevance in this action. It would be internally inconsistent, both logically and legally, for this Court to grant DCG its requested relief in both actions, and as such the two sets of claims must at a minimum be considered together.

3. Furthermore, this Court should find that the relevant language of the Note is unambiguous, despite DCG's attempts to introduce ambiguity, and that it bars the Claims. It is abundantly clear that the $1.1 billion face value of the Note was never intended to ratchet downward in the event of appreciation of the Foreclosed Assets, whose value was expressly accounted for when the Note's face value was set in the first place. Furthermore, no timing or other mechanisms for reduction of the value of the principal amount were provided in the way that DCG asserts—which a reading of the plain language of the Note confirms. In any event, if the Court adopts Genesis' waiver arguments, that of necessity bars Count I of DCG's Complaint.

4. Additionally, DCG has not plausibly pleaded any cognizable "mistake" in support of Count III of its Complaint, which the Court should dismiss on that basis. Nor has DCG provided any facts whatsoever to support its conclusory assertions that GGC received certain unspecified "Other TAC Recoveries." Finally, DCG has sought no relief from GAP, nor identified any basis for GAP's inclusion in the case; therefore, the Court should dismiss GAP from this action.

**REPLY**[3]

I.   **DEFENDANTS' AFFIRMATIVE DEFENSES PROVIDE SUFFICIENT GROUNDS TO DISMISS THE COMPLAINT**

   A.   **The Repayment Claims are Untimely because They were Not Preserved in the Proofs of Claim.**

5.      The Repayment Claims, which affirmatively seek payment from reorganized GGC, are barred as untimely-asserted contingent claims.[4]  When DCG filed its timely Proofs of Claim,[5] both contingencies that it now argues form the basis of its current Repayment Claims were eminently foreseeable.  First, it was foreseeable that value of the TAC Collateral could increase, which would, under DCG's incorrect reading, reduce the value of its obligations under the Note.  Second, DCG's repayment to Genesis of the TAC Recoveries (based on the interpretation of the Note to which DCG adhered at the time) was not only foreseeable, but actually came to pass.[6]

6.      DCG asserts that Genesis' argument "rests on factual assertions outside the Complaint," specifically "an assertion about 'Foreclosed Assets' and a vague allusion to DCG's 'prior reading.'"  Opp. ¶ 64.  But Genesis makes no assertion about the Foreclosed Assets that DCG has not made in its Complaint—the Foreclosed Assets, and specifically the value that GGC supposedly derived from them in connection with the Gemini Settlement, are the *focus* of the

---

[3]      Capitalized terms not defined herein shall have the meanings ascribed to them in the *Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint Against Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.*, dated Sept. 17, 2025 (ECF No. 8, the "Brief" or "Br.").

[4]      DCG does not dispute that contingent claims must be asserted prior to a bar date in order to be preserved. Opp. ¶¶ 64-65.

[5]      To the extent DCG argues that the Court cannot consider DCG's Proofs of Claim in the context of the Motion to Dismiss, governing caselaw is clear that a court can take judicial notice of publicly available documents, in particular pleadings such as DCG's own proof of claim, filed by one of the parties to the present action. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166-67 (S.D.N.Y. 2015); *Dechberry v. New York City Fire De'p.*, 124 F. Supp. 3d 131, 136 (E.D.N.Y. 2015).  It would be an absurd result if the parties were forced to proceed to discovery and summary judgment to obtain a threshold determination of whether claims were preserved in proofs of claim filed in these very proceedings.

[6]      *See* Br. ¶ 49 n.66.

Complaint (DCG, in order to make its argument work, calls the Foreclosed Assets "TAC Collateral"). And there is no mystery as to DCG's "prior reading" of the Note. DCG pleads that it "has remitted to Genesis [$106 million in TAC Recoveries], under the misapprehension that the Principal Amount of the Note had not already been adjusted to zero." Compl. ¶ 71. DCG's "prior reading" of the Note was the basis of this supposed "misapprehension"—specifically, its (correct) prior interpretation of the relevant provisions of the Note on the basis of which it paid the $106 million in TAC Recoveries to GGC. Genesis has asserted no new facts, and has not looked outside the four corners of the Complaint and the Proof of Claim, in support of its argument that the Repayment Claims are barred.

7.      DCG asserts that attaching the Note to its Proofs of Claim provided sufficient notice to preserve its Claims, Opp. ¶ 67, an argument that governing law in this district squarely forecloses. *See* Br. ¶¶ 49-51. DCG cites to a case from the District of Delaware, *In re SemCrude, L.P.*, 443 B.R. 472, 474 (Bankr. D. Del. 2011) ("*Semcrude*"), for the proposition that a claimant need merely attach an agreement to its proof of claim in order to preserve every possible claim based on that agreement. But not only is *Semcrude* from outside of this district, it has been discussed only once in this Circuit, in *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2023 WL 3574203, (Bankr. S.D.N.Y. May 19, 2023) ("*LATAM*"), in which Judge Garrity declined to follow its holding, observing that in *Semcrude*, the claimant had, through informal proofs of claim as well as other actions in litigation against the debtors, sufficiently put the debtors on notice of their claims. *LATAM* at *9. This Court should decline to follow *Semcrude* on the same basis.

8.      In support of its assertion that its broad reservation of rights preserved the present Repayment Claims, DCG cites *In re Tronox Inc.*, No. 09-10156 (MEW), 2015 WL 3799702, at *8 (Bankr. S.D.N.Y. June 17, 2015) ("*Tronox*"), without any indication of how *Tronox* supposedly

-4-

supports the proposition for which it is cited.[7]  The law in this Circuit is clear that a broad

reservation of rights does not preserve claims of which the debtor has no notice.  *See* Br. ¶ 50.

**B.      DCG Waived the Claims when it Executed the Promissory Note Letters.**

9.      Over a period of eight months in 2024 and 2025, DCG executed the four Promissory

Note Letters, each of which memorialized DCG's contractual obligation pursuant to the Note to

pay each TAC Recovery Payment to GGC.  Each letter also recorded the remaining principal

amount of the Note after application of the relevant payment, by attaching an amended version of

the Note itself, identical in all respects to the prior version except for the "Schedule of

Repayments" page, where it added the date and amount of the new TAC Recovery Payment, and

the new "Unpaid Principal Amount After Payment."  Each of the Promissory Note Letters also

included a generic and broad reservation of rights by both parties.

10.     In its Complaint, DCG made the strategic decision to misleadingly attach the

original version of the Note, dated June 30, 2022, and *not* the most recently amended version from

February 7, 2025, which reflects the four TAC Recovery Payments and the agreed reduced unpaid

principal amount of approximately $1.02 billion.  It now argues that because it attached the

outdated version of the Note to its Complaint and did not acknowledge or attach the four signed

agreements pursuant to which the key terms of the Note were updated as recently as this year, this

Court should not consider the Promissory Note Letters and should bar Genesis' waiver defense.

This argument has no basis in law or logic.

11.     Cases cited by DCG correctly observe that a court may consider "documents that

---

[7]      The cited portion of *Tronox* examines whether individual tort claimants, in following "Tort Claims Trust
Distribution Procedures" outlined in an approved plan, could file their claims in a category that was limited to "Non-
Asbestos Toxic Exposure" even if their proofs of claim "only alleged property damage."  The case bases its holding
in part on Mississippi law regarding nuisance claims.  *Tronox* does not support the proposition for which it is cited.

are integral to the complaint" in the context of a motion to dismiss,[8] which clearly includes the Note. Yet DCG seeks, through artful pleading, to prevent this Court from considering the Promissory Note Letters, which amend the key terms of the Note (and which evidence DCG's waiver of its Claims). This is not the law: Courts in this district, when adjudicating a motion to dismiss, consistently consider superseding or updated versions of documents relied upon in the pleadings. *See DeSouza v. Andy Frain Servs., Inc.*, No. 12-Civ. 1308 (WHP), 2012 WL 3245496, at *2 (S.D.N.Y. Aug. 6, 2012) (considering, in context of motion to dismiss, a letter agreement between plaintiff and defendant that superseded the terms of earlier agreement that formed the basis for plaintiff's claim); *see also In re China XD Plastics Co. Ltd. Secs. Litig.*, No. 14-CV-05308 (GBD), 2016 WL 1241522, at *6 (S.D.N.Y. Mar. 23, 2016) (considering, in context of motion to dismiss, an updated version of a financial analyst's report that retracted factual assertions upon which plaintiffs' complaint based its allegations).

12. DCG further argues (without support) that the letters' generic reservations of rights prevent this Court from holding DCG to any of its substantive commitments in the letters. This argument, if accepted, would swallow the doctrine of waiver whole: No party could ever waive a claim, even by executing an agreement that directly contradicts it, as long as it had the foresight to reserve all rights.[9] In any event, it is a widely accepted principle of contractual construction that where two provisions arguably conflict, the specific (such as a contractual agreement to amounts outstanding) governs over the general (such as a broad reservation of rights to pursue unspecified

---

[8]   Opp. ¶ 59 (quotations omitted).

[9]   A very recent decision from this district confirms this interpretation of the doctrine. *See In re 491 Bergen St. Corp.*, No. 25-cv-4387 (LAK), 2025 WL 2831274, at *5 (S.D.N.Y. Oct. 6, 2025) (holding that, where a party had clearly enumerated in a letter the categories and amounts of payments it believed it was owed, but added a broad and generic reservation of rights, it had waived the right to seek categories of payments *not* enumerated in the letter, quoting prior caselaw holding that "[a] waiver … may be accomplished by . . . such conduct . . . as to evince an intent not to claim the purported advantage.").

categories of claims). *See In re Sears Holdings Corp.*, No. 21 Civ. 5437 (NSR), 2022 WL 4482375, at \*5 (S.D.N.Y. Sept. 27, 2022).[10]  The Court should reject DCG's reliance on the Repayment Letters' generic reservations of rights and find that all of the Claims were waived pursuant to the Promissory Note Letters:   The Repayment Claims because DCG expressly memorialized its obligation to make the payments, and the Note Reduction Claim because DCG expressly memorialized the remaining outstanding balance of the Note well after DCG became aware of the Gemini Settlement that supposedly reduced its balance to zero.

### C.      The Claims are Barred by Judicial Estoppel.

13.      DCG maintains that it is not judicially estopped from asserting the Claims, despite what it previously persuaded the Court to include in the Disclosure Statement about the Note.  In support of this argument, it quotes the following articulation of the doctrine of judicial estoppel from the Supreme Court:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*See* Opp. ¶ 85 (*quoting Zedner v. United States*, 547 U.S. 489, 504 (2006)).  Each aspect of this doctrine applies to bar DCG's Claims.  Without question, DCG "assume[d] a certain position in a legal proceeding."   When the Debtors sought approval of their Disclosure Statement, DCG objected vociferously, arguing that its positions regarding the Note, *inter alia*, must be included in full in order for creditors to have sufficient information to vote on the Plan.  DCG also "succeed[ed] in maintaining that position":  the Court sustained DCG's objection, requiring (at DCG's request)

---

[10]      DCG also asserts in the Preliminary Statement to its Opposition, although not in the Argument section, that the Note's terms invalidating waivers "without the prior written consent of the Holder [GGC] and the Obligor [DCG]" somehow bar Genesis' waiver defense.  Opp. ¶ 15.  The duly executed Promissory Note Letters constitute precisely the "written consent" that this provision of the Note requires.

the inclusion of an annex to the Disclosure Statement that articulated DCG's positions regarding the Note.  Now, it would seem, DCG believes its "interests have changed."  It failed in its efforts to cap creditor recoveries and reap the lion's share of the Debtors' assets for itself, and now seeks to evade its obligations under the Note.  In this new effort, with its new interpretation of the Note, it has "assume[d] a contrary position" to what it earlier articulated, which was a voluminous (and, according to counsel, exhaustive[11]) list of DCG's counterargument to every statement in the Disclosure Statement that DCG believed was mistaken or incomplete.  To credit this new position would be, without question, "to the detriment of [Genesis, which] acquiesced in the position formerly taken by [DCG]" by including DCG's lengthy disquisitions in the Disclosure Statement—and, more fundamentally, relied on an understanding of the terms of the Note (which DCG shared at the time) in negotiating with its creditors and constructing a Plan.[12]

14.     In its Opposition, DCG seeks to conflate its deafening silence with respect to its current interpretation of the Note, in the context of its supposedly exhaustive response to all claims Genesis had against it, with complete silence, where it seems to believe the caselaw is more favorable to its arguments.[13]  But the cited caselaw does not support its arguments.  First, DCG claims that *In re Knight-Celotex, LLC*, 695 F.3d 714, 722-23 (7th Cir. 2012) ("*Knight-Celotex*") stands for the proposition that "silence about then-existing claims is not 'clearly inconsistent' with the subsequent assertion of claims."  Opp. ¶ 87.  This is misleading at best.  In *Knight-Celotex*, a

---

[11]     DCG's counsel explained its approach to compiling its objection to the Disclosure Statement as follows:  "So what we did was we went through the disclosure statement, and in *every section* where [the debtors] laid out claims that they thought they had against my client [DCG], we had our response to that."  Nov. 7, 2023 Hr'g Tr. 70:1-4, J. Saferstein for DCG (emphasis added).

[12]     For DCG to succeed on its new Claims would also accrue to the detriment of Genesis' creditors, who relied on DCG's representations in the Disclosure Statement in making reasoned voting decisions, may have voted differently if DCG had disclosed its present Claims, and have not received close to full recoveries under the Plan.

[13]     *See* Opp. ¶ 87.

chapter 7 trustee sought to retain a law firm in one of two jointly administered bankruptcy cases, and made the "harmless and seemingly inadvertent" error of characterizing the firm as a "disinterested person" despite the fact that the trustee intended to pursue claims against the firm in the other bankruptcy case. *Knight-Celotex* at 717, 718. The Seventh Circuit declined to find that the trustee was judicially estopped from later pursuing the claims on the basis of his "silence" in connection with the retention application. The *Knight-Celotex* trustee's "silence" is not remotely analogous to DCG's insistent arguments that the Court must include its views in the Disclosure Statement, and DCG does not explain how *Knight-Celotex*'s holding applies in this case. DCG also cites this Court's decision in *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 206 (Bankr. S.D.N.Y. 2017) (SHL) ("*Oi*"). But this Court in *Oi* gives a litany of examples where silence in a prior proceeding *can* provide a basis for judicial estoppel, and the only examples it gives in which courts have "refused to apply judicial estoppel to silence" are cases in which a party *had not spoken at all* about a given issue. DCG has spoken at length about the Note; it cannot now be permitted to change its story.

15.    Finally, DCG argues that this court did not "adopt" its prior inconsistent statements. Opp. ¶ 88. But DCG mischaracterizes what "adoption" would mean here: the Court did not accept as true *any* statement by DCG, nor need it have done so to apply judicial estoppel. What the Court accepted, when it approved the Disclosure Statement, was DCG's representations that its articulated positions *were its actual positions*. There is no judicial process for confirming that a party's representations of its positions in a disclosure statement are its actual positions. But there is a mechanism for preventing a party from later changing those positions, and that is the doctrine of judicial estoppel, which prevents precisely the type of gamesmanship that the Claims represent.

**D. The Claims were Compulsory Counterclaims in the 2024 Adversary Proceeding.**

16. There is only one reason for DCG to have brought the present Claims in this new action, rather than in the still-pending 2024 Adversary Proceeding: Its claims in both cases suffer when considered in conjunction.[14] In the 2024 Adversary Proceeding, DCG (conveniently, through different counsel) asked this Court to order the payment of the Foreclosed Assets, and any proceeds thereof, to DCG—an interpretation of the 2022 MLA A&A Agreement (executed July 14, 2022) that undermines the entire stated purpose of the Note.[15] In the present action, DCG seeks to take advantage of the Foreclosed Assets' appreciation in value to reduce DCG's own indebtedness to GGC. To grant DCG its requested relief on both sets of claims would therefore permit DCG to benefit twice from the appreciation in value of the TAC Collateral.

17. DCG claims, in an ineffectual gesture at reconciling the inconsistency, that its Counterclaim in the 2024 Adversary Proceeding was pleaded "in the alternative, on premises that DCG disputed, solely to preserve its rights." Opp. ¶¶ 14, 77. This is a rank mischaracterization of DCG's own prior claim before this Court. While DCG frames its Counterclaim as a logical outgrowth of Genesis' interpretation of the 2022 MLA A&A Agreement (which interpretation DCG disputes), Counterclaim at 16, this gloss is irrelevant, as DCG expressly requested that the Court *both* dismiss GGC's claim *and* grant DCG judgment on its Counterclaim for the Foreclosed

---

[14] To the extent DCG's general argument that "[n]one of Genesis' affirmative defenses is cognizable on this motion to dismiss because none 'appears on the face of the complaint …, documents incorporated by reference within the complaint[,] or documents that are integral to the complaint," Opp. ¶ 59, is intended to apply to Genesis' arguments that reference filings in the 2024 Adversary Proceeding, there can be no doubt that this Court can take judicial notice of such documents. *Dechberry*, 124 F. Supp. 3d at 136 (taking judicial notice of statements in pleadings by a party in a prior action in considering motion to dismiss).

[15] DCG's requested relief would yield an absurd result whereby DCG would have signed the $1.1 billion Note on June 30, 2022, and then two weeks later, still in the depths of "crypto winter," executed an agreement with GGC entitling DCG to the approximately $1.2 billion worth of Foreclosed Assets that had reduced the impact of the TAC collapse on Genesis from more than $2 billion. Given that the present value of the Note at its execution was nowhere near $1.1 billion, the net result would have been a "hole" even larger than the purported $1.1 billion balance sheet deficiency that the Note was supposedly intended to address.

Assets and any proceeds thereof. DCG Counterclaim at 23. The Counterclaim is not asserted as a claim for setoff or otherwise cabined, and therefore cannot be reconciled with the present Claims, by which DCG seeks to benefit doubly from the increase in value of the Foreclosed Assets. *See id*. A claim that arises from the same factual core as the counterparty's claim in a prior action (*i.e.* the multi-part transaction that was documented in the June-July 2022 Agreements), where both claims cannot be granted without granting double relief, are necessarily "so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *See United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979) ("*Aquavella*").[16]

18. DCG argues that the Claims do not arise out of the same transaction as GGC's claims in the 2024 Adversary Proceeding by pointing out that the "TAC Recoveries" it alleges here are not at issue in that earlier proceeding. Opp. ¶ 74. But DCG's claims do not arise from the alleged TAC Recoveries, but from the Note: The Note Reduction Claim is a "declaratory claim [that] merely asserts a defense to a contract claim by Genesis [under the Note]," Opp. ¶ 76, and the Repayment Claims seek to recoup payments made pursuant to the requirements of the Note, documented by amendments to the Note.

19. The caselaw is clear that, where a prior proceeding remains pending, to bring a compulsory counterclaim in a new action "contravene[s] the purpose of [Rule 13] in that it creates a multiplicity of actions, wastes judicial resources, and unduly burdens the litigation process." *J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*, 892 F. Supp. 486, 490 (S.D.N.Y. 1995). Rather than

---

[16] DCG argues that the facts of *Aquavella*, which Genesis cites because it is the seminal Second Circuit case that defines a compulsory counterclaim, somehow undermine Genesis' argument that DCG's Claims are compulsory counterclaims. But Genesis does not assert that *Aquavella*'s facts are analogous, because they are not. In that case, the government brought its compulsory counterclaim in a new action because, at the time it filed that claim, the prior action had been dismissed. (The prior action was later revived on appeal.) No such fact pattern exists here: The 2024 Adversary Proceeding remains pending, DCG's Claims are compulsory counterclaims in that action, and therefore they should have been asserted – if at all – in that action.

defend or even explain its decision to bring its Claims in a new and separate action, DCG instead limply insists that "no different legal effect" results from this decision.  Opp. ¶ 70.

20.      Finally, DCG argues that its Claims are not compulsory counterclaims in the 2024 Adversary Proceeding because they had not accrued until after it filed its amended answer and Counterclaim in that action on April 1, 2024.  Opp ¶ 73.  This too rings false.  DCG had notice of the Gemini Settlement terms, on which it bases its Claims here, as early as February 28, 2024, and the full details of the Gemini Settlement were filed publicly on March 19, 2024.  *See* Br. ¶ 72.

## II.   THE PLAIN LANGUAGE OF THE NOTE IS CONTRARY TO DCG'S PROPOSED INTERPRETATION AND PRECLUDES THE RELIEF SOUGHT

21.      DCG's Opposition correctly states that in order to gain dismissal of the Complaint on grounds that the Claims are inconsistent with the plain language of the Note, Genesis must show "that there is *no . . .* plausible reading of the Note's terms" other than the reading for which Genesis advocates.  Opp. ¶ 31.  Genesis has done just this.  DCG has put forth an entirely *implausible* reading of the Note, which would lead to an economically absurd result and asks the Court to infer material terms that appear nowhere in the Note's text.  This implausible reading does not undermine Genesis' interpretation of the Note's plain language, or create an ambiguity.[17]

### A.   The Definition of "TAC Collateral" Unambiguously Excludes the GBTC Shares and the Other Foreclosed Assets.

22.      The definition of "TAC Collateral" appears in the Note's fourth recital, which must be read together with the third recital, where the term "TAC Collateral" is first used, and which

---

[17]      DCG asserts that, in the event the Court disagrees with DCG's interpretation of the Note, its "allegation (accepted as true on this motion) that all parties understood that TAC Collateral included the GBTC Shares allegedly foreclosed on by Genesis before June 30, 2022" necessarily creates an ambiguity.  Opp. ¶ 32.  That is not correct. DCG cannot manufacture ambiguity by pleading that Defendants previously agreed with DCG's own interpretation. *See Wolff v. Rare Medium, Inc.*, No. 01 Civ. 4279 (VM), 2001 WL 1448476 (S.D.N.Y. Nov. 15, 2001) (holding that a court is not required to accept, even at pleading stage, plaintiff's unsupported allegation that defendant interpreted contractual language the same way as plaintiff did).

indicates that the Note's face value (the value of the "Assumed Liability") was $1.1 billion as of June 30, 2022.  The parties agree that the purpose of the Note was to fill a purported $1.1 billion "hole" caused by the collapse of TAC.  Br. ¶ 13; Opp. ¶ 21.  This Court can take judicial notice[18] of certain highly relevant facts, including the fact that in June 2022, TAC defaulted on more than $2 billion in loans, and GAP foreclosed on approximately $1.2 billion of collateral that had been pledged to secure those loans.  DCG Counterclaim ¶ 13.  Taking these facts together, it is clear that the $1.1 billion face value of the Assumed Liability was the purported value of the "hole" that occasioned the Note.  Therefore, its face value was necessarily *net of* additional amounts that had already been applied in order to determine the purported size of the "hole," as described in the third recital, which says that "as of June 30, 2022, the parties agree that the aggregate principal amount of the Intercompany Payables, *after giving effect to all repayments and recoveries in respect of the TAC Loans (and taking into account the value of any potential realization on any TAC Collateral*[]) as of such date, is [$1.1 billion]."  Note at recital 3.  Each phrase in this recital has only one plausible meaning.  "[A]fter giving effect to all repayments . . .," *id.*, can only refer to the fact that, over the course of the lending relationship, TAC had repaid certain amounts and reborrowed other amounts.  "[A]fter giving effect to all … recoveries," *id.*, can only refer to the application of the value of the Foreclosed Assets (formerly TAC Collateral) to reduce the balance of the TAC Loans from more than $2 billion.  And the parenthetical "(and taking into account the value of any potential realization on any TAC Collateral)," *id.*, can only refer to the fact that there was still certain TAC Collateral remaining (which excluded the Foreclosed Assets, because those were no longer TAC Collateral), and the parties did not know whether any value from those assets

---

[18]      *See supra* note n.5.

was forthcoming, through foreclosure or otherwise (so any possible value was only a "potential" realization).

23. DCG's interpretation requires the value of the Foreclosed Assets to be bifurcated for purposes of this three-item list – categorizing their value as of the date of the writing as "recoveries" (or else that term refers to a null set), and their hypothetical future value as "potential realization on any TAC Collateral." *Id.* But this would be a bizarre syntactical inconsistency, spreading the value of the Foreclosed Assets across two of three listed categories. The only plausible reading is that the Note's language instead explains that the $1.1 billion figure was net of the two known quantities of value (prior repayments; applied recoveries from the Foreclosure) and the one unknown quantity (the remaining collateral that had not been foreclosed upon).

24. The Note's fourth recital builds on the third. The third recital refers to the "TAC Collateral" as assets on which there is only a "potential realization" (and which potential realization has been accounted for in calculating the purported $1.1 billion "hole"). The fourth recital then defines TAC Collateral – building on the same three categories as above ((i) repayments, (ii) recoveries, and (iii) potential future realization on collateral). In this schema, value from the TAC Collateral is category (iii). DCG's tortured reading would allocate some value from category (ii) (recoveries from the Foreclosed Assets) to category (iii). This reading has no basis in the contractual language. It is clear that the Foreclosed Assets, of which the GBTC Shares are a subset, are excluded from the definition of TAC Collateral.[19]

---

[19] Even if Genesis's finance team continued to identify the Foreclosed Assets as "TAC Collateral" internally, Opp. ¶ 50, this would have no legal significance for purposes of interpreting the Note. This kind of shorthand, in this context, would be akin an inheritor of a house continuing to refer to it as "Grandma's house"—the appellation refers to a historical fact, which has no legal implications for its present ownership. In any event, this kind of parol evidence should only be considered where the court has found an ambiguity in language, which is not the case here.

**B.**     **Even if the GBTC Shares were "TAC Collateral," "TAC Recovery" Unambiguously Excludes any Value Received by GGC in Connection with the Gemini Settlement.**

25.     Even if the Foreclosed Assets (including the GBTC Shares) were "TAC Collateral," DCG's interpretation of §§ 1.6.1-1.6.2 of the Note asks the Court to ignore express contractual language, and to infer terms that are absent. Neither is consistent with basic principles of contract interpretation, and neither yields a plausible reading of the Note.

26.     First, § 1.6.1 of the Note says plainly that a "TAC Recovery" is a payment or other amount *received* "whether in cash, securities, or other property." DCG does not, and cannot, dispute the fact that no amount of "cash, securities, or other property" were received by GGC in connection with the Gemini Settlement, which supposedly gave rise to the "TAC Recovery" on which DCG's Claims hinge. To this, DCG offers two anemic responses. First, it points out that in another provision – § 1.6.2 – the Note indicates that its Principal Amount may be reduced automatically if a TAC Recovery is received by way of set-off. But to expand the definition of TAC Recovery to include value received through set-off would render the express provision that a TAC Recovery must come in the form of "cash, securities or other property" a nullity. The Note unambiguously provides that a "TAC Recovery" must be an amount received in the form of "cash, securities, or other property," GGC received none of the three in connection with the Gemini Settlement, and therefore no "TAC Recovery" occurred.

27.     Second, DCG repeatedly points to the Note's "straightforward mechanism" for reducing its principal amount, as if that mechanism necessarily operates whenever DCG says it does. It does not. The language in question is limited to a single provision, stating that "the Principal Amount hereof shall be reduced immediately and automatically (on a dollar-for-dollar basis)" upon the receipt by GGC of any TAC Recovery. Note § 1.6.2. The mechanism works well

-15-

for dealing with the type of "TAC Recovery" that is actually contemplated by the Note, which was understood and deployed successfully by both parties until February 2025 (when DCG made its most recent payment to GGC). DCG paid to GGC, as a TAC Recovery, each of the first four distributions it received from the TAC liquidating estate, and each payment immediately and automatically reduced the Principal Amount of the Note. The parties memorialized each of these reductions in amended versions of the Note, in an updated "Schedule of Repayments."

28.     But the alleged "TAC Recovery" that, according to DCG, reduced the value of the Note to zero, was a horse of an entirely different color. Per DCG, when the Gemini Settlement became effective, part of the value received by GGC was attributable to the value of the GBTC Shares as of that date, and because the market value of the GBTC Shares on that date was more than the outstanding amount under the Note, DCG's obligations thereunder "immediately and automatically" vanished (which it didn't notice for more than a year). If that was the intended result, the Note lacks a number of crucial terms. For instance, by what process would the parties agree on the valuation of the relevant assets? Digital assets trade – and fluctuate in value – 24 hours a day, and agreements concerning the value of digital assets generally provide for a cutoff time for purposes of fixing their value (for instance, 8:00 PM the day prior to the relevant effective date). The Note contains no such provisions. Additionally, how would the amount of the reduction be documented? Note § 1.4, Recordation of Payments, clearly provides that the Holder is "authorized to record all repayments or prepayments . . . on the schedule attached hereto," but the Schedule includes no space to indicate how digital assets have been valued and converted to dollars for reduction of the principal amount (denominated in dollars). [20]

---

[20]     Indeed, the very inclusion of the Schedule of Repayments makes clear that the value received by Genesis through the Gemini Settlement was incompatible with the parties' conceptions of the types of transactions that would reduce the balance of the Note.

### III. DCG HAS NOT PLAUSIBLY PLEADED A "MISTAKE" IN SUPPORT OF COUNT III OF ITS COMPLAINT

29.     DCG's Opposition doubles down on the conclusory assertion that it has plausibly pleaded a "mistake" in making nearly $106 million in payments over eight months, documented by four separate signed agreements, despite the fact that it had access to all relevant information during that entire period.  As an initial matter, it is simply not plausible that a sophisticated party such as DCG could make a "mistake" of this magnitude and not even notice for months on end.  But even now, in its Complaint and its Opposition, DCG fails to articulate *what the mistake was*, or even whether it was a mistake of fact (not knowing about the Gemini Settlement) or a mistake of law (not having thought of its current theory – that the Gemini Settlement reduced the balance of the Note – before making the payments).  Either way, a claim for restitution on the basis of a mistake must be supported by a well-pleaded mistake, which is absent from the Complaint.  *See ITT World Directories, Inc. v. CIA Editorial de Listas, S.A.*, 525 F.2d 697, 702-03 (2d Cir. 1975).

30.     DCG cites two cases for the proposition that "it is irrelevant whether the mistake is due to the negligence of the payor."  Opp. ¶ 57 (*quoting Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704 (1st Dep't. 1990) ("*Manufacturers*")).  *Manufacturers* deals with a clear mistake of fact:  a bank inadvertently made duplicative transfers, one to the wrong account, and sought recovery of that transfer.  If DCG means to plead an analogous mistake of fact, the mistake must be ignorance of the Gemini Settlement's treatment of the GBTC Shares, which would be utterly implausible.  The Gemini Settlement resolved Plan-related disputes with Gemini, and provided for the treatment of the GBTC Shares.[21]  DCG makes no attempt to identify the common thread between its implausible "mistake" and the clerical error in *Manufacturers*.

---

[21]     The Gemini Settlement was announced on February 28, 2024, Br. ¶ 27, on the last day of the evidentiary hearing to consider the Debtors' proposed Plan.  The Gemini Settlement Motion was filed on March 19, 2024, *id*, which was the day after closing arguments on Plan confirmation.

31. DCG also cites *RCN Telecom Serv., Inc. v. 202 Ctr. St. Realty LLC*, 156 Fed. App'x. 349 (2d Cir. 2005) ("*RCN*") for the same proposition—that negligence is no bar to a claim for restitution on the basis of mistake. *RCN* deals with a mistake of law, but under entirely distinguishable circumstances: A tenant made rent payments during a period when, in retrospect, both landlord and tenant agreed that no rent was due. The parties' dispute focused on whether restitution could be made in the form of rent credits instead of cash. Even if DCG intends to plead, implausibly, that it is entitled to restitution on the basis of a mistaken contractual interpretation, it makes no attempt to explain how the facts or holding of *RCN* map to the present facts, as they do not. It speaks volumes that DCG could not identify a case involving a "mistake" comparable to its own in which the court held for the "mistaken" party. Indeed, courts that have considered similar "mistake of law" assertions have held that, where a sophisticated party repeatedly remits voluntary payments over an extended period "pursuant to an understanding of its legal obligations," the party's lack of diligence with respect to its rights precludes later recoupment. *See Turner Network Sales, Inc. v. DISH Network LLC*, 413 F. Supp. 3d 329, 340 (S.D.N.Y. 2019).

## IV. DCG HAS NOT ALLEGED FACTS TO SUPPORT A CLAIM ARISING FROM "GGC'S OTHER TAC RECOVERIES"

32. The Complaint contains a single two-sentence paragraph about "GGC's Other TAC Recoveries." Compl. ¶ 70. DCG admits that it has not pleaded what this category comprises, but says that, "upon information and belief," Genesis has liquidated assets that were previously TAC Collateral, which must have given rise to one or more "TAC Recoveries" that reduced the principal amount of the Note. *Id.* None of these statements is a fact alleged in the Complaint.

33. DCG argues that Genesis is asking this Court to consider this paragraph "in isolation." Opp. ¶ 93. Far from it. Genesis merely asserts that DCG has based its Claims on two

alleged categories of "TAC Recoveries" – the one that supposedly happened in connection with the Gemini Settlement, and "other." DCG asserts no facts in support of "other."

34.    DCG cites two cases, neither of which excuses a sophisticated party from pleading facts in support of allegations made on information and belief sufficient to state a plausible claim.[22] DCG pleads no facts, or indeed no "information" at all, and its bare "belief" that Genesis disposed of some unspecified assets is insufficient to state a claim. DCG does not specify the assets, to whom or when they were supposedly sold, or any other facts. As such, to the extent the Complaint relies on "GGC's Other TAC Recoveries," it must be dismissed.

## V.    GAP IS NOT A PROPER PARTY TO THIS ACTION

35.    The Complaint asserts no claims against GAP. Each of the Claims is lodged expressly and exclusively against GGC alone. GAP is a proper party, DCG asserts, because *any* party to a contract which is the subject of litigation is a necessary party to that litigation. DCG argues that the requirements of Fed. R. Civ. P. 8 are met because the Complaint includes the conclusory statement that there exists "a concrete, live controversy between DCG, on the one hand, and GGC and GAP, on the other hand . . ." Opp. ¶ 99 (*quoting* Compl. ¶ 78). But merely stating that a controversy exists between given parties does not make it so; if DCG had erroneously asserted that the controversy giving rise to the Claims was between DCG on the one hand, and GGC, GAP, and the United States of America on the other hand, such a statement (without more) would not make the United States of America (or GAP) a proper party to the action.[23]

---

[22]    Opp. ¶ 96 (*citing Arista Records, LLC v. Doe 3*, 604 F.3d 110, 121 (2d Cir. 2010)) (in First Amendment case, finding allegations made on information and belief were supported by "factual assertions" in exhibit to complaint); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (construing *pro se* plaintiff's pleading "more liberally" than "formal pleadings drafted by lawyers").

[23]    DCG attempts to paint Genesis' argument that GAP is not a proper party to the present action as a mere pleading technicality, implying that Genesis' argument hinges on the absence of GAP's name from the parentheticals identifying GGC as the party against whom each of the four counts is lodged. Opp. ¶ 99. DCG requests that, if the

36.     The Complaint does not in fact meet the requirements of Rule 8 with respect to GAP. Rule 8 requires both "a … statement of the claim showing that the pleader is entitled to relief; and … a demand for the relief sought." Fed. R. Civ. P. 8(a)(2)–(3). DCG does neither with respect to GAP. But the Rule that applies to whether GAP should be a party to the litigation – given that no claims lie against it – is Fed. R. Civ. P. 19, which is the rule that the cases cited by DCG interpret. Without question, it is often the case that multiple contract counterparties must be joined under Rule 19. But DCG elides the actual requirements of Rule 19, which require joinder of a party if "(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject matter of the action", Fed. R. Civ. P. 19(a)(1)(A)-(B), such that adjudication in that person's absence would impede their interests or create a risk of multiple or inconsistent obligations on the part of an existing party. None of these criteria is met with respect to GAP in this case. Indeed, a determination of whether a party must be joined under Rule 19(a) is governed by "no precise formula," but rather is made in light of "the general policies of avoiding multiple litigation, providing the parties with complete and effective relief in a single action, and protecting the absent persons from the possible prejudicial effect of deciding the case without them."[24] DCG identifies no reason to join GAP under this framework or any other, and GAP therefore must be dismissed.

---

Court agrees with this (spuriously framed) argument, the Court grant DCG leave to amend the parentheticals. This relief would not remedy the underlying issue, which is that each of the Claims seeks relief from GGC, not from GAP, such that GAP is not a proper party. Amending the parentheticals would not change that fact.

[24]     7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1604 (3d ed. 2025).

## CONCLUSION

37.     For all the foregoing reasons, the Debtors respectfully requests that the Court

dismiss the Complaint.

 Dated: November 3, 2025
        New York, New York

Respectfully submitted,


*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jack Massey
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: (212) 225-2000
F: (212) 225-3999

*Counsel to GGC and GAP*